Nos. 22-16888, 22-16889

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

IN RE: FACEBOOK SIMULATED
CASINO-STYLE GAMES LITIGATION

———————————

On Cross-Appeals from the United States District Court
for the Northern District of California
Case No. 5:21-CV-02777 | The Honorable Edward J. Davila

———————————

## PRINCIPAL BRIEF OF META PLATFORMS, INC.

———————————

Behnam Dayanim
ORRICK HERRINGTON &
SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC 20005
Telephone: (202) 339-8400

Christopher Chorba
Timothy Loose
Bradley J. Hamburger
Patrick J. Fuster
Adrienne M. Liu
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000

———————————

*Attorneys for Defendant-Appellant-Cross-Appellee Meta Platforms, Inc.*

# CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1 of the Federal Rules of Appellate Procedure, the undersigned states that Defendant-Appellant-Cross-Appellee Meta Platforms, Inc. is a publicly traded corporation with no parent corporation, and no publicly traded corporation owns more than 10% of its stock.

Dated: July 24, 2023               GIBSON, DUNN & CRUTCHER LLP

By: _____ /s/ Christopher Chorba _____

*Counsel for Meta Platforms, Inc.*

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................. 1

STATEMENT OF JURISDICTION ........................................ 6

STATEMENT OF THE ISSUE .............................................. 7

STATEMENT OF FACTS ..................................................... 8

I.   Meta Hosts Casino-Themed Video Games and Allows Third-Party Developers to Charge Users for Virtual Chips. .................... 8

II.  Plaintiffs Seek to Hold Meta Liable for Hosting Casino-Themed Video Games and Facilitating In-Game Purchases of Virtual Chips. ............................................................... 12

III. Meta Moves to Dismiss This Action Under Section 230. ............. 15

IV.  The District Court Dismisses the Claims Under Section 230 Except as to Meta's Processing of In-App Transactions and *Sua Sponte* Certifies Its Order for Immediate Appeal. ................ 17

SUMMARY OF ARGUMENT ............................................. 19

STANDARD OF REVIEW ................................................... 23

ARGUMENT ...................................................................... 24

I.   Section 230 Prevents Plaintiffs from Treating Meta as the Publisher of Information Contained Within Casino-Themed Video Games. ....................................................................... 24

     A.  Plaintiffs Conceded That Two of the Three Section 230 Elements Are Satisfied. ........................................... 26

     B.  Plaintiffs' Claims Impermissibly Attempt to Hold Meta Liable for Third-Party Content Purchased and Played in Casino-Themed Games. ..................................... 29

C.  Plaintiffs' Theory of Liability Would Require Meta to Monitor, Edit, or Remove Online Content Made Available for In-App Purchase. ............................................. 40

II.  The District Court Misapplied Section 230 ................................... 45

A.  The District Court's Decision Turns on Labels Rather than Substance. ..................................................................... 46

B.  The Decision Misread This Court's Precedent ..................... 49

C.  The District Court's Interpretation Threatens the Availability of Third-Party Content Online .......................... 56

CONCLUSION ....................................................................... 59

CERTIFICATE OF COMPLIANCE ....................................... 61

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ali v. Fed. Bureau of Prisons*,
552 U.S. 214 (2008) ............................................................... 31

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................... 23

*Backpage.com, LLC v. Cooper*,
939 F. Supp. 2d 805 (M.D. Tenn. 2013) ............................... 35

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) ............. 15, 22, 24, 27, 29, 32, 37, 46, 48

*Batzel v. Smith*,
333 F.3d 1018 (9th Cir. 2003) ......................................... 56, 58

*Brown v. Entm't Merchants Ass'n*,
564 U.S. 786 (2011) ............................................................... 31

*Carafano v. Metrosplash.com, Inc.*,
339 F.3d 1119 (9th Cir. 2003) .......................... 6, 34, 35, 40, 49, 58, 59

*Coffee v. Google LLC*,
2022 WL 94986 (N.D. Cal. Jan. 10, 2022) .......................... 52, 53

*Doe v. Internet Brands, Inc.*,
824 F.3d 846 (9th Cir. 2016) ....................................... 4, 21, 40

*Doe v. MySpace, Inc.*,
528 F.3d 413 (5th Cir. 2008) ................................................ 59

*Does 1–6 v. Reddit, Inc.*,
51 F.4th 1137 (9th Cir. 2022) ............................................... 48

*Dunn v. Hall*,
1 Ind. 344 (1849) ................................................................... 38

iv

*Durning v. Citibank, N.A.*,
   950 F.2d 1419 (9th Cir. 1991)...............................................................54

*Dyroff v. Ultimate Software Grp., Inc.*,
   934 F.3d 1093 (9th Cir. 2019).................................23, 24, 31, 32, 47, 51

*Evans v. Hewlett-Packard Co.*,
   2013 WL 4426359 (N.D. Cal. 2013).....................................................37

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
   521 F.3d 1157 (9th Cir. 2008).... 4, 27, 29, 31, 33, 34, 40, 44, 47, 49, 56

*Fed. Agency of News LLC v. Facebook Inc.*,
   432 F. Supp. 3d 1107 (N.D. Cal. 2020).................................................37

*Force v. Facebook, Inc.*,
   934 F.3d 53 (2d Cir. 2019) ....................................................................28

*Fyk v. Facebook, Inc.*,
   808 F. App'x 597 (9th Cir. 2020) ..........................................................28

*Goddard v. Google, Inc.*,
   2008 WL 5245490 (N.D. Cal. Dec. 17, 2008)..................................36, 47

*Gonzalez v. Google LLC*,
   143 S. Ct. 1191 (2023)......................................................................22, 54

*Gonzalez v. Google LLC*,
   2 F.4th 871 (9th Cir. 2021) .........................................................22, 54, 55

*HomeAway.com, Inc. v. City of Santa Monica*,
   918 F.3d 676 (9th Cir. 2019)...................................5, 22, 50, 51, 52, 55

*Jane Doe No. 1 v. Backpage.com, LLC*,
   817 F.3d 12 (1st Cir. 2016) ........................................................20, 35, 48

*Jones v. Bock*,
   549 U.S. 199 (2007)................................................................................23

*Kater v. Churchill Downs Inc.*,
   886 F.3d 784 (9th Cir. 2018)........................................2, 13, 41, 42, 59

*Kimzey v. Yelp! Inc.*,
836 F.3d 1263 (9th Cir. 2016)................................................... 24, 29, 49

*Klayman v. Zuckerberg*,
753 F.3d 1354 (D.C. Cir. 2014)........................................................ 28

*L.W. v. Snap Inc.*,
2023 WL 3830365 (S.D. Cal. June 5, 2023) ...................................... 53

*La Park La Brea A LLC v. Airbnb, Inc.*,
285 F. Supp. 3d 1097 (C.D. Cal. 2017)............................................. 36

*Lemmon v. Snap, Inc.*,
995 F.3d 1085 (9th Cir. 2021)....................................................... 29, 48

*Marshall's Locksmith Serv. Inc. v. Google, LLC*,
925 F.3d 1263 (D.C. Cir. 2019)........................................................ 27

*Mason v. Mach. Zone, Inc.*,
851 F.3d 315 (4th Cir. 2017)............................................................ 42

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964)........................................................................ 39

*Perfect 10, Inc. v. CCBill LLC*,
488 F.3d 1102 (9th Cir. 2007)............ 1, 3, 20, 26, 33, 44, 48, 49, 57, 58

*Sams v. Yahoo! Inc.*,
713 F.3d 1175 (9th Cir. 2013)........................................................... 23

*Smith v. California*,
361 U.S. 147 (1959)................................................................ 20, 39, 59

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.*,
1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995).................................. 26

*United States v. Ritchie*,
342 F.3d 903 (9th Cir. 2003)............................................................. 23

*Yamaha Motor Corp., U.S.A. v. Calhoun*,
516 U.S. 199 (1996)........................................................................... 7

*YZ Productions, Inc. v. Redbubble, Inc.*,
  545 F. Supp. 3d 756 (N.D. Cal. 2021) .................................................. 37

*Zeran v. America Online, Inc.*,
  129 F.3d 327 (4th Cir. 1997) ......................................................... 58, 59

## Statutes

28 U.S.C. § 1292(b) ................................................... 1, 6, 18, 55

28 U.S.C. § 1331 ........................................................................ 6

28 U.S.C. § 1332(d) ................................................................... 6

28 U.S.C. § 1367 ........................................................................ 6

47 U.S.C. § 230(a) .................................................................... 44

47 U.S.C. § 230(a)(5) ............................................................... 57

47 U.S.C. § 230(b) .................................................................... 44

47 U.S.C. § 230(b)(2) ............................................................... 56

47 U.S.C. § 230(b)(4) ............................................................... 26

47 U.S.C. § 230(c)(1) .............. 3, 6, 7, 15, 16, 19, 20, 26, 27, 28, 31, 52, 55

47 U.S.C. § 230(e) .................................................................... 48

47 U.S.C. § 230(e)(5) ............................................................... 36

47 U.S.C. § 230(f)(2) ........................................................... 15, 27

47 U.S.C. § 230(f)(3) ......................................................... 16, 28, 32

Allow States and Victims to Fight Online Sex Trafficking Act,
  Pub. L. No. 115-164, 132 Stat. 1253 (2018) ........................................ 35

Communications Decency Act of 1996,
  Pub. L. No. 104-104, Tit. V, 110 Stat. 133 ........................................ 26

vii

**Legislative Materials**

H.R. Rep. No. 104-458 (1996) ................................................... 26

**Other Authorities**

A. Carman, *Spotify Launches Podcast Subscriptions, but You Can't Subscribe In-App*, The Verge (Apr. 27, 2021) ........................ 57

Amazon, *Kindle Store* ............................................................ 39

Kimbell Art Museum, *The Cardsharps* ................................... 42

Redbox, *On Demand* ............................................................... 39

Steam, *Store* ........................................................................... 39

T. Hsu, *Substack's Growth Spurt Brings Growing Pains*, New York Times (Apr. 14, 2022) ........................................ 57

*Webster's Third New International Dictionary* (1993) ............ 32

## INTRODUCTION

Section 230 of the Communications Decency Act "establish[es] broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user.'" *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007). This appeal presents the question whether online services lose protection under Section 230 when they facilitate, for a fee, a user's purchase of third-party content. The district court held that they do, reasoning that Section 230 does not bar Plaintiffs' attempt to hold Meta liable for allegedly unlawful content created and sold by third parties to users of online games hosted on Facebook. But given its doubts, the district court *sua sponte* certified its order for interlocutory appeal under 28 U.S.C. § 1292(b). This Court accepted that invitation to review the decision below and should now reverse.

Meta provides an online service, Facebook, where third-party developers can offer games, including casino-themed video games that simulate slot machines, card games, and bingo. As part of its hosting function, Meta allows these third-party developers to make certain premium content (such as virtual chips or additional gameplay) available

1

for in-app purchase within the games. Meta processes such payments for a set 30% fee but doesn't direct third-party developers to offer any particular virtual content.

Facebook hosts dozens of competing casino-themed video games. Although users need not purchase any additional content from third-party developers to play these games, developers offer in-game purchases of content mocked up to look like casino chips to enhance the game experience. The video games, unlike real casinos, don't allow players to cash out virtual chips for real money or use them outside the game. But after this Court held in *Kater v. Churchill Downs Inc.*, 886 F.3d 784 (9th Cir. 2018), that one such video game might constitute gambling under Washington State's unusually broad definition, Plaintiffs asserted a hodgepodge of state gambling and consumer protection claims, as well as related federal racketeering claims, against Meta for hosting casino-themed video games and processing in-game purchases of virtual chips.

Plaintiffs conceded that Section 230 bars their claims that Meta violated federal and state law by merely hosting third-party casino-themed video games. But they claim they can avoid Section 230 by isolating the in-app purchase of third-party content from the overall

hosting of casino-themed video games.  The district court agreed, holding that Plaintiffs' claims, although largely barred by Section 230, could proceed on the theory that Meta acts like a "bookie" by facilitating the in-game purchase of virtual chips.

Text, precedent, and common sense refute Plaintiffs' attempt to deny Section 230 protection to online services that allow third-party developers to use payment-processing tools to sell virtual content within their apps.  Plaintiffs' claims fall within the plain language of Section 230:  They would "treat" Meta "as the publisher" (as responsible for the dissemination) of "any information" (the casino-themed games and their virtual chips) "provided by another information content provider" (the third-party app developers).  47 U.S.C. § 230(c)(1). Precedent confirms that Section 230 protects online services that process purchases of third-party content when claims against them depend on such content.  *E.g.*, *Perfect 10*, 488 F.3d at 1118–19.  And that understanding dovetails with the reality that publishers of physical and online content alike routinely charge a fee when they process transactions for third-party content.  Nothing in Section 230's text or this

Court's decisions suggests it protects only online services that disseminate free content.

If there remained any doubt, what confirms that the claims treat Meta as a publisher is Plaintiffs' contention that Meta has a legal duty to review online games and remove content—activities that are "perforce immune under section 230." *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1170–71 (9th Cir. 2008) (en banc). They specifically argued below that Meta must monitor the universe of apps on Facebook for casino-themed video games, track in-app purchases of third-party content, and remove the option to purchase virtual chips for some players depending on geolocation data. There is no way such a sweeping duty could be limited to casino-themed video games. And at any rate, this Court has held that Section 230 bars claims that would require online services "to remove any user content or otherwise affect how it publishes or monitors such content." *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016).

The district court's contrary reading of Section 230 has no basis in the statutory text or this Court's precedent. Plaintiffs can't repackage their "publisher" theory of liability as a "bookie" theory because

4

Section 230 depends on substance, not labels. The case on which the district court and Plaintiffs principally relied, *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676 (9th Cir. 2019), held only that Section 230 did not protect an online service that facilitated a real estate transaction whose illegality arose independently of the third-party rental listings, which were merely incidental to the legal violation. Thus, in *HomeAway*, the claims did not turn at all on the nature of the third-party content (the online rental listings); whereas here, the claims turn entirely on the nature of the casino-themed video games and virtual chips. That distinction is dispositive under Section 230.

The district court's reasoning has no logical stopping point and, if accepted, could threaten the availability of online content well beyond casino-themed games. Countless online services process payments for untold amounts of virtual content sold by third parties—for example, ebooks, podcasts, and newsletters. Because online services could be held liable if third-party content is unlawful *anywhere* it could be accessed, this end-run around Section 230 would allow fifty varying state regimes to dictate the availability of content *everywhere* given the "'obvious

5

chilling effect'" of the "'specter of tort liability.'" *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1124 (9th Cir. 2003).

This Court should reverse the order denying in part Meta's motion to dismiss and remand with instructions for the district court to dismiss the complaint with prejudice.

## STATEMENT OF JURISDICTION

The district court has jurisdiction under 28 U.S.C. § 1332(d) because the putative class meets the Class Action Fairness Act's minimal-diversity requirement and the complaint alleges claims that in aggregate exceed $5 million. 2-ER-261. The district court also has federal-question jurisdiction under 28 U.S.C. § 1331, because the complaint alleges violations of the Racketeer Influenced and Corrupt Organizations Act, and supplemental jurisdiction under 28 U.S.C. § 1367 over the state-law claims.

This Court has jurisdiction under 28 U.S.C. § 1292(b). On September 2, 2022, the district court certified for interlocutory appeal its order granting in part and denying in part Meta's motion to dismiss. 1-ER-36–37. On September 12, 2022, Meta timely petitioned this Court

for permission to appeal. No. 22-80100, Dkt. 1-2. And on December 8, 2022, the Court granted Meta's petition. 2-ER-40.

In an interlocutory appeal like this one, "appellate jurisdiction applies to the *order* certified to the court of appeals, and is not tied to the particular question formulated by the district court." *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996).

## STATEMENT OF THE ISSUE

Section 230 protects from liability (1) a "provider or user of an interactive computer service" (2) whom a plaintiff seeks to "treat[] as a publisher or speaker" (3) of "any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The claims here seek to hold Meta liable for hosting third-party online content—specifically, casino-themed video games—because the developers of that content used Meta's payment-processing tools to sell the virtual chips used in the games. Do such claims impermissibly treat Meta as a publisher of third-party content?

**STATEMENT OF FACTS**

**I.  Meta Hosts Casino-Themed Video Games and Allows Third-
Party Developers to Charge Users for Virtual Chips.**

Meta offers Facebook as a service to allow people to engage socially,

share information, build a community, and access entertainment.  One

feature allows third-party developers to offer a variety of online games

for Facebook users to play.  Some games are free, others cost money to

play, and many are free to access but allow users to make in-app

purchases of third-party content to enhance the gaming experience.

Meta hosts games and makes its payment-processing tools available to

all developers on the same terms.  2-ER-203–26.

One genre of online games is the so-called "social casino" game that

simulates a casino—similar to how, say, "Madden NFL 23" simulates a

professional football game.  As part of the gameplay, a player receives an

initial allotment of virtual chips.  2-ER-262.  Players can use these virtual

chips to play card games, bingo, or "animated slot machines," where the

spin's outcome determines whether the player receives more virtual

chips.  2-ER-262.  In one video game called Double Down Casino, the

animated slot machine could look like this:



2-ER-255.

The cartoon piggy bank toward the top of the image holds the players' virtual chips. If players run out of chips while playing games at the "social casino," they can either wait until the app provides more free chips or buy more to keep playing right away. 2-ER-262–63. Double Down Casino, for example, allows players to buy virtual chips for their cartoon piggy banks on this screen:

9



2-ER-255.

Across all of the games at issue here, players can't "cash out" the pretend chips for real money or use the chips outside the make-believe casino. 2-ER-254–55. The virtual chips are a figment of the game—just like the gold coins Mario collects in "Super Mario Bros"—and can be used only to extend or otherwise enhance the gameplay: to spin animated slot machines, to play card games or bingo, or to gift to another player within the app. 2-ER-263.

Many third-party developers have created and designed competing games in the "social casino" space. 2-ER-264. Nearly fifty casino-themed video games have appeared on the Facebook App Center (now called Facebook Gaming), as well as on the Google Play Store and the Apple App Store. 2-ER-266–67. When these third-party developers sought to publish their casino-themed video games on Facebook, Meta reviewed them through the same process as all other apps and games on Facebook. 2-ER-268; *see* 2-ER-210–11.

Meta enables developers to offer certain content on Facebook (here, the pretend chips) through in-app purchases, as it does for all apps it hosts. 2-ER-263–66; *see* 2-ER-219–20. Meta doesn't tell developers what content they must or should offer—that is up to the developers. Meta does have rules, however, for what developers may *not* sell on Facebook. Its policy prohibits the sale of "virtual currency or other stored-value items that can be used outside of the app where the transaction was completed" and instructs third-party developers that they "must not allow users to cash out, redeem, or otherwise receive anything of value in exchange for anything purchased using Facebook Payments." 2-ER-220. In exchange for allowing third-party developers access to payment-

11

processing tools for online content, Meta charges a 30% service fee on all in-app transactions made on Facebook, regardless of whether the player purchases extra "lives" in Candy Crush, additional virtual currency to sign players to their football team in Madden NFL, extra gems in Scrabble GO, or virtual chips in a casino-themed video game. 2-ER-270; *see* 2-ER-222.

Meta also offers marketing tools for online games on Facebook. For example, App Ads allows app developers to try to reach "lookalike audiences to increase engagement" with their games; App Invite is a way to send all types of games to potentially interested new players; and Facebook Analytics for Apps (now called Meta Business Manager) helps developers monitor game activity and target their advertisements. 2-ER-268–69. Meta makes these marketing tools—as with its payment-processing tools—generally available to all third-party developers, not just developers of casino-themed video games. 2-ER-234–40.

## II. Plaintiffs Seek to Hold Meta Liable for Hosting Casino-Themed Video Games and Facilitating In-Game Purchases of Virtual Chips.

Plaintiffs are current and former players of casino-themed video games. 2-ER-272–79. They allege that these video games constitute

12

actual gambling—not make-believe gambling—even though no one can win real money. Following this Court's ruling in *Kater v. Churchill Downs Inc.*, 886 F.3d 784 (9th Cir. 2018), that one particular game might constitute illegal gambling under Washington law, Plaintiffs' counsel have turned their sights from the third-party developers of casino-themed video games to the online services that host them: Meta, Apple, and Google.

Plaintiffs brought two putative class actions against Meta, claiming it engaged in illegal gambling operations by hosting casino-themed video games, processing in-game purchases of third-party content, and providing advertising tools informed by data analytics. The district court consolidated the two class actions. 3-ER-349. The master complaint asserts that Meta violated the gambling and consumer protection laws of 15 States—Alabama, Arkansas, California, Georgia, Illinois, Kentucky, Minnesota, Missouri, Montana, New Jersey, New York, South Carolina, Tennessee, Virginia, and Washington—and unjustly enriched itself as a result. 2-ER-283–326. Based on these state-law predicates, the complaint also pleads claims under the federal Racketeer Influenced and Corrupt Organizations Act (RICO). 2-ER-326–31. Plaintiffs raise no

claims against Meta under the laws of the other 35 States or the District of Columbia.  *See generally* 2-ER-253–335.

Plaintiffs bring these claims on behalf of 15 putative statewide classes and a putative nationwide class of everyone who purchased online content in any of fifty different games hosted on Facebook.  2-ER-266–67; 2-ER-279–81.  The complaint also seeks wide-ranging relief.  Plaintiffs seek damages for not only Meta's 30% service fee, but also the 70% that the third-party developers retained.  2-ER-332.  And Plaintiffs seek an injunction requiring Meta to stop "illegally host[ing]" casino-themed video games in the Facebook App Center.  2-ER-259; 2-ER-332.

Other plaintiffs, represented by the same counsel, brought materially identical claims against Apple and Google.  *In re Apple Inc. Store Simulated Casino-Style Games Litig.*, No. 5:21-md-02985-EJD (N.D. Cal.); *In re Google Play Store Simulated Casino-Style Games Litig.*, No. 5:21-md-03001-EJD (N.D. Cal.).  The district court coordinated the class actions against Meta with the multidistrict litigation against Apple and Google.  3-ER-349.  Because Plaintiffs asserted so many claims under so many different laws, the district court also ordered initial motions to

dismiss limited solely to Section 230 of the Communications Decency Act. 2-ER-252.

### III. Meta Moves to Dismiss This Action Under Section 230.

Meta moved to dismiss all the claims because Plaintiffs' allegations establish all three elements for Section 230 protection. 2-ER-179–99.

- *First*, Facebook is an "interactive computer service" that "provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(c)(1), (f)(2). Every court to address the issue has so held. *Infra*, p. 28.

- *Second*, Plaintiffs' claims "treat[]" Meta "as the publisher or speaker" of content created by third-party developers. 47 U.S.C. § 230(c)(1). Anything that "involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content" falls within this element. *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009). The complaint alleges textbook "publication" activity—*i.e.*, that the Facebook App Center served as a "'center[] for distribution and payment'" for casino-themed video games. 2-ER-192–94 (quoting 2-ER-256).

15

And liability would turn on the nature of that third-party content. 2-ER-195–96.

- *Third*, the casino-themed video games, including the virtual chips, are "information provided by another information content provider" (that is, the third-party developers), not by Meta. 47 U.S.C. § 230(c)(1), (f)(3); *see* 2-ER-196–99. As Plaintiffs allege, independent third-party developers created the games (including the in-game option to buy virtual chips) and only later made them available through Facebook. 2-ER-264.

Plaintiffs did not dispute either the first or third element. They agreed that Facebook is an interactive computer service. 2-ER-154. And they also did not contest that the casino-themed video games were third-party content. 2-ER-154. Instead, they disputed solely the second element—whether their claims treated Meta as a publisher of casino-themed video games. They argued in opposing the motion to dismiss that their claims treat Meta not as a publisher, but as a "bookie[]" that facilitates in-game sales of virtual chips used in the allegedly unlawful casino-themed games. 2-ER-146; *see* 2-ER-155–70. They also argued

16

that their claims about marketing tools don't treat Meta as the publisher of the allegedly offending advertisements.  2-ER-170–74.

## IV.   The District Court Dismisses the Claims Under Section 230 Except as to Meta's Processing of In-Game Transactions and *Sua Sponte* Certifies Its Order for Immediate Appeal.

The district court granted in part and denied in part Meta's motion to dismiss under Section 230 in a consolidated order that also ruled on Apple's and Google's motions.  The court "easily dismissed" Plaintiffs' claims insofar as they sought to hold Meta liable for hosting casino-themed video games or for promoting them with recommendations and notifications on Facebook.  1-ER-33.  The court also rejected Plaintiffs' theory that "sharing data with the social casino app developers" made Meta responsible for ads that the developers created and targeted to Facebook users.  1-ER-35.  In the court's view, the "sharing of data is fairly seen as a classic editorial role," and Meta's generally applicable advertising analytics hadn't "contribute[d] to the alleged illegality" of the games.  1-ER-35–36.  Allowing third-party developers to use data analytics, the court explained, "is like an editor providing edits or suggestions to a writer."  1-ER-36.

The district court nonetheless held that Plaintiffs' claims could proceed on the theory that Meta purportedly sold "gambling chips." 1-ER-34. This Court's decisions, as the district court read them, set forth a rule that Section 230 protects an online service "from liability based on a third-party's bad acts" but not for its "own bad acts," 1-ER-30–31—a construct that the court thought applied here because Plaintiffs' claims were supposedly grounded in Meta's "own bad acts" of processing allegedly illegal in-game sales of virtual chips, "not in the content" of the casino-themed video games hosted on Facebook. 1-ER-34.

The district court also *sua sponte* certified its order for immediate appeal under 28 U.S.C. § 1292(b). The court said that "reasonable minds could differ" on how to read "the Ninth Circuit's precedent on this complicated question." 1-ER-37. And although the court recognized the general rule that "an appellate court should not review a district court's ruling until after entry of final judgment," it believed this case "presents exceptional circumstances" that justified an interlocutory appeal because Section 230 could resolve this case "in its entirety." 1-ER-36–37.

This Court granted Meta, as well as Apple and Google, permission to take an interlocutory appeal. 2-ER-40; *see Custodero v. Apple, Inc.*,

18

Nos. 22-16914, 22-16916 (9th Cir.); *Andrews v. Google LLC*, Nos. 22-16921, 22-16923 (9th Cir.). That order also allowed Plaintiffs to cross-appeal. 2-ER-40–41.

## SUMMARY OF ARGUMENT

Section 230 applies to (1) a "provider or user of an interactive computer service" (2) whom a plaintiff seeks to "treat[] as a publisher or speaker" (3) of "any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Plaintiffs have not disputed that Facebook is an interactive computer service and that the casino-themed video games, including the virtual chips, are "information" provided by third-party app developers, leaving only the question whether Plaintiffs' claims treat Meta as a "publisher" of those video games and their virtual chips.

Plaintiffs' claims treat Meta as a publisher of casino-themed video games. In page after page of their complaint, they allege that Meta facilitated gambling and engaged in unfair business practices by hosting, distributing, and operating casino-themed video games created by third-party developers. The district court correctly recognized that these claims present quintessential publisher theories of liability. But the

19

court nonetheless allowed Plaintiffs to avoid Section 230 by focusing on only the purchases of virtual chips within casino-themed video games.

Online services do not lose Section 230 protection just because they receive a fee for providing access to third-party content, rather than doing so for free. The district court's contrary reading conflicts with the statutory command that Meta shall not "be treated as the publisher or speaker" (held responsible for the content) "of any information" (the virtual chips made available for purchase within casino-themed video games) "provided by another information content provider" (the third-party app developers). 47 U.S.C. § 230(c)(1). It also cannot be squared with decisions where this and other courts have held that online services don't lose Section 230 protection when they process transactions for third-party content. *E.g.*, *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118–19 (9th Cir. 2007); *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 20–21 (1st Cir. 2016). And its artificial distinction between disseminating content and facilitating the sale of content ignores the reality that the "dissemination" of third-party content has long "take[n] place under commercial auspices." *Smith v. California*, 361 U.S. 147, 150 (1959).

20

Plaintiffs also allege that Meta has a duty to monitor Facebook for casino-themed video games and then to remove the option to purchase virtual chips within those apps. Under this Court's precedent, this confirms that their claims treat Meta as a publisher of third-party content. Section 230 prohibits liability theories that would require online services "to remove any user content or otherwise affect how it publishes or monitors such content." *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016). Plaintiffs' theory violates that rule in three ways— first, by forcing Meta to monitor all games on Facebook for casino-themed content; second, by requiring Meta to assess the content of each casino-themed video game against state and local law wherever the game could be accessed; and third, by compelling Meta either to remove any allegedly offending games from Facebook or to disable, for those games only, its generally applicable payment-processing tools.

The district court thought that the case could proceed on the theory that Plaintiffs' claims treat Meta as a "bookie"—rather than a publisher of casino-themed video games. The doubts the court expressed when certifying its ruling for immediate appeal were justified.

21

To begin, the district court's reasoning focused on semantics, even though this Court has made clear that Section 230 cannot be avoided through labels. The prohibition on treating Meta as a publisher depends on the claims' substance, "not the name of the cause of action." *Barnes*, 570 F.3d at 1101–02. And no exception to Section 230 applies to the gambling claims that Plaintiffs bring here.

The district court also misread *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676 (9th Cir. 2019), where this Court held that Section 230 did not protect rental services when processing transactions for unregistered properties. Because the claims depended on something other than third-party content (there, unregistered vacation rentals), the online services would "face no liability for the content" (there, the online rental listings) posted by third parties. *Id.* at 684. And the only other decision the district court cited, *Gonzalez v. Google LLC*, 2 F.4th 871 (9th Cir. 2021), *vacated*, 143 S. Ct. 1191, 1192 (2023) (per curiam), read *HomeAway* just as Meta does here. 2 F.4th at 898. While *HomeAway* and *Gonzalez* involved claims that imposed liability for real-world acts that were unlawful independent of third-party content, Section 230

22

applies here because third-party content (the virtual chips and their uses within the video games) is essential to Plaintiffs' theory of liability.

This Court should reverse the decision below and remand with instructions for the district court to dismiss the complaint with prejudice.

## STANDARD OF REVIEW

This Court reviews de novo the district court's interpretation of Section 230 and its order on Meta's motion to dismiss. *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1096 (9th Cir. 2019). To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Dismissal is appropriate when "the allegations, taken as true, show the plaintiff is not entitled to relief" because of a defense like Section 230. *Jones v. Bock*, 549 U.S. 199, 215 (2007). This Court may also consider "documents incorporated by reference in the complaint." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *see, e.g., Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013) (considering judicially noticeable materials in affirming grant of motion to dismiss on immunity defense).

This Court regularly resolves the application of Section 230 at the pleadings stage. *E.g.*, *Dyroff*, 934 F.3d at 1101.

## ARGUMENT

### I. Section 230 Prevents Plaintiffs from Treating Meta as the Publisher of Information Contained Within Casino-Themed Video Games.

Plaintiffs have not contested that the complaint establishes two Section 230 elements:  Facebook is an interactive computer service, and third parties created and developed the content making up the casino-themed video games.  They argue only that their claims don't treat Meta as the publisher of such games because they target in-game purchases of virtual chips and thus treat Meta as a "bookie" facilitating the sale of supposed gambling chips.

Plaintiffs are attempting to use "creative pleading in an effort to work around § 230." *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1265 (9th Cir. 2016).  This Court has repeatedly held that Section 230 cannot "be so casually eviscerated."  *Id.* at 1269; *see, e.g.*, *Barnes*, 570 F.3d at 1102.  Even when reduced to in-game purchases of virtual chips, the claims still treat Meta as a publisher because liability turns solely on the nature of the purchased third-party content (the virtual chips sold and used within

casino-themed video games, as distinguished from virtual currency sold and used within a host of other, non-casino-themed games).

The plain text of Section 230, applicable precedent, and common sense all make clear that a provider does not lose protection under the statute simply because it receives a fee for facilitating the transmission of third-party content within an app. Meta's payment-processing tools apply equally to numerous types of third-party applications and content; Plaintiffs' effort to hold Meta liable for payment processing therefore turns entirely on the nature and content of these particular video games. And that is exactly what it means to treat Meta as the publisher of this content in violation of Section 230.

Were there any doubt, the duty that Plaintiffs allege for Meta to monitor the content of games on Facebook and remove allegedly unlawful third-party content from its generally applicable payment-processing tools confirms that the claims treat Meta as a publisher of the content that makes up casino-themed video games, including the virtual chips at issue here.

## A.   Plaintiffs Conceded That Two of the Three Section 230 Elements Are Satisfied.

Congress enacted Section 230 as part of the Communications Decency Act of 1996.  Pub. L. No. 104-104, Tit. V, § 509, 110 Stat. 133, 137–39.  One year earlier, a New York trial court had held that an internet service provider could be held liable for not removing defamatory material from an online bulletin board because the service had taken steps to remove other "objectionable material."  H.R. Rep. No. 104-458, at 194 (1996) (Conf. Rep.) (citing *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995)).  Congress was of the view that decisions like *Stratton Oakmont* put online services to an unacceptable choice—do the impossible and remove *all* content that is potentially unlawful under any of fifty state tort regimes, or remain a passive conduit and do *nothing* at all to take down harmful content.  47 U.S.C. § 230(b)(4).

To that end, Congress adopted Section 230(c)(1), which "establish[es] broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service."  *Perfect 10*, 488 F.3d at 1118 (quotation marks omitted).  Specifically, that provision states that "[n]o provider or user of

26

an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).

This Court has applied Section 230 according to its plain terms. The decision in *Barnes* broke down subsection (c)(1) into three components:  Section 230 "protects from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat . . . as a publisher or speaker (3) of information provided by another information content provider."  570 F.3d at 1100–01.  Other circuits have adopted this text-based formulation.  *E.g.*, *Marshall's Locksmith Serv. Inc. v. Google, LLC*, 925 F.3d 1263, 1267–68 (D.C. Cir. 2019).  These three elements of Section 230 protection govern Plaintiffs' state-law claims, *see, e.g.*, *Barnes*, 570 F.3d at 1000, as well as their federal RICO claims, *see, e.g.*, *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1164 (9th Cir. 2008) (en banc).

Meta satisfies the first element because Facebook is an "interactive computer service."  47 U.S.C. § 230(c)(1).  That term includes any "system" that "provides or enables computer access by multiple users to a computer server."  § 230(f)(2).  The district court and Plaintiffs agreed

27

below that Facebook meets that test. 1-ER-32; 2-ER-154. Multiple courts of appeals, including this one, have so held. *Fyk v. Facebook, Inc.*, 808 F. App'x 597, 597 n.2 (9th Cir. 2020); *Force v. Facebook, Inc.*, 934 F.3d 53, 64 (2d Cir. 2019); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1358 (D.C. Cir. 2014). That uniform view is correct because, as the complaint alleges, Facebook makes third-party content (here, video games) available to users via the internet. 2-ER-269.

Plaintiffs also did not contest the third element: that the virtual content that makes up casino-themed video games (including the pretend chips that are part of those games) are "information provided by another information content provider." 47 U.S.C. § 230(c)(1); *see* 2-ER-154. And with good reason: The complaint nowhere alleges that Meta was "responsible, in whole or in part, for the creation or development" of the games or chips. § 230(f)(3). As the district court noted, "the applications at issue were created by third parties." 1-ER-32. Third-party developers then provided these games—fully formed with allegedly unlawful animated slot machines and the in-game option to buy virtual chips—to Facebook, which hosted the games and made available payment-processing tools to players who chose to buy content from the developers.

28

*Supra*, pp. 11–12. Nothing Meta allegedly did "materially contribut[ed]" to the "alleged unlawfulness" of the casino-themed games. *Roommates.com*, 521 F.3d at 1167–68. As this Court has held, "proliferation and dissemination of content does not equal creation or development of content"—and that is all Plaintiffs alleged here. *Kimzey*, 836 F.3d at 1271.

### B. Plaintiffs' Claims Impermissibly Attempt to Hold Meta Liable for Third-Party Content Purchased and Played in Casino-Themed Games.

The remaining element—whether the claims "treat[]" Meta "as a publisher or speaker" of the casino-themed video games, including the in-game virtual chips—is the crux of the parties' dispute. *Barnes*, 570 F.3d at 1100–01. Claims treat defendants as publishers when they "depend on a third party's content, without which no liability could have existed." *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1094 (9th Cir. 2021). Such claims strike at the heart of Section 230 because online services, if they could be held responsible for third-party content, would have to "review[], edit[], and decid[e] whether to publish or to withdraw from publication" all content made available by the service. *Barnes*, 570 F.3d at 1102.

29

Plaintiffs' claims treat Meta as a publisher. They advanced an express publisher theory under which Meta would be "responsible for making social casinos available to the public"—in fact, the complaint used variants of "host," "distribute," and "operate" more than 110 times. 2-ER-307; *see, e.g.*, 2-ER-259; 2-ER-271; 2-ER-330. These same allegations underlie the state-law claims of gambling, *e.g.*, 2-ER-291, unfair business practices, *e.g.*, 2-ER-299, and unjust enrichment, *e.g.*, 2-ER-308, as well as the federal RICO claims, 2-ER-329. And the district court "easily" concluded that Section 230 bars claims that Meta violated federal and state law by hosting such games. 1-ER-33.

That straightforward analysis should have ended this case. But Plaintiffs tried to avoid Section 230 by repackaging their claims as a challenge to one aspect of the content-hosting process: Meta's tools for processing payments to app developers when players make in-game purchases of virtual chips. The district court agreed with Plaintiffs that this distinction made all the difference to Section 230. 1-ER-34.

That conclusion was mistaken for multiple reasons, beginning with the statutory text: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information

30

provided by another information content provider." 47 U.S.C. § 230(c)(1). This language fully encompasses casino-themed video games and their virtual chips, and there is no exception just because a third-party developer uses Meta's tools to receive payment for such content.

**Any information.** The casino-themed video games as a whole and the in-game virtual chips in particular are "information" within the meaning of Section 230. This Court has equated "information" with "content," *Dyroff*, 934 F.3d at 1097, and "Internet speech," *Roommates.com*, 521 F.3d at 1175. Those descriptions cover the information that makes up video games—online content that also qualifies as speech, as the Supreme Court has held in the First Amendment context. *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790 (2011). And the statutory phrase "*any* information" is not limited to information accessed for free, but encompasses information "'of whatever kind.'" *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008).

**Provided by another information content provider.** Third-party app developers, not Meta, "provided" the games, including the virtual chips that can be bought and used within the games. Plaintiffs do not dispute that only the developers are "responsible, in whole or in

part, for the creation or development" of the make-believe casinos and virtual casino chips. 47 U.S.C. § 230(f)(3). Meta's terms for hosting games didn't tell third-party developers what online content they should or must offer for in-game purchase—only that they "must not allow users to cash out, redeem, or otherwise receive anything of value in exchange for anything purchased using Facebook Payments." 2-ER-220.

***Treat as a publisher.*** Finally, the claims "treat" Meta as a "publisher." The term "publisher," in 1996 as now, means "one that makes [something] public," including "one whose *business* is publishing." *Webster's Third New International Dictionary* 1837 (1993) (emphasis added); *see Barnes*, 570 F.3d at 1102 (relying on same dictionary definition in earlier edition). And a claim "treats"—in other words, "regard[s]" or "act[s] toward or deal[s] with accordingly"—a defendant as a publisher if it would hold the defendant responsible for the allegedly wrongful nature of the third-party content. *Webster's Third* at 2434.

Cases from across the country bolster the conclusion that Section 230 protects online services from liability for third-party content even when a service offers payment-processing tools that "facilitate the communication and content of others." *Dyroff*, 934 F.3d at 1098. This

32

Court held just that in *Perfect 10* as to an online payment-processing service. The plaintiffs there sued an online service that "allow[ed] consumers to use credit cards or checks to pay for subscriptions or memberships to e-commerce venues." 488 F.3d at 1108. They claimed that third parties were selling pirated images using the defendant's payment-processing service. *Id.* This Court held that Section 230 barred the claims to the extent that they "would make [the service] liable for information originating with a third-party user." *Id.* at 1118–19.

The story was much the same in *Roommates.com*. In that case, the plaintiffs brought housing-discrimination claims against the operator of a "website designed to match people renting out spare rooms with people looking for a place to live." 521 F.3d at 1161. The website offered only "paying subscribers" access to the "'Additional Comments' section of profile pages," where renters could list preferences for their ideal roommates. *Id.* at 1173. Some comments revealed that renters were discriminating on the basis of race, religion, sexual orientation, or family status. *Id.* But even though the service charged for access to the discriminatory statements, this Court never suggested that a pay-to-access model fell outside the scope of Section 230. The statute barred the

33

discrimination claims based on the paid comments section because they sought to hold the online service liable for the harmful effects of third-party content, and not any independent conduct. *Id.* at 1174. That reasoning applies with equal force here, where Facebook merely disseminates the content that third-party app developers decide to sell and that players decide to purchase. *Supra*, pp. 11–12.

This Court's decision in *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003), similarly protected an online service that charged a fee in connection with third-party content. There, the service operated a dating website where users could "post anonymous profiles" for "a fee." *Id.* at 1121. One user pretended to be a famous actress and shared the actress's real home address and telephone number, causing her to receive harassing emails and letters from unwanted suitors. *Id.* at 1121–22. The actress sued the online service for defamation, negligence, and invasion of privacy. *Id.* at 1122. Again, this Court never suggested that the pay-to-post model changed the analysis of the treats-as-a-publisher element. Section 230 protected the online service simply because the claims sought to impose liability for the website's "editing" or "structur[ing]" of the

allegedly unlawful third-party content—a traditional publisher activity. *Id.* at 1124–25.

The First Circuit has likewise applied Section 230 to claims that sought to impose liability on an online service that processed transactions for third-party content. Victims of sex trafficking sued a website, Backpage, that had "charge[d] a posting fee" for advertising space purchased by their traffickers. *Jane Doe No. 1*, 817 F.3d at 17. The plaintiffs sought to evade Section 230, arguing that "Backpage's acceptance of anonymous payments" was "distinguishable from publisher functions." *Id.* at 20. The First Circuit disagreed, holding the claims sought to treat the service as the publisher of the ads because they "challenge[d] features that are part and parcel of the overall design and operation of the website" and "reflect choices about what content can appear on the website and in what form, [which] are editorial choices that fall within the purview of traditional publisher functions." *Id.* at 21; *see also Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 824 (M.D. Tenn. 2013). Again, the First Circuit never suggested that the Section 230

analysis turned in any way on whether the service received a fee for posting or processing the ads.*

District courts within this Circuit have also applied Section 230 to bar claims against "websites that process payments and transactions in connection with third-party listings." *La Park La Brea A LLC v. Airbnb, Inc.*, 285 F. Supp. 3d 1097, 1106–07 (C.D. Cal. 2017) (collecting further out-of-circuit cases). A few examples:

- In *Goddard v. Google, Inc.*, 2008 WL 5245490 (N.D. Cal. Dec. 17, 2008), a plaintiff alleged that Google had engaged in money laundering through its "receipt of payments" for ads from fraudulent subscription providers. *Id.* at *1. The court held that the money-laundering claim treated Google as a publisher of the ads, noting that "the fact that a website elicits online content for profit is immaterial" to Section 230. *Id.* at *3.

---

\* Congress subsequently enacted the Allow States and Victims to Fight Online Sex Trafficking Act, Pub. L. No. 115-164, 132 Stat. 1253 (2018), which exempted certain sex-trafficking offenses from subsection (c)(1). 47 U.S.C. § 230(e)(5). There is no similar exception for civil claims invoking anti-gambling statutes—much less claims seeking to hold services liable for displaying video games that simulate casino games but don't offer players the chance to win real money.

- In *Evans v. Hewlett-Packard Co.*, 2013 WL 4426359 (N.D. Cal. 2013), the plaintiff sued HP for distributing an illegal app where HP had "control over the revenues generated from sales of the app." *Id.* at *1. The court held that Section 230 bars "claims against internet service providers based on content created by a third party." *Id.* at *3.

- In *Federal Agency of News LLC v. Facebook Inc.*, 432 F. Supp. 3d 1107 (N.D. Cal. 2020), the court held that Section 230 protected the use of data analytics for paid advertisements, reiterating that "there is no 'for-profit exception to § 230's broad grant of immunity.'" *Id.* at 1119.

- In *YZ Productions, Inc. v. Redbubble, Inc.*, 545 F. Supp. 3d 756 (N.D. Cal. 2021), Section 230 protected an e-commerce marketplace that processed the sale of allegedly infringing website designs despite the fact that it "pocket[ed] a significant portion of profits." *Id.* at 769.

These decisions reflect the common-sense insight that publishers routinely decide what third-party content to offer as part of their "'traditional editorial functions.'" *Barnes*, 570 F.3d at 1102. One such

37

editorial function is the sale—or, as here, the facilitation of the content creator's sale—of third-party content on a for-profit basis. Third-party developers decided which casino games to simulate, designed the imagery and sound effects for the games, mocked up virtual chips for the gameplay, and made them available for in-game purchase. 2-ER-262–64. It is only after all that third-party activity that Facebook performs the editorial functions of disseminating the video games through Facebook and allowing players to purchase virtual chips from the developers using payment-processing tools. 2-ER-264.

The publisher's role in exchanging third-party content for money is not a new phenomenon. "As an adjunct to publishing, the selling of books originated in Boston as early as 1652, when Hezekiah Usher opened the first shop" in colonial America, blazing a trail that Benjamin Franklin would follow a century later. 22 *Encyclopedia Americana: A Library of Universal Knowledge* 784 (1919). State courts treated these booksellers as publishers liable for the content of their wares. *E.g.*, *Dunn v. Hall*, 1 Ind. 344, 354–55 (1849). Given the intertwined relationship between the printing of the books and their sale, the Supreme Court later held that the First Amendment prohibits strict liability in publisher-style suits

38

against booksellers, observing the "most significant role" played by a retail bookseller in book distribution even though "the dissemination takes place under commercial auspices." *Smith*, 361 U.S. at 150–54; *cf. New York Times Co. v. Sullivan*, 376 U.S. 254, 278–80 (1964) (applying *Smith* to for-profit newspaper publisher).

To this day, many of the most prominent publishers—such as Penguin for books and Warner Bros. for movies—facilitate the sale of third-party content. That reality is no different for online publishers of content. Examples abound: Amazon sells ebooks written by others; Redbox does the same for movies; and Steam does it for video games. Amazon, *Kindle Store*, https://tinyurl.com/mrxu6mz6 (last visited July 24, 2023); Redbox, *On Demand*, https://tinyurl.com/dy2xud63 (last visited July 24, 2023); Steam, *Store*, https://tinyurl.com/2p9azz5w (last visited July 24, 2023). Like their physical equivalents (the bookstore, movie theater, and games retailer), these online stores are engaged in core "publisher" activities.

Section 230 protection does not vanish just because the online service disseminates content for which third parties charge users a fee, rather than offering the content for free. This Court should reject

Plaintiffs' attempt to add an unwritten "transaction" exception to Section 230.

### C. Plaintiffs' Theory of Liability Would Require Meta to Monitor, Edit, or Remove Online Content Made Available for In-App Purchase.

An additional indication that Section 230 applies here is that, according to Plaintiffs, Meta could avoid liability only by monitoring all games and then removing one particular type of online content (virtual chips) from its payment-processing tools for one particular type of game (casino-themed video games). Such compelled monitoring of third-party content on pain of liability is precisely what Congress meant to eliminate by enacting Section 230. *Carafano*, 339 F.3d at 1123. As this Court has held, Section 230 bars liability theories that would require an online service "to remove any user content or otherwise affect how it publishes or monitors such content." *Internet Brands*, 824 F.3d at 851; *accord Roommates.com*, 521 F.3d at 1170–71.

This principle further confirms that Plaintiffs' claims treat Meta as a publisher in violation of Section 230. Under their liability theory, Meta would have a legal duty to monitor content on Facebook in at least three ways: sorting through games, assessing their gameplay against state law

wherever they might be accessed, and tracking individual users' behavior within the games.

To start, Meta's alleged duty to monitor games on Facebook and withhold its payment-processing tools for any allegedly unlawful content would be a massive undertaking. Meta could know whether a game might contain unlawful gambling content only if it analyzed the particulars of each game. *Kater* illustrates what the analysis would require, as this Court explored the design and gameplay of an app called Big Fish Casino and suggested that whether it was gambling under Washington law could turn on whether "users receive free chips throughout gameplay." 886 F.3d at 785–87. Here, Plaintiffs allege that players can "wait for some period of time before receiving more free chips" in at least some casino-themed video games. 2-ER-262–63. So their liability theory would require Meta to determine how often (and perhaps in what amounts) each game gives free chips to players.

Further complicating matters is the substantial state-by-state variation in gambling laws. The complaint here claims that the casino-themed video games are unlawful in 15 States but says nothing about the remaining 35 States and the District of Columbia. Nor are gambling laws

uniform across the Nation. In *Kater*, this Court distinguished the "broad definition" of gambling under Washington law from "different state statutes [and] state definitions," citing cases applying California, Illinois, and Maryland law. 886 F.3d at 788. Maryland law, for example, does not "encompass virtual resources available and used only within [the game]"—a limitation that would categorically exclude virtual chips that exist only within the make-believe casinos in the third-party games Plaintiffs challenge here. *Mason v. Mach. Zone, Inc.*, 851 F.3d 315, 320 (4th Cir. 2017).

That step would not be the end of Meta's alleged duty to monitor. Even after sorting through countless games on Facebook and performing a nationwide legal analysis for each of them, Meta would then have to monitor how *millions* of users play the games. 2-ER-269. That is because Plaintiffs do not argue that mocking up a virtual item to look like a casino chip is illegal—just as no one would argue that Caravaggio was guilty of gambling fraud for painting *The Cardsharps*. Kimbell Art Museum, *The Cardsharps*, https://tinyurl.com/22ny6ss4 (last visited July 24, 2023). Instead, their theory is that in-game *purchases* of virtual chips are unlawful because purchasers are "substantially certain" to use the chips

42

"to wager on a slot machine spin" in the video game.  2-ER-151.  So Meta would have to monitor gameplay within each app, tally up the relative rates at which millions of players use chips for simulated slots, and then prevent players from accessing those virtual items by in-app purchase when it's "substantially certain" (whatever that means) that the purchaser will later use the chips to play an animated slot machine.

Plaintiffs have never denied that their claims would require Meta to monitor, alter, and remove content in games on Facebook.  To the contrary, they expressly challenge Meta's decision not to "remove social casinos" from Facebook's "offerings" after *Kater*.  2-ER-271.  Plaintiffs have even proposed a content-specific monitoring rule whereby Meta would not process "in-app transactions *for apps in the Casino category* within certain states, as objectively determined by IP address information" using "geo-restrictions" for third-party content.  2-ER-166 (emphasis added).  In addition to asserting a nationwide duty to monitor content, Plaintiffs go one step further, suggesting that Meta could avoid liability by requiring "social casino developers" to remove "in-app transactions" from gameplay in favor of "one-time download fees or monthly subscriptions fees."  2-ER-166.  Meta, in other words, should

43

remove the in-game option for players to access third-party content for a fee and instead mandate that app developers change their games to offer virtual items for purchase in different ways. All of this "can be boiled down to deciding whether to exclude material that third parties seek to post online" and is therefore "perforce immune under section 230." *Roommates.com*, 521 F.3d at 1170–71.

This Court has previously recognized that imposing such extensive monitoring obligations on online services with payment-processing tools would strike at the heart of Section 230. In *Perfect 10*, this Court held that Section 230 shielded a payment-processing service from liability under state law. Such overlapping state regulation, this Court explained, would undercut "Congress's expressed goal of insulating the development of the Internet from the various state-law regimes" because "material on a website may be viewed across the Internet, and thus in more than one state at a time." 488 F.3d at 1118 (citing 47 U.S.C. §§ 230(a), (b)). So too here.

In short, if Plaintiffs were to prevail in this action, Meta would have to monitor where the player accessed the app, what gameplay each app allows, whether (and perhaps how frequently) the app replenishes the

44

player's stock of virtual chips for free, and how millions of players use the chips they purchase. That consequence confirms that Plaintiffs' claims treat Meta as "the publisher or speaker" of casino-themed video games—in direct contravention of Section 230.

## II. The District Court Misapplied Section 230.

The district court's recharacterization of Plaintiffs' theory cannot change the reality that the claims treat Meta as a publisher responsible for the content that can be purchased and used within casino-themed video games on Facebook. In fact, the district court acknowledged that claims here turn on the nature of the third-party apps, noting that Plaintiffs do not "take issue" with "virtual currency sale[s] in general." 1-ER-34. That is to say that, under Plaintiffs' theory, Meta would be liable for facilitating the in-app purchase of virtual chips in the game Double Down Casino but not, for example, for the in-app purchase of extra lives in Candy Crush.

Nevertheless, the district court held that the claims fall outside Section 230 because they "do not attempt to treat [Meta, Apple, and Google] as 'the publisher or speaker' of third-party content, but rather seek to hold the Platforms responsible for their own illegal conduct—the

45

sale of gambling chips." 1-ER-34. The district court's approach encourages attempts to avoid Section 230 through creative labeling of quintessential publishing activities, conflicts with this Court's precedent, and threatens the availability of third-party content online.

### A. The District Court's Decision Turns on Labels Rather than Substance.

The first problem with the district court's analysis is that it would turn Section 230 into a labeling game. Under this Court's precedent, "what matters is not the name of the cause of action," but "whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Barnes*, 570 F.3d at 1101–02. That test bars the claims here because Meta's alleged liability for processing in-app purchases of virtual currency turns solely on the casino-themed content in the games. Yet the district court denied protection on the theory that the claims treat Meta as a "'bookie'" rather than as "the 'publisher or speaker' of third-party content." 1-ER-34.

Plaintiffs cannot evade Section 230 by characterizing Meta's hosting and payment-processing functions as being like the "bookie" in a gambling enterprise (a theory they did not even allege in their complaint). The aspects of the games that allegedly constitute

46

gambling—the creation and sale of virtual casino chips, the later exchange of virtual chips for spins of simulated slots, and the payouts (or losses) of the make-believe chips—"were created by third parties," as the district court recognized. 1-ER-32; *see* 2-ER-262–64. In this case, as in just about every case alleging wrongdoing based on the dissemination of third-party content, the online service could be described in derogatory terms—for example, a forum for heroin sales, *Dyroff*, 934 F.3d at 1095; a housing discriminator, *Roommates.com*, 521 F.3d at 1173–74; or a money launderer, *Goddard*, 2008 WL 5245490, at *1. But the application of Section 230 does not turn on whether Plaintiffs use pejorative labels to describe publisher functions. What matters is that Meta's alleged conduct consists of nothing more than its dissemination of third-party content—that is, hosting third-party content (casino-themed video games that include virtual chips) and providing payment-processing tools for developers to sell such content.

Nor are civil gambling-related claims exempt from the normal operation of Section 230. This Court has said that, "regardless of the type of claim brought, we focus on whether the duty the plaintiff alleges stems from the defendant's status or conduct as a publisher or speaker."

*Lemmon*, 995 F.3d at 1091 (products liability); *see, e.g.*, *Does 1–6 v. Reddit, Inc.*, 51 F.4th 1137, 1141 (9th Cir. 2022) (sex trafficking); *Barnes*, 570 F.3d at 1101–02 (negligence).  Section 230 has exceptions for federal criminal statutes, intellectual-property law, communications privacy law, and certain sex-trafficking offenses.  47 U.S.C. § 230(e).  But there is no carveout for any of the claims Plaintiffs assert here.

The application of Section 230 also doesn't turn on whether the purchased content is allegedly unlawful.  The district court appeared to think otherwise, emphasizing that Plaintiffs' claims would impose liability for the "processing of *unlawful* transactions for *unlawful* gambling."  1-ER-34.  But Section 230 would be circular if claims of illegality defeated its protections.  Because Meta's processing of in-game purchases of virtual chips is "part and parcel" of the publication of the casino-themed video games, Plaintiffs' claims that the transactions are unlawful implicate "what content can appear" on Facebook "and in what form."  *Jane Doe No.* 1, 817 F.3d at 21; *accord Perfect 10*, 488 F.3d at 1108.  Section 230 therefore bars Plaintiffs' attempt to hold Meta responsible for third-party content made available for purchase through its payment-processing tools.

At bottom, the district court's labels-based approach would create a blueprint for avoiding Section 230 through "creative pleading." *Kimzey*, 836 F.3d at 1265. Plaintiffs' complaint is replete with allegations that Meta violated the law by hosting, distributing, and operating casino-themed video games. *Supra*, p. 30. Although the district court correctly held that those allegations "easily" fail Section 230, it determined that these same claims no longer sought to hold Meta liable for third-party content so long as Plaintiffs narrowed their focus to one narrow category of content: virtual chips made available for sale within the game. 1-ER-33–34. As this Court has recognized, Section 230 cannot "be so casually eviscerated." *Kimzey*, 836 F.3d at 1269.

## B. The Decision Misread This Court's Precedent.

The decision below also departs from precedent. As shown above, this Court has routinely applied Section 230 to online services that facilitate access to third-party content for a fee. *Roommates.com*, 521 F.3d at 1173–74; *Perfect 10*, 488 F.3d at 1108, 1118–19; *Carafano*, 339 F.3d at 1121.

The district court grounded its contrary analysis in this Court's decision in *HomeAway*. 1-ER-34. That was Plaintiffs' lead case below as

well.  *E.g.*, 2-ER-146–47.  But the reasoning of *HomeAway* only underscores that Plaintiffs' claims treat Meta as the publisher of virtual chips in casino-themed video games.

In *HomeAway*, online rental services, including Airbnb, sought Section 230 protection against a Santa Monica ordinance prohibiting vacation rentals of unregistered properties.  918 F.3d at 680.  The services stressed that third parties had posted the property listings that would create the opportunity for unregistered rentals.  *Id.* at 681.  This Court explained, however, that Section 230 didn't apply merely because the third-party content was involved in a peripheral sense—there, because third parties had posted the rental listings.  *Id.* at 682.  The key question was whether the prohibition against "processing transactions for unregistered properties" required the services "to monitor third-party content."  *Id.* at 682.

The answer to that question in *HomeAway* was no because the ordinance did "not proscribe, mandate, or even discuss the content of the listings."  918 F.3d at 683.  Although the rental services argued that their "most practical compliance option" might be to "remove noncompliant third-party listings," they could refrain from booking unlawful real-world

rentals simply by cross-referencing the rental transaction itself (information that was "distinct, internal, and nonpublic") against the city's own registry of licensed properties—all without ever looking at the third-party listings. *Id.* at 682. The services, in short, faced liability not for "the content of the bookings" but only for "unlicensed bookings." *Id.* at 684.

This case is the exact opposite of *HomeAway*. As the district court recognized, Plaintiffs don't argue that Meta's facilitation of "virtual currency sale[s]" or "universal 30% cut" is unlawful standing alone. 1-ER-34. Liability for the in-game transactions instead turns on one thing, and one thing only: the allegedly "proscribe[d]" casino-themed content that users can play with purchased virtual chips in the third-party online games. *HomeAway*, 918 F.3d at 683; *accord Dyroff*, 934 F.3d at 1098. Plaintiffs' claims also would create a legal obligation—not just a practical incentive—"to review the content provided by" third-party developers to determine whether the game contains unlawful content and whether the user has attempted to purchase virtual content that could be used in an unlawful way within the casino-themed video games. *HomeAway*, 918 F.3d at 682. As Plaintiffs see the law, Meta could not

allow the casino-themed games to remain on Facebook in their current form and would be liable for failing to remove either (1) casino-themed video games from Facebook entirely or (2) online content within them (the virtual chips) from the generally applicable payment-processing tool for in-game purchases. *Supra*, pp. 40–45.

The district court reached a contrary conclusion by overlooking that *HomeAway* wasn't about the purchase of online content at all. 918 F.3d at 682–83. Claims like those in *HomeAway* don't hold online services liable for "information provided by another information content provider"—a statutory term that doesn't cover rental properties or other physical items—so long as the claims do not turn on third-party content. 47 U.S.C. § 230(c)(1). On the flipside, however, the text of Section 230 contains no across-the-board "transaction" exception that exposes online services to liability for third-party online content just because they charge a fee for allowing access to that content.

Other district courts in this Circuit have rejected Plaintiffs' reading of *HomeAway*. In *Coffee v. Google LLC*, 2022 WL 94986 (N.D. Cal. Jan. 10, 2022), for example, the plaintiffs argued that *HomeAway* precluded Section 230 protection for "Google's processing of virtual currency [that]

facilitates Loot Box sales" in violation of state gambling laws. *Id.* at \*6. (A "Loot Box" is akin to a digital pack of baseball cards where purchasers don't know whether they'll get a Hall of Fame player like Jackie Robinson or a little-known benchwarmer.) The district court rejected this attempt to avoid Section 230 by isolating the virtual currency from the games more generally. Because Google offered "neutral tools and services to all developers" for in-app purchases, Google did "not become responsible for offending content" that could be accessed with virtual currency in third-party online games. *Id.*

Similarly, in *L.W. v. Snap Inc.*, 2023 WL 3830365 (S.D. Cal. June 5, 2023), the plaintiffs sought to hold Google and Apple liable for distributing allegedly defective apps and, citing *HomeAway*, stressed that Apple and Google "'receive a commission'" when the apps "are downloaded from their respective platforms." *Id.* at \*5. The district court held that *HomeAway* didn't allow such a workaround of targeting only the commissions for app sales, reasoning that the plaintiffs hadn't "allege[d] that either Google or Apple did anything more than create neutral tools by which users could download and access" the apps. *Id.*

53

Apart from *HomeAway*, the district court relied on only this Court's decision in *Gonzalez*. 1-ER-34. The Supreme Court has since vacated that decision without addressing Section 230. *Gonzalez*, 143 S. Ct. at 1192; *see also Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 n.2 (9th Cir. 1991) (vacated decision "has no precedential authority"). But even if taken on its own terms, *Gonzalez* supports Meta, not Plaintiffs.

This Court's analysis in *Gonzalez* followed *HomeAway*'s rule that a claim treats an online service as a publisher if liability would turn on third-party online content, but not if liability is independent of such content. On the one hand, *Gonzalez* held that Section 230 barred most of the claims there: those premised on the theory that Google supported terrorism by failing to "prevent ISIS from using" its video platform, YouTube, to spread propaganda. 2 F.4th at 883, 892. On the other hand, *Gonzalez* held that the plaintiffs could pursue their claims that Google, independent of the content of the videos, unlawfully shared advertising revenue with ISIS. *Id.* at 898. That theory did not depend on "any content provided by a third-party" (or even on the fact that ISIS YouTube videos were the original source of the advertising revenue) because federal law prohibits anyone from providing ISIS with material support

54

like money—full stop. *Id.* at 898–99. At most, the videos were incidental to liability for the revenue-sharing claims, just like the third-party listings in *HomeAway*. *Id.* at 898 (citing *HomeAway*, 918 F.3d at 683).

*Gonzalez* thus reinforced the key distinction between liability for online content and liability for *something other than online content*. In *HomeAway* and *Gonzalez*, Section 230 did not bar claims targeting real-world acts (completing rental transactions for unregistered properties and making monetary payments to a designated foreign terrorist organization) that were illegal irrespective of any third-party online content. The claims here, by contrast, turn entirely on the third-party online content in the casino-themed video games, including the virtual chips and their uses to play casino-themed video games—all of which is online content "provided by another information content provider." 47 U.S.C. § 230(c)(1).

The district court recognized that its reading of *HomeAway* and *Gonzalez* might be subject to doubt when it *sua sponte* certified its order for review under 28 U.S.C. § 1292(b). 1-ER-37. This Court should clarify that *HomeAway* did not create an all-purpose "transaction" exception

that defeats Section 230 protection anytime an online service facilitates access to a certain type of content for a fee.

## C. The District Court's Interpretation Threatens the Availability of Third-Party Content Online.

The decision below, if upheld, would have destabilizing effects on the availability of third-party content through the internet. A core purpose of Section 230 was to "promote development of e-commerce." *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003), *superseded by statute on other grounds as stated in Breazeale v. Victim Servs., Inc.*, 878 F.3d 759, 766–67 (9th Cir. 2003). In enacting Section 230, Congress made an express policy judgment that the "vibrant and competitive free market" for online services should remain "unfettered by Federal or State regulation." 47 U.S.C. § 230(b)(2).

That includes third-party content available for purchase online. If the district court's reasoning were adopted, there would be no shortage of "clever lawyer[s]" able to recast their claims as challenges to tools for purchasing content rather than the hosting of the same content. *Roommates.com*, 521 F.3d at 1174. That was true in *Roommates.com* itself, where the online service had booked subscriptions to comments that facilitated housing discrimination. *Id.* at 1173–74. The online

payment processor in *Perfect 10* likewise had facilitated the sale of pirated images by third parties. 488 F.3d at 1108. Plaintiffs' wordplay of isolating the transaction from the content itself would offer an easy end-run around this Court's existing decisions applying Section 230, none of which makes protection turn on whether the service received compensation in connection with the purchase of challenged third-party content.

Nor is it hard to imagine the next cases that would be brought under the district court's reading of Section 230. Americans turn to interactive media for "a variety of political, educational, cultural, and entertainment services." 47 U.S.C. § 230(a)(5). Take, for example, the ebooks, movies, and video games distributed for a fee by Amazon, Redbox, and Steam. *See supra*, p. 39. Or consider other online services that process subscriptions for podcasts (like Spotify) or newsletters (like Substack) produced by third parties. *E.g.*, A. Carman, *Spotify Launches Podcast Subscriptions, but You Can't Subscribe In-App*, The Verge (Apr. 27, 2021), https://tinyurl.com/maj8vrt8; T. Hsu, *Substack's Growth Spurt Brings Growing Pains*, New York Times (Apr. 14, 2022), https://tinyurl.com/mtfz9hfw. Under the district court's reasoning, any

plaintiff alleging harm from a podcast or newsletter could sue the online intermediary for its role in the "processing of *unlawful* transactions for *unlawful* [podcasts or newsletters]"—all the while disclaiming any attempt to impose liability for the hosting of the podcast or newsletter. 1-ER-34.

In the end, there is no meaningful distinction for purposes of Section 230 between hosting content and charging a fee to facilitate access to content. Hinging Section 230 protection on such semantics would place online services in an "impossible" situation where Meta would have to review the content of every online game, Amazon would have to read every ebook, Spotify would have to listen to every podcast, and Substack would have to review every newsletter "for possible problems" before making them available for purchase online. *Carafano*, 339 F.3d at 1124; *accord Zeran v. America Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997). That is a herculean task because "material on a website may be viewed across the Internet, and thus in more than one state at a time." *Perfect 10*, 488 F.3d at 1118. Placing this monitoring dilemma back on online services would hinder, not "promote," the "development of e-commerce." *Batzel*, 333 F.3d at 1027. If the district court's reasoning

stands, online services—like publishers throughout history—would be more likely to "'severely restrict'" the third-party content made available on their services given the "'obvious chilling effect'" of the "'specter of tort liability.'" *Carafano*, 339 F.3d at 1124; *see Smith*, 361 U.S. at 153 (noting chilling effect as part of First Amendment analysis).

Meta's interpretation would not leave Plaintiffs without a remedy. Section 230 ensures that "the original culpable party" cannot "escape accountability" for unlawful content. *Zeran*, 129 F.3d at 330; *accord Doe v. MySpace, Inc.*, 528 F.3d 413, 419 (5th Cir. 2008). If Plaintiffs are right that all casino-themed video games are like Big Fish Casino and that 14 other States share Washington's unusually "broad definition" of gambling, *Kater*, 886 F.3d at 788, then they can pursue claims against the third-party developers, as other plaintiffs have. That's the balance that Congress struck in Section 230—and the balance that this Court should honor here.

## CONCLUSION

This Court should reverse the order denying in part Meta's motion to dismiss and remand with instructions for the district court to dismiss the complaint with prejudice.

Dated: July 24, 2023        Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By:     /s/ Christopher Chorba

*Counsel for Meta Platforms, Inc.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Circuit Rule 28.1-1(b) because it contains 11,173 words, including 95 words manually counted in any visual images and excluding the portions exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

The brief complies with the typeface and type-style requirements of Rule 32(a)(5)(A) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point, New Century Schoolbook font.

Dated: July 24, 2023                    Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By:     /s/ Christopher Chorba

*Counsel for Meta Platforms, Inc.*

61

## CERTIFICATE OF RELATED CASES

Under Circuit Rule 28-2.6, Defendant-Appellant Meta Platforms, Inc. identifies *Custodero v. Apple, Inc.*, Nos. 22-16914, 22-16916 and *Andrews v. Google LLC*, Nos. 22-16921, 22-16923 as related appeals that were coordinated in the district court and raise the same or closely related issues.

Dated: July 24, 2023        Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By:     /s/ Christopher Chorba    
       *Counsel for Meta Platforms, Inc.*