Nos. 22-16888, -16889, -16914, -16916, -16921, -16923

# In the United States Court of Appeals
# for the Ninth Circuit

───────────────────

IN RE: FACEBOOK SIMULATED CASINO-STYLE GAMES LITIGATION,

KATHLEEN WILKINSON, et al.,
*Plaintiffs-Appellees*,

v.

FACEBOOK, INC.,
*Defendant-Appellant*.

───────────────────

IN RE: APPLE INC. APP STORE SIMULATED CASINO-STYLE GAMES LITIGATION,

FRANK CUSTODERO, et al.,
*Plaintiffs-Appellees*,

v.

APPLE, INC.,
*Defendant-Appellant*.

───────────────────

IN RE: GOOGLE PLAY STORE SIMULATED CASINO-STYLE GAMES LITIGATION,

JENNIFER ANDREWS, et al.,
*Plaintiffs-Appellees*,

v.

GOOGLE, LLC, et al.,
*Defendants-Appellants*.

───────────────────

## BRIEF OF AMICUS CURIAE TECHFREEDOM
## IN SUPPORT OF DEFENDANTS-APPELLANTS

───────────────────

On Appeals from the United States District Court
for the Northern District of California
(Nos. 5:21-cv-2777, 5:21-md-2985, 5:21-md-3001)

───────────────────

Corbin K. Barthold
Berin Szóka
Ari Cohn
TECHFREEDOM
1500 K Street NW
Washington, DC 20005
(771) 200-4997
cbarthold@techfreedom.org
*Attorneys for Amicus Curiae*
*TechFreedom*

## CORPORATE DISCLOSURE STATEMENT

TechFreedom has no parent corporation, it issues no stock, and no publicly held corporation owns a ten-percent or greater interest in it.

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICUS CURIAE ....................................................1

SUMMARY OF ARGUMENT ...........................................................2

ARGUMENT ...................................................................................5

I.    In *Gonzalez v. Google*, the Supreme Court Elected Not to Disrupt the Broad Protections of Section 230........................5

II.    The Lesson of *Gonzalez v. Google*—That Section 230 Protects a Wide Array of Publishing Activity—Resolves Much of This Appeal ...................................................10

CONCLUSION...............................................................................13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gonzalez v. Google,*
    No. 21-1333 (U.S. May 18, 2023) .................................................. 8, 9

*Gonzalez v. Google,*
    2 F.4th 871 (9th Cir. 2021) ................................................................ 5

*Klayman v. Zuckerberg,*
    753 F.3d 1354 (D.C. Cir. 2014) ........................................................ 10

*Twitter v. Taamneh,*
    No. 21-1496 (U.S. May 18, 2023) .................................................. 8, 9

*Zeran v. Am. Online,*
    129 F.3d 327 (4th Cir. 1997) ............................................................. 5

**Statutes**

47 U.S.C. § 230(c)(1) .............................................................................. 2

47 U.S.C. § 230(e) .................................................................................. 5

**Other Authorities**

A. Conan Doyle, "Silver Blaze," *The Memoirs of Sherlock*
    *Holmes* (1894) .................................................................................. 4

Brief of Google LLC, *Gonzalez v. Google*, No. 21-1333
    (U.S. Jan. 12, 2023) ............................................................... 6, 10, 11

Brief of Microsoft Corp., *Gonzalez v. Google*, No. 21-1333
    (U.S. Jan. 19, 2023) ................................................................. 11, 12

# TABLE OF AUTHORITIES
## (Cont.)

**Page(s)**

Brief of TechFreedom, *Gonzalez v. Google*, No. 21-1333
(U.S. Jan. 18, 2023) ........................................................... 2

Brief of U.S., *Gonzalez v. Google*, No. 21-1333 (U.S. Dec. 7,
2022) ...................................................................................... 6

Corbin K. Barthold, *Four Things to Watch in Gonzalez v.
Google*, FedSoc Blog, https://tinyurl.com/yvcehzx7
(Mar. 17, 2023) .............................................................. 2, 8

Corbin K. Barthold, *Section 230 Heads to the Supreme
Court*, Reason, https://bit.ly/3QoUtC1 (Nov. 4, 2022) ................ 2, 3

*Gonzalez v. Google*, No. 21-1333, OA Tr. (U.S. Feb. 21,
2023) ................................................................ 7, 8, 11, 12

Jan Wolfe, *Supreme Court to Weigh if YouTube, Twitter,
Facebook Are Liable for Users' Content*, Wall St. J.,
https://tinyurl.com/mr3j9hk6 (Oct. 3, 2022) ...................... 8

Jeff Kosseff, *The Twenty-Six Words That Created the
Internet* (Cornell Univ. Press 2019) .................................. 2

Pet. for Cert. of Twitter, Inc., *Twitter v. Taamneh*, No. 21-
1496 (U.S. May 26, 2022) .................................................. 8

*Platform Responsibility & Section 230: Filtering Practices
of Social Media Platforms*, Hearing Before the House
Comm. on the Judiciary (Apr. 26, 2018) (testimony of
Berin Szóka), https://bit.ly/3Wdbqkd ................................ 1

**INTEREST OF AMICUS CURIAE***

TechFreedom is a nonprofit, nonpartisan think tank based in Washington, D.C. It is dedicated to promoting technological progress that improves the human condition. It seeks to advance public policy that makes experimentation, entrepreneurship, and investment possible.

Throughout its existence, TechFreedom has staunchly defended free speech on the Internet. Accordingly, TechFreedom's experts have long been at the forefront of the fight to protect Section 230, the bulwark of online free expression. Through its articles, reports, congressional testimony, legal briefs, regulatory comments, and more, TechFreedom seeks to explain why Section 230 is so important, and why eliminating or narrowing it would be a catastrophic mistake. See, e.g., *Platform Responsibility & Section 230: Filtering Practices of Social Media Platforms*, Hearing Before the House Comm. on the Judiciary (Apr. 26, 2018) (testimony of Berin Szóka), https://bit.ly/3Wdbqkd.

Recently, the Supreme Court heard its first Section 230 case, *Gonzalez v. Google*, No. 21-1333 (U.S.). TechFreedom filed an amicus

---

* No party's counsel authored any part of this brief. No one, apart from TechFreedom and its counsel, contributed money intended to fund the brief's preparation or submission. All parties have consented to the brief's being filed.

brief in, and offered extensive commentary on, that appeal. Brief of TechFreedom, *Gonzalez v. Google*, No. 21-1333 (U.S. Jan. 18, 2023); see, e.g., Corbin K. Barthold, *Four Things to Watch in Gonzalez v. Google*, FedSoc Blog, https://tinyurl.com/yvcehzx7 (Mar. 17, 2023); Corbin K. Barthold, *Section 230 Heads to the Supreme Court*, Reason, https://bit.ly/3QoUtC1 (Nov. 4, 2022). The Court ultimately broke no new ground in *Gonzalez*. But several aspects of that appeal—including the decision to break no new ground—are relevant to this appeal. We write to explain why the briefing, argument, and decision in *Gonzalez* support affirmance of key aspects of the district court's decision here.

## SUMMARY OF ARGUMENT

Section 230 is "one of the greatest protections of free online speech in the world." Jeff Kosseff, *The Twenty-Six Words That Created the Internet*, 4 (Cornell Univ. Press 2019). "No provider or user of an interactive computer service," its pivotal clause states, "shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). With limited exceptions, this provision protects platforms—from large websites and apps to individual blogs and social media accounts—from liability for disseminating content created by others.

Last term, the Supreme Court heard its first Section 230 case, *Gonzalez v. Google*, No. 21-1333 (U.S.). The plaintiffs in *Gonzalez* argued that the "targeted recommendation" of videos on Google-owned YouTube falls outside the Section 230 shield. But Section 230 protects platforms' "publisher behavior," and "targeting content at people is what publishers do." Barthold, Reason, *supra*. Nothing in Section 230 enables one to draw a line between "ordinary" (protected) publishing and overly "targeted" (unprotected) publishing. *Id*. If the Court tried to draw such a line anyway, many worried, it might "end the internet as we know it" in the process. *Id*.

In the end, fortunately, the Court did not start down that path. In fact, its ruling offered no substantive analysis of Section 230 whatsoever. The justices did little more than remark the lack of merit in the lawsuit's underlying claim and remand the case.

In this appeal, the plaintiffs argue (among other things) that Section 230 does not protect a platform for "aiding" developers of casino-style gaming apps by providing them data about how their apps perform. You might think that, because the Supreme Court did not analyze Section 230 in *Gonzalez*, *Gonzalez* has nothing to say about this argument. Not so. The Court's decision is the dog that didn't bark, cf. A.

Conan Doyle, "Silver Blaze," *The Memoirs of Sherlock Holmes* (1894); its silence tells us much.

**I.** In *Gonzalez*, the United States urged the Supreme Court to draw a line between "hosting" third-party content and "recommending" it. The former is protected by Section 230, the government asserted, but not the latter. But such a line, Google responded, would be impossible to draw. At oral argument, it was clear that the justices were *interested* in the government's proposed line, but that they strongly agreed with Google that it was utterly *illusory*. The Court's choice to duck Section 230 in *Gonzalez*—despite their evident desire to hear a Section 230 case—is telling. It amounts to a tacit acknowledgement that Section 230 broadly protects publishing activity.

**II.** Just as the Supreme Court could not carve "recommendations" out of Section 230 in *Gonzalez*, this Court should not try to carve "data analytics" out of Section 230 here. Publishers benefit those they publish in many ways—e.g., by recommending their content, by offering them edits and other feedback, and, as here, by giving them information that shows how well their content is performing. The Supreme Court could not parse degrees of "recommendation" benefit, and this Court should not try to parse degrees of "information" benefit. The message of

Section 230—and of the briefing, oral argument, and (non-)ruling in *Gonzalez*—is that publishing activity is protected, period.

## ARGUMENT

### I.    In *Gonzalez v. Google*, the Supreme Court Elected Not to Disrupt the Broad Protections of Section 230

In *Gonzalez v. Google*, 2 F.4th 871 (9th Cir. 2021), vacated, No. 21-1333 (U.S. May 18, 2023), this Court held that Section 230 protected Google from liability for allegedly letting its subsidiary, YouTube, "recommend content—including ISIS videos—to users based upon users' viewing history and what is known about the users," *id.* at 894. As has long been understood, Section 230 bars lawsuits that seek to hold a platform "liable for its exercise," over most third-party content, of "a publisher's traditional editorial functions." *Zeran v. Am. Online*, 129 F.3d 327, 330 (4th Cir. 1997); 47 U.S.C. § 230(e) (exceptions). This Court's ruling simply applied that conventional understanding of the law.

The Supreme Court agreed to review *Gonzalez*. In that appeal, the United States weighed in on the side of the petitioners. It urged the justices to reverse this Court and narrow the scope of Section 230's protections. To that end, it purported to offer a simple new rule. Section 230 protects a platform from liability "for hosting … content," the

government argued, but not from liability for its "own conduct in designing and implementing … targeted-recommendation algorithms." Brief of U.S., p. 12, *Gonzalez v. Google*, No. 21-1333 (U.S. Dec. 7, 2022).

In response, Google showed that this line is entirely illusory. Some websites provide a practically unfiltered feed of third-party content. Others hand-pick certain third-party content and give it prominent placement on a homepage. YouTube presents third-party content in part "based on predictions of what users might consider relevant." Brief of Google LLC, p. 41, *Gonzalez v. Google*, No. 21-1333 (U.S. Jan. 12, 2023). And still other websites might have yet more elaborate ways of displaying, organizing, or promoting third-party content. Crucially, though, these examples do not fall into neat buckets; they sit on a continuum. And as Google underscored in its brief, the government could not "offer any limiting principle" for parsing these varied methods of organizing third-party content into one category that's protected by Section 230, and another that's not. *Id*. at 45.

Google had it right—as became abundantly clear at oral argument. After the petitioners finished their presentation (which the justices found deeply confusing), the government stepped forth and attempted to present its purportedly clean dividing line. The government's counsel claimed that YouTube can use "algorithms to identify users who are

likely to be especially receptive" to a message, and to target the message at those users specifically. *Gonzalez v. Google*, No. 21-1333, OA Tr. 113 (U.S. Feb. 21, 2023). That capacity, he insisted, was what placed YouTube on the far side of the government's newly concocted Section 230 line.

The justices were conspicuously unpersuaded. "Well," said Justice Thomas at one point, "I'm still confused." *Id*. at 72. "How do we draw the line," Justice Sotomayor reflected; "that's where my colleagues [still] seem to be suffering." *Id*. at 97. Under the government's theory, Justice Kavanaugh opined, "lawsuits will be nonstop." *Id*. at 81. Justice Kagan summed things up:

> The problem [with the government's position] is that in trying to separate the content from the choices that are being made, whether it's by YouTube or anyone else, you can't present this content without making choices. So, in every case in which there is content, there's also a choice about presentation or prioritization. And the whole point of suits like this is that those choices [inherently] amplify certain messages.

*Id*. at 75-76. Justice Kagan hit the nail on the head. The government's line was no line at all.

Later, Google's counsel drove the point home. "[N]othing in the statute," she explained, "turns on the degree" to which third-party content gets "tailor[ed]." *Id*. at 119. Small wonder, then, that "the other side" could offer "no [real] line" and "no way to say[,] in some way that

would be workable," how a website can permissibly "organize … information." *Id*.

After what happened at oral argument, it seemed doubtful that the Supreme Court would issue a ruling on Section 230 at all. See, e.g., Barthold, FedSoc Blog, *supra*. And sure enough, the Court ultimately concluded, in a short *per curiam* opinion, simply that "plaintiffs' complaint—independent of §230—states little if any claim for relief." *Gonzalez v. Google*, No. 21-1333 (U.S. May 18, 2023) (slip op. 2).

In both *Gonzalez* and a companion case, *Twitter v. Taamneh*, No. 21-1496 (U.S.), the plaintiffs sought to hold platforms liable for aiding and abetting under the Anti-Terrorism Act. *Gonzalez* presented the Section 230 question, *Taamneh* the underlying merits of the ATA claim. It was widely understood that Section 230, not the ATA, was what had attracted the justices' attention to this pair of cases in the first place. See, e.g., Jan Wolfe, *Supreme Court to Weigh if YouTube, Twitter, Facebook Are Liable for Users' Content*, Wall St. J., https://tinyurl.com/mr3j9hk6 (Oct. 3, 2022). Indeed, the *Taamneh* petitioner wanted its ATA appeal heard only if the Court also had Section 230 before it. Pet. for Cert. of Twitter, Inc., p. 1, *Taamneh*, No. 21-1496 (U.S. May 26, 2022) ("This is a protective, conditional petition relating to *Gonzalez*."). In the end, though, the Court ruled in *Taamneh* that the plaintiffs had failed to state

a claim under the ATA, *Twitter v. Taamneh*, No. 21-1496 (U.S. May 18, 2023) (slip op. 30-31), and then "decline[d] to address the application of §230" in *Gonzalez*, No. 21-1333 (slip op. 3).

An aside: This Court could take the same approach, here, that the Supreme Court took in *Taamneh* and *Gonzalez*. That is, the Court could leave Section 230 on the shelf and simply find an absence of underlying liability. Just as the Supreme Court found that the plaintiffs in *Taamneh* and *Gonzalez* had failed to plead ATA liability, on the platforms' part, linked to the underlying terrorist content they allegedly recommended, this Court might find that the plaintiffs here have failed to plead liability, on the platforms' part, linked to the underlying casino-style gaming apps they hosted. Even if those apps constitute illegal gambling, in other words, it does not necessarily follow that *publishing* those apps is illegal. And the Court is free to rule so.

At any rate, that the Supreme Court issued a full opinion in *Taamneh*, but not in *Gonzalez*, is quite revealing. The justices wanted to decide a Section 230 case, but they didn't. Why? Partly because they could not separate "targeted" recommendations from "untargeted" ones, or "sophisticated" algorithms from "unsophisticated" ones. They left the broad "publisher" protections of Section 230 squarely in place because there is no sound way to narrow them.

II.    The Lesson of *Gonzalez v. Google*—That Section 230 Protects
       a Wide Array of Publishing Activity—Resolves Much of This
       Appeal

In *Gonzalez*, the Supreme Court declined to disrupt the Section 230
status quo. This Court, in this case, should follow the high court's lead.
It should not step in and try to do "better" than the justices. It should not
try to draw lines the justices could not draw.

The district court divided the plaintiffs' allegations into three
groups. The third of these—our focus, and the one the district court called
the "trickiest"—was the plaintiffs' allegation that platforms "aid" and
"work" with developers of casino-style gaming apps, by providing them
"data driven analytics" that they can use to "attract" users. No. 22-16888,
ER 33, 35. As the district court correctly noted, this "third theory of
liability is much like the 'recommendations' found non-actionable in
*Gonzalez*." *Id*. at 34. That conclusion should resolve this appeal as to this
"data analytics" theory.

But the theory still fails even if one accepts, for the sake of
argument, that this case and *Gonzalez* are not neatly analogous. Again,
Section 230 protects a platform as it performs the traditional editorial
functions of a publisher. See, e.g., *Klayman v. Zuckerberg*, 753 F.3d 1354,
1359 (D.C. Cir. 2014) (collecting authority). Google's observation about
the absence of a "limiting principle," Brief of Google LLC, p. 45, *Gonzalez*,

No. 21-133345 (U.S. Jan. 12, 2023), for how to judicially curtail this protection applies beyond the facts of *Gonzalez* itself. In fact, Google and others pointed out as much in that appeal.

At the core of the plaintiffs' "data analytics" theory is the notion that, by providing data to third parties, platforms leave those third parties better off than they'd otherwise be. But *every* publisher offers *a variety* of benefits to the third parties whose content it publishes. As Google noted at the *Gonzalez* oral argument, a cable provider that elects to carry a certain television channel thereby gives that channel "a new audience that they wouldn't otherwise have." No. 21-1333, OA Tr. 132 (U.S. Feb. 21, 2023). Call that "work[ing]" with or "aid[ing]" the television channel if you will, cf. No. 22-16888, ER 33; but "it's still inherent to publishing," No. 21-1333, OA Tr. 132 (U.S. Feb. 21, 2023).

In an amicus brief in *Gonzalez*, Microsoft made a similar point. It highlighted the benefits that its products bestow on third parties. Here, for instance, is what Microsoft had to say about LinkedIn, its professional social-networking service:

> LinkedIn helps its members form, grow, and learn from their professional networks. One way it does so is by displaying for members the content and interactions of other people in their network. It also does so by sharing content that is likely to be of interest for the member but that she has not expressly chosen to include in her network.

Brief of Microsoft Corp., p. 15, *Gonzalez v. Google*, No. 21-1333 (U.S. Jan. 19, 2023); see also No. 21-1333, OA Tr. 148 (U.S. Feb. 21, 2023) (Google's counsel commending Microsoft's brief to the justices' attention). You could say, in line with the plaintiffs' allegations here, that LinkedIn offers users "data driven analytics" (a feed of useful information from fellow professionals and companies in their field) that help them learn and become more "attract[ive]" to potential employers. Yet LinkedIn is simply fulfilling its role as a publisher.

As the district court observed, "providing social casino developers with big data is like an editor providing edits or suggestions to a writer." No. 22-16888, ER 36. For purposes of Section 230 protection, there is nothing nefarious, or even noteworthy, about the fact that a platform's "sharing data with" app developers could enable them to create "more appealing" apps. *Id.* at 34. That is no different than saying that YouTube's recommending a video, based on a prediction about what users want to see, could enable content creators to gain an audience, obtain viewer feedback, and develop more appealing videos. Publishers provide both deliberate and incidental benefits to those whose content they publish. "And so," to paraphrase Google's counsel, "if you go down this road of did you [benefit them], then you have to say how much?" No. 21-1333, OA Tr. 120 (U.S. Feb. 21, 2023). The Supreme Court effectively

concluded in *Gonzalez* that that road is unnavigable. And in every way that matters, this case is no different.

## CONCLUSION

The Court should either require dismissal with prejudice, as sought by the defendants-appellants, or, at minimum, affirm the judgment as to the hosting theory and the "data analytics" theory discussed in this brief.

July 28, 2023

Respectfully submitted,

Corbin K. Barthold
Berin Szóka
Ari Cohn
TECHFREEDOM
1500 K Street NW
Washington, DC 20005
(771) 200-4997
cbarthold@techfreedom.org
*Attorneys for Amicus Curiae
TechFreedom*

## CERTIFICATE OF COMPLIANCE

I certify:

This brief complies with the type-volume limits of Fed R. App. P. 29(a)(5) because it contains 2,712 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced serif typeface, in 14-point font, using Microsoft Office 365.

<u>/s/ Corbin K. Barthold</u>

CERTIFICATE OF SERVICE

On July 28, 2023, a copy of this brief was filed and served on all registered counsel through the Court's CM/ECF system.

/s/ Corbin K. Barthold