Nos. 22-16888, 22-16889

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

IN RE: FACEBOOK SIMULATED CASINO-STYLE GAMES LITIGATION,

KATHLEEN WILKINSON, et al.,

PLAINTIFFS-APPELLEES,

v.

FACEBOOK, INC.,

DEFENDANT-APPELLANT.

On Appeals from the United States District Court
for the Northern District of California
No. 5:21-cv-02777 (Hon. Edward J. Davila)

## BRIEF OF *AMICUS CURIAE* ELECTRONIC FRONTIER
## FOUNDATION IN SUPPORT OF DEFENDANT-APPELLANT
## AND AFFIRMANCE IN PART AND REVERSAL IN PART

Sophia Cope
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Tel: (415) 436-9333
Fax: (415) 436-9993
Email: sophia@eff.org

*Counsel for Amicus Curiae*
*Electronic Frontier Foundation*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... ii

STATEMENT OF INTEREST ........................................................................ 1

INTRODUCTION ........................................................................................ 2

ARGUMENT ................................................................................................ 6

I.    Narrowing Section 230(c)(1)'s Immunity Would Harm Internet
Users' Free Speech ................................................................................ 7

      A.    Users Would No Longer Benefit From Recommendations or
Content Would Be Removed If Section 230(c)(1) Immunity
Is Lost for Recommendations ........................................................... 8

      B.    The Breadth of Apps and Virtual Content Available to Users
Would Be Narrowed If Section 230(c)(1) Immunity Is Lost
for Processing Third-Party Payments ........................................... 12

      C.    Any Narrowing of Section 230(c)(1) Immunity Would Lead
Platforms to Severely Censor User-Generated Content ................ 19

II.    Section 230 Incentivizes the Development of Diverse Online
Platforms for User Speech .................................................................. 24

CONCLUSION .......................................................................................... 34

CERTIFICATE OF COMPLIANCE .............................................................. 35

CERTIFICATE OF SERVICE ...................................................................... 36

# TABLE OF AUTHORITIES

**Cases**

*Doe v. Internet Brands, Inc.*,
  824 F.3d 846 (9th Cir. 2016) ....................................................................... 13

*Domen v. Vimeo, Inc.*,
  433 F. Supp. 3d 592 (S.D.N.Y. 2020),
  *aff'd on other grounds*, 2021 WL 4352312 (2d Cir. 2021) .......................... 26

*Dyroff v. Ultimate Software Group, Inc.*,
  934 F.3d 1093 (9th Cir. 2019) ........................................................................ 9

*Fair Housing Counsel of San Fernando Valley v. Roommates.com, LLC*,
  521 F.3d 1157 (9th Cir. 2008) .......................................................... 5, 7, 9, 11

*Ginsberg v. Google Inc.*,
  586 F. Supp. 3d 998 (N.D. Cal. 2022) ......................................................... 13

*Gonzalez v. Google LLC*,
  2 F.4th 871 (9th Cir. 2021),
  *vacated and remanded*, 143 S.Ct. 1191 (2023) ............................................. 4

*HomeAway.com, Inc. v. City of Santa Monica*,
  918 F.3d 676 (9th Cir. 2019) ........................................................................ 14

*In re Apple Inc. App Store Simulated Casino-Style Games Litig.*,
  625 F. Supp. 3d 971 (N.D. Cal. 2022) ............................................ 4, 5, 8, 12

*Jones v. Dirty World Ent. Recordings LLC*,
  755 F.3d 398 (6th Cir. 2014) ............................................................... 5, 9, 19

*Kater v. Churchill Downs Inc.*,
  886 F.3d 784 (9th Cir. 2018) ........................................................................ 15

*NetChoice, LLC v. Moody*,
  34 F.4th 1196 (11th Cir. 2022) ............................................................... 26, 31

*NetChoice, LLC v. Moody*,
  546 F. Supp. 3d 1082 (N.D. Fla. 2021),
  *aff'd on other grounds*, 34 F.4th 1196 (11th Cir. 2022) .............................. 26

ii

*Packingham v. North Carolina*,
    582 U.S. 98 (2017) ................................................................. 1, 2

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*,
    413 U.S. 376 (1973) ....................................................................... 8

*Reno v. ACLU*,
    521 U.S. 844 (1997) ............................................................... *passim*

*Wicks v. Miss. State Emp't Servs.*,
    41 F.3d 991 (5th Cir. 1995) ........................................................... 7

*Zeran v. Am. Online, Inc.*,
    129 F.3d 327 (4th Cir. 1997) ............................................... 4, 7, 13

## Statutes

47 U.S.C. § 230 ........................................................... *passim*

47 U.S.C. § 230(a)(1) ........................................................ 11

47 U.S.C. § 230(a)(3) ........................................................ 26

47 U.S.C. § 230(a)(5) ........................................................ 16

47 U.S.C. § 230(c)(1) ..................................................... *passim*

47 U.S.C. § 230(c)(2) ..................................................... 3, 25

47 U.S.C. § 230(c)(2)(A) ............................................... 25, 26

47 U.S.C. § 230(c)(2)(B) ............................................... 25, 33

47 U.S.C. § 230(f)(4) ......................................................... 9

## Other Authorities

*About, Living Lchaim* ........................................................ 29

Andrew Bloomenthal, *World's Top 10 Internet Companies*, Investopedia
    (Dec. 28, 2022).............................................................. 24

Ani Petrosyan, *Number of Internet and Social Media Users Worldwide
    as of April 2023*, Statista (May 22, 2023) ...................................... 21

iii

Anupam Chander & Uyên P. Lê, *Free Speech*, 100 Iowa L. Rev. 501 (2015) ............................................................................... 25

Apple Support, *Use Apple Pay in Apps, App Clips, and Safari on iPhone*, iPhone User Guide ........................................................ 15

Apple, *AppStore* ...................................................................... 21

AppsFlyer, *App Monetization Guide: How to Generate Revenue From Apps in 2022* .................................................................. 16

AppsFlyer, *In-Game Purchase* ................................................. 16

Carey Schenkman et al., *Do You See What I See? Capabilities and Limits of Automated Multimedia Content Analysis*, Center for Democracy & Technology (May 2021) ....................................................... 22

Corynne McSherry, *Platform Censorship: Lessons from the Copyright Wars*, EFF Deeplinks (Sept. 26, 2018) ................................ 22

Craigslist (homepage) ............................................................... 30

Cyber Temptation, Patreon ....................................................... 18

Dan Canopy, *Samsung Frame TV Art, Paper Waves* ................. 17

Daphne Keller, *Amplification and Its Discontents*, Knight First Amendment Institute at Columbia University (June 8, 2021) .......... 10

Discord, *Moderating on Discord* ............................................. 32

Ebay (homepage) ...................................................................... 30

EFF, *Free Speech: Only As Strong As the Weakest Link* ............ 19

EFF, *How Does Privacy Badger Work?* .................................... 34

EFF, *Privacy Badger* ............................................................... 34

EFF, *Section 230* ...................................................................... 2

EFF, *What is Privacy Badger?* ................................................ 34

Eric Goldman, *Section 230 Doesn't Protect App Stores That Sell Virtual Chips for Casino Apps–In re Apple App Store* (Sept. 6, 2022) .............................. 15

Erie County Public Library, *Covid-19 Oral History Project* ............................ 27

Ethan Wham, *The Economic Case for Section 230, Disruptive Competition Project*, Computer & Communications Industry Association (Sept. 6, 2019) ........................................................................................ 23

Etsy, *About* ................................................................................................ 17

Facebook, *How Do I Take a Break From Someone's Profile on Facebook?* .... 33

Facebook, *How to Report Things* ................................................................ 33

Francesca Margherita, *How to Structure Your Membership and Price Your Benefits*, Patreon, Creator Hub .................................................................... 17

Geoffrey A. Fowler & Chris Alcantara, *Gatekeepers: These Tech Firms Control What's Allowed Online*, Washington Post (March 24, 2021)......... 19

Gettr (homepage) ...................................................................................... 30

Gettr, *Terms of Use* .................................................................................. 31

Google, *How Google Play Works* ................................................................ 21

Harvard Library, *DASH* ............................................................................. 27

Holly Dagres, *Meet Iran's Gen Z: the Driving Force Behind the Protests*, Foreign Policy (Nov. 1, 2022)...................................................................... 23

Instagram*, About Instagram* ..................................................................... 26

Ivy Eisenberg, *How the Zoom Minyan Brought Me Closer to Judaism*, Table (Jan. 18, 2021)................................................................................... 29

J. Clement, *Consumer Spending on In-Game Purchases Worldwide From 2020 to 2025*, Statista (Sept. 7, 2021) ................................................ 12

Jason Wise, *How Many Videos Are Uploaded to YouTube a Day in 2022?* Earthweb (Nov. 22, 2022) ........................................................................... 21

Jeff Kosseff, *The Twenty-Six Words That Created the Internet*, Cornell University Press (2019) ....................................................................... 6, 24, 26

Jonathan Bell, *Three Best Payment Gateway Hosts for Secure E-Commerce in 2023*, Digital.com (Jan. 2, 2023) .............................................. 19

Library of Congress, *How to Tag* ....................................................... 28

Library of Congress, *Veterans History Project* ................................. 27

Mathew Ingram, *The Challenges of Global Content Moderation*, The Media Today, Columbia Journalism Review (June 10, 2021) ............. 10

Matt Burgess, *Iran's Protests Reveal What's Lost If Twitter Crumbles*, Wired (Dec. 1, 2022) ....................................................................... 24

Meira Gebel, *What is Etsy? Everything You Need to Know Before Buying or Selling on the Handmade and Vintage E-commerce Platform for Independent Creators*, Business Insider (Dec. 18, 2020) ........................... 30

Melissa Florer-Bixler, *Why My Church Isn't Dropping Our Online Service*, Sojourners (Feb. 2, 2022) ................................................................ 29

Mid-Continent Public Libraries, *Tell Me a Story Oral History Projects* ........... 27

National Archives and Records Administration, *Citizen Archivist* ................... 28

New York Public Library, *Building Inspector* .................................... 28

Paige Collins & David Greene, *General Monitoring is Not the Answer to the Problem of Online Harms*, EFF Deeplinks .................................... 20

Patreon, *Pricing* ............................................................................ 17

Philip Bump, *The Politics Undergirding the Social Media Fight*, Washington Post (July 7, 2023) ....................................................... 31

Radoslov Ch., *What Percentage of Websites are WordPress in 2022?*, (Oct. 16, 2022) ......................................................................... 29, 30

Rebekah Sayler, *Zoom Meeting Backgrounds 4 Pack Bundle* ........................... 17

Reddit, *Moderator Code of Conduct* ................................................. 32

Reddit, *Reddiquette* ........................................................... 32

Roblox, *Roblox Community Standards* .............................. 31

Shopify Partners, *A Commerce Solution Freelancers and Agencies Love* ........ 30

Smithsonian Institution, *Smithsonian Digital Volunteers* ................................... 28

Susan Wojcicki, *Expanding Our Work Against Abuse of Our Platform*, YouTube Official Blog (Dec. 5, 2017) ....................................... 22

Sydney Li & Jamie Williams, *Despite What Zuckerberg's Testimony May Imply, AI Cannot Save Us*, EFF Deeplinks (April 11, 2018) ...................... 23

The Internet Archive (homepage) ........................................................ 28

The Internet Archive, *Save Pages in the Wayback Machine* ............................... 28

TikTok*, Our Mission,* ........................................................... 26

Truth Social (homepage) ........................................................ 32

University of Iowa Libraries, *DIY History* ........................................... 28

University of Notre Dame Law School Kresge Law Library, *NDLS Scholarship* ............................................................ 27

Wikipedia*, Wikipedia: About* ........................................... 27

Yale Law School Lillian Goldman Law Library, *Communities in Yale Law School Open Scholarship Repository* ............................................. 27

*YouTube By The Numbers*, YouTube Official Blog ........................................... 22

YouTube, *Recommended Videos* ....................................................... 11

## STATEMENT OF INTEREST[1]

The Electronic Frontier Foundation ("EFF") is a member-supported, nonprofit civil liberties organization that has worked for more than 30 years to protect innovation, free expression, and civil liberties in the digital world. On behalf of its more than 39,000 dues-paying members, EFF ensures that users' interests are represented in courts considering crucial online free speech issues, including their right to transmit and receive information online.

EFF has litigated or otherwise participated in a broad range of internet free expression and intermediary liability cases because they often raise novel issues surrounding free expression and the rights of internet users. EFF often files *amicus curiae* briefs in these cases because their outcome can significantly impact, and sometimes curtail, the free expression rights of all users who rely on internet platforms. *See Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (citing EFF's *amicus curiae* brief). EFF believes that 47 U.S.C. § 230 ("Section 230") is a foundational law that enables internet speech by protecting the intermediaries

---

[1] Pursuant to Federal Rule of Appellate Procedure Rule 29(a)(4)(E), *amicus curiae* certifies that no person or entity, other than *amicus curiae*, its members, or its counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. The parties have consented to the filing of this brief.

that host people's speech.[2] EFF thus regularly participates in cases that seek to limit Section 230 because they jeopardize users' free speech.

## INTRODUCTION

Online intermediaries provide the foundational building blocks of the "'vast democratic forums of the Internet,'" which the Supreme Court recognized as "the most important place[] … for the exchange of views" today. *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (quoting *Reno v. ACLU*, 521 U.S. 844, 868 (1997)). Few internet users have the technological know-how or financial resources to build their own applications ("apps") and websites, transmit their own email messages, or ensure that their creative content is delivered to ready audiences. Online intermediaries proved essential in hastening the internet's evolution from a military project to a tool used by virtually everyone, and they provide the underlying structure that enables the internet "to alter how we think, express ourselves, and define who we want to be." *Id.* at 105.

In enacting 47 U.S.C. § 230 ("Section 230"), Congress recognized the crucial role that online intermediaries play in users' ability to speak freely online. Section 230's immunities protect the architecture of the internet—the services that provide the "essential venues for public gatherings to celebrate some views, to protest others, or simply to learn and inquire." *Packingham*, 582 U.S. at 104.

---

[2] *See* EFF, *Section 230*, https://www.eff.org/issues/cda230.

When everyone with an internet connection can access others' expression, a user who created content can become "a pamphleteer" or "a town crier with a voice that resonates farther than it could from any soapbox." *Reno*, 521 U.S. at 870. Section 230 fostered the development of services that would realize the internet's promise to give everyone that power.

Congress granted online intermediaries robust protections precisely because it decided that immunizing them from lawsuits related to harmful content created by their users and from lawsuits related to managing user content would provide significant benefits.[3] Congress understood that Section 230 would: (1) enable the vast development of diverse forums for free expression and (2) incentivize services to moderate their users' expression and give users tools to manage their own online experiences. Internet users have benefitted greatly from Section 230, which has increased their opportunities to express themselves. The statute's legal protections have thus enabled a revolution in the types of forums available for everyone to speak while lowering the costs once associated with mass communications.

Plaintiffs seek a narrow interpretation of Section 230(c)(1) that would drastically erode the significant benefits Congress sought in enacting the statute. Specifically, Plaintiffs have three theories of liability. *In re Apple Inc. App Store*

---

[3] *See* 47 U.S.C. § 230(c)(1) & (c)(2).

*Simulated Casino-Style Games Litig.* ("*Casino-Style Games*"), 625 F. Supp. 3d 971, 993 (N.D. Cal. 2022).

The first and third theories of liability relate to the Defendants "'offering, categorizing, and promoting' social casino applications in their respective App Stores," including by using algorithms to raise the profiles of apps, and by enabling app developers to conduct targeted advertising based on game activity to increase user engagement. *Id.* at 975-76, 993. This suite of allegations amounts to trying to hold Defendants responsible for providing recommendations and notifications, and engaging in other publishing or editorial activities, about content provided by others, which the district court rightly held are activities shielded by Section 230 immunity. *Id.* at 994-95. *See also Zeran v. Am. Online, Inc.,* 129 F.3d 327, 330 (4th Cir. 1997) (Section 230 bars "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content").

After this Court's opinion was vacated in *Gonzalez v. Google LLC*, 2 F.4th 871 (9th Cir. 2021), *vacated and remanded*, 143 S.Ct. 1191 (2023), this Court has an opportunity again hold that recommendations and notifications provided by platforms—about third-party content—fall under Section 230(c)(1), "lest [this Court] cut the heart out of section 230 by forcing [platforms] to face death by ten

thousand duck-bites, fighting off claims that they promoted or encouraged—or at least tacitly assented to—the illegality of third parties." *See Fair Housing Counsel of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1174 (9th Cir. 2008) (en banc). *See also Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398, 415 (6th Cir. 2014) (declining to adopt an "encouragement theory" for losing Section 230(c)(1) immunity).

Plaintiffs' second theory of liability seeks to hold Defendants responsible for being the payment processors for in-app virtual gambling chips, a type of virtual content. *Casino-Style Games*, 625 F. Supp. 3d at 976, 993. The district court erred in holding that these actions fall outside Section 230(c)(1) immunity, concluding that Plaintiffs "seek[] to hold the Platforms liable for their own conduct." *Id.* at 994. Affirming the district court's holding would result in drastic consequences as online intermediaries would lose Section 230 immunity for providing content-neutral financial tools for third-party content. This would harm users' ability to access the breadth of apps and content currently available via the app stores and the internet generally, as platforms would be forced to curtail users' ability to purchase and access virtual content that has not been vetted for lawfulness to mitigate the companies' legal risk.

## ARGUMENT

Plaintiffs advance a radical argument to narrow Section 230(c)(1) that runs contrary to the statute's text and purpose, which confirm that Congress sought to broadly immunize online intermediaries from legal claims based on the speech of one of the millions of "pamphleteers" using them, including those who create allegedly illegal social casino apps. *See Reno*, 521 U.S. at 870. Additionally, the judicial interpretation of Section 230 that Plaintiffs seek would be detrimental to all users' speech online. It would incentivize online platforms to take down ever more user-generated content, and would limit their ability to provide financial tools that enhance the user experience and facilitate the online marketplace.

Section 230 provides one of the legal foundations that enable online intermediaries to provide their services to internet users. "Section 230 has allowed third-party content-based services to flourish in the United States."[4] "[I]t is not an accident that U.S. websites are relatively liberal with third-party content; Section 230 allows them to take those liberties."[5]

---

[4] Jeff Kosseff, *The Twenty-Six Words That Created the Internet*, Cornell University Press, 4 (2019) (*"Twenty-Six Words"*).

[5] *Id.*

## I.  Narrowing Section 230(c)(1)'s Immunity Would Harm Internet Users' Free Speech

Internet users' free speech would be gravely harmed should this Court endorse Plaintiffs' arguments and interpret Section 230(c)(1) as not immunizing recommendations and other tools that online intermediaries employ to make user-generated content available over the internet.

In passing Section 230, "Congress recognized the threat that tort-based lawsuits pose to freedom of speech." *Zeran*, 129 F.3d at 330. Yet narrowing Section 230(c)(1) immunity as Plaintiffs urge this Court to do would fundamentally change the relationship between online platforms and their users by incentivizing companies to drastically alter the digital services they provide while simultaneously curtailing what people can post and access online. Online intermediaries would face increased liability, and they would also spend increased time and money defending lawsuits that may drag on for years and be exceedingly costly, regardless of the substantive merits of the claims.[6] The fear of both would

---

[6] Section 230 is both a defense against liability and a procedural means to end a lawsuit early. *See Roommates.com*, 521 F.3d at 1175 ("[S]ection 230 must be interpreted to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles."). *Cf. Wicks v. Miss. State Emp't Servs.*, 41 F.3d 991, 995 n.16 (5th Cir. 1995) ("[I]mmunity means more than just immunity from liability; it means immunity from the burdens of defending a suit").

drive fundamental changes to how online platforms operate, including an increase in censorship of user content.

### A. Users Would No Longer Benefit From Recommendations or Content Would Be Removed If Section 230(c)(1) Immunity Is Lost for Recommendations

Plaintiffs' first and third theories of liability relate to Defendants "'offering, categorizing, and promoting' social casino applications in their respective App Stores." *Casino-Style Games*, 625 F. Supp. 3d at 975-76, 993. By arguing that these actions fall outside Section 230(c)(1) immunity, Plaintiffs seek to hold the platforms responsible not only for hosting, but also for *recommending* third-party content.

Yet these actions reflect the platforms' protected choices about how to arrange and display user-generated content. In this way, online intermediaries act just as print publishers did before them.[7] And Congress understood this. Section 230(c)(1) protects online intermediaries that give users access to content

---

[7] Newspapers traditionally made, and continue to make, decisions to direct readers to certain articles or advertisements, including where they place that content in the newspaper, what size headlines to use, which to accompany with photographs, etc. These decisions may be customized for different editions of the newspaper since the publisher is aiming at different audiences. Newspapers have not traditionally published all articles in the same font organized solely by when the article was completed. *See Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 391 (1973) (stating under the First Amendment "we reaffirm unequivocally the protection afforded to editorial judgment" including for both content and layout of newspapers). *See also* Apple Opening Br. (July 24, 2023) at 36.

"provided by another" individual or entity—in this case, the social casino apps available via Defendants' app stores. 47 U.S.C. § 230(c)(1). And those online intermediaries include services that, among other things, "filter, screen, allow, or disallow content;" "pick [and] choose" content; and make decisions about how to "display," "organize," or "reorganize" content. 47 U.S.C. § 230(f)(4). Thus, as a technical and common-sense matter, Section 230's protections must include both hosting *and* recommending third-party content.

In addition to a plain reading of the statutory language, this Court has rejected exposing online intermediaries to potential legal liability for having "promoted or encouraged—or at least tacitly assented to—the illegality of third parties." *Roommates.com,* 521 F.3d at 1174. *Accord Jones*, 755 F.3d at 415. The district court correctly held that Section 230(c)(1) applies to Plaintiffs' first and third theories of liability, and this Court should take this opportunity to again affirm that Section 230(c)(1) not only applies to hosting user-generated content, but also actions that amount to *recommending* user-generated content. *See Dyroff v. Ultimate Software Group, Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019) (holding that "recommendations and notifications are tools meant to facilitate the communication and content of others" and "are not content in and of themselves").

Such a holding would recognize the significant consequences of placing recommendations and notifications outside of Section 230 protection.

If online intermediaries—and not just app stores—know that they may be exposed to substantive claims related to how their systems recommend, promote, rank, arrange, or otherwise display content posted by their users, companies will cease to curate user-generated content in any helpful way, beyond perhaps listing it in reverse chronological order.[8] This is particularly likely given the challenges of monitoring user-generated content at scale—that is, the content of millions or billions of users.[9]

The end of niche curation would harm internet users as recommendations and notifications help users find content relevant to their interests and connect with other users that share their interests and values. For example, a service may stop providing users with new content that is like material they have viewed in the past, on the theory that such basic matching is a recommendation that falls

---

[8] *See* Daphne Keller, *Amplification and Its Discontents*, Knight First Amendment Institute at Columbia University, 23-24 (June 8, 2021), https://knightcolumbia.org/content/amplification-and-its-discontents.

[9] *See, e.g.*, Mathew Ingram, *The Challenges of Global Content Moderation*, The Media Today, Columbia Journalism Review (June 10, 2021), https://www.cjr.org/the_media_today/the-challenges-of-global-content-moderation.php.

outside Section 230.[10] The internet would become a much less dynamic and less valuable space for online communities, largely because services may no longer introduce people to new content that they might find interesting. This result would run counter to Congress' goal of preserving the "array" of internet services that provide valuable "educational and informational resources to our citizens." 47 U.S.C. § 230(a)(1).

Or, to preserve their ability to recommend content to users, online intermediaries would *remove* any third-party content that may in any way expose the companies to legal risk were that content to be swept up in the companies' platform-wide recommendation algorithms. Platforms would be cautious even if user-generated content might ultimately be found lawful, as they would fear the costs and burdens of defending meritless claims absent Section 230 immunity. This is because Section 230 not only shields online intermediaries from liability, but also from being involved in protracted litigation. *See Roommates.com*, 521 F.3d at 1175.

---

[10] *See, e.g.*, YouTube, *Recommended Videos* (recommended videos are based on, in part, users' watch history), https://www.youtube.com/howyoutubeworks/product-features/recommendations/#signals-used-to-recommend-content.

**B.** **The Breadth of Apps and Virtual Content Available to Users Would Be Narrowed If Section 230(c)(1) Immunity Is Lost for Processing Third-Party Payments**

A conclusion by this Court that an online intermediary's provision of payment processing services for third-party content triggers the loss of Section 230(c)(1) immunity would be disastrous for the whole of the internet. Plaintiffs' second theory of liability takes a common aspect of today's internet experience—purchases of virtual content (or other benefits) via games, apps, and websites generally—and contort it to fit their legal argument.[11] The district court erred in holding that these actions fall outside Section 230(c)(1) immunity, concluding that Plaintiffs "seek[] to hold the Platforms liable for their own conduct." *Casino-Style Games*, 625 F. Supp. 3d at 994.

Congress never intended to create a legal distinction between hosting user-generated content and enabling *purchases* of that same user-generated content. Congress simply wanted to shield online intermediaries from being held liable for content that others create. *See Doe v. Internet Brands, Inc.*, 824 F.3d 846, 850 (9th Cir. 2016) (Section 230(c)(1) "protects websites from liability for

---

[11] For gaming specifically, in 2020, global audiences spent $54 billion on "additional in-game content," and that amount is projected to reach $74 billion by 2025. J. Clement, *Consumer Spending on In-Game Purchases Worldwide From 2020 to 2025*, Statista (Sept. 7, 2021), https://www.statista.com/statistics/558952/in-game-consumer-spending-worldwide/.

material posted on the website by someone else"). *Accord Zeran*, 129 F.3d at 330 ("By its plain language, [Section 230(c)(1) ] creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service."). It should not matter that an online intermediary facilitates a purchase of third-party content, when if the company simply hosted that content without being involved in a financial transaction between two users (or making a recommendation, for that matter), it would unquestionably be entitled to Section 230 (c)(1) immunity. *See, e.g.*, *Ginsberg v. Google Inc.*, 586 F. Supp. 3d 998, 1006 (N.D. Cal. 2022) (granting Section 230(c)(1) immunity against claims based on providing Telegram messaging app in the Google Play store).

Thus, exposing Defendants to liability for their provision of payment processing services for problematic user-generated content essentially means exposing them to liability *for* problematic user-generated content. There is no practical distinction. If a piece of user-generated content is unlawful (as alleged here, virtual gambling chips), concluding that a platform may be sued for facilitating its purchase is the functional equivalent of concluding that the platform may be sued for *hosting* that content. With this argument, Plaintiffs and the district court are doing an end-run around Section 230(c)(1) immunity. *See* Google Opening Br. (July 24, 2023) at 29 (arguing that Plaintiffs have engaged in

13

"creative pleading"). *See also* Apple Opening Br. (July 24, 2023) at 43-44 (arguing that Plaintiffs' claims "inextricably depend on third-party content"); Meta Opening Br. (July 24, 2023) at 57 (arguing "there is no meaningful distinction for purposes of Section 230 between hosting content and charging a fee to facilitate access to content").

Plaintiffs' proposed legal regime would force Defendants to review every app to ensure that they do not involve purchases for virtual content that may in any way expose the companies to lawsuits. This runs counter to this Court's decision in *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676 (9th Cir. 2019). In that case, a Ninth Circuit panel held that Section 230(c)(1) did not shield short-term rental websites from Santa Monica's municipal ordinance that prohibited the websites from processing payments for unlicensed real-world properties. *Id.* at 684. The Court stated that the key question is "what the duty at issue actually requires: specifically, whether the duty would necessarily require an internet company to monitor third-party content." *Id.* at 682. The Court held that "the Ordinance does not require the Platforms to monitor third-party content and thus falls outside of the CDA's immunity." *Id.* at 682. By contrast, Plaintiffs here seek to hold Defendants liable for processing payments for virtual content created by app developers, which would most definitely force the platforms to review all purchasable in-app content for any hint of legal risk. *See* Google

Opening Br. (July 24, 2023) at 34-35; Apple Opening Br. (July 24, 2023) at 49-50; Meta Opening Br. (July 24, 2023) at 51.

A loss of Section 230(c)(1) immunity for processing financial transactions related to third-party content would be disastrous for internet users—and not just those who use social casino apps.

At a minimum, Defendants would avoid processing payments for virtual gambling chips in social casino apps, forcing the app developers to process payments themselves or to find a new revenue model, which may add friction to and degrade the user experience.[12] Or Defendants would simply remove the social casino apps from their app stores, even if there is not consensus on their alleged illegality, to avoid possible future litigation.[13] More broadly, Defendants would refuse to facilitate financial transactions for *any in-app content* that raises legal

---

[12] *See, e.g.*, Apple Support, *Use Apple Pay in Apps, App Clips, and Safari on iPhone*, iPhone User Guide, https://support.apple.com/guide/iphone/use-apple-pay-in-apps-app-clips-and-safari-iph67e89f7c8/ios.

[13] *See* 2-ER-46, *Plaintiffs' Answer to Petition for Leave to Appeal and Conditional Cross-Petition* (Sept. 22, 2022) at 3 (arguing "[i]n at least one state—and Plaintiffs allege many more—these casino games are considered illegal online gambling," citing *Kater v. Churchill Downs Inc.*, 886 F.3d 784 (9th Cir. 2018)). *See also* Eric Goldman, *Section 230 Doesn't Protect App Stores That Sell Virtual Chips for Casino Apps–In re Apple App Store* (Sept. 6, 2022) (arguing that "[t]he consequences of a payments-forecloses-230 exclusion are potentially seismic" and asking "can an app engage in 'gambling' if the player can never accumulate a financial benefit?"), https://blog.ericgoldman.org/archives/2022/09/section-230-doesnt-protect-app-stores-that-sell-virtual-chips-for-casino-apps-in-re-apple-app-store.htm.

questions, or would remove apps wholesale, harming users' ability to have robust app-based experiences[14] and undermining the internet as a source "for a variety of political, educational, cultural, and entertainment services." 47 U.S.C. § 230(a)(5). *See* Apple Opening Br. (July 24, 2023) at 52 (arguing that Plaintiffs' argument is "limitless" because "processing *any* transaction for in-app content on any app could potentially expose Apple to legal risk") (emphasis in original).

In-app purchases are particularly beneficial as they allow app developers to offer apps for "free" to users without any upfront costs. In 2021, 95% of mobile apps were free to install.[15] This gives price-conscious users access to the broadest array of gaming and other app-based services, where users can choose to spend money once inside the service.[16]

---

[14] In-app purchases may be consumable or non-consumable. Consumable purchases "are virtual products that can be purchased and then used only once," and in gaming may include "extra lives, hints, one-time features, or in-app currency like tokens." Non-consumable purchases "are products that, once purchased within the game, have no expiration date and can be used on a recurring basis," and may include "unlocking a new level within a game or upgrades for a character or vehicle." AppsFlyer, *In-Game Purchase*, https://www.appsflyer.com/glossary/in-game-purchase/.

[15] AppsFlyer, *App Monetization Guide: How to Generate Revenue From Apps in 2022*, https://www.appsflyer.com/resources/guides/app-monetization/.

[16] *Id.* ("Making your app free has several benefits that can help you generate more revenue in the long run, because it lowers the risk [to users] involved of trying your app out. A free app requires very little commitment, which in turn, makes it easier and cheaper to acquire new users.").

A ruling for Plaintiffs here would have ripple effects across the internet. Beyond Defendants and their app stores, other online intermediaries would also refuse, out of fear of losing Section 230(c)(1) immunity, to facilitate financial transactions for user-generated content that might expose the platforms to legal risk—again, even if that content is lawful. Etsy, for example, is a global online marketplace that allows individuals to sell handmade items and the platform facilitates these financial transactions.[17] Some people sell virtual content, such as Zoom backgrounds[18] and digital art for modern televisions.[19] Similarly, Patreon is an online community where artists and other creators can offer "memberships" to supporters in exchange for exclusive content and other benefits.[20] Patreon processes the monthly membership fees.[21] If facilitating financial transactions were to expose these platforms to potential lawsuits based on the artists' virtual content, the platforms would be forced to review such virtual content for possible

---

[17] *See* Etsy, *About*, https://www.etsy.com/about.

[18] Rebekah Sayler, *Zoom Meeting Backgrounds 4 Pack Bundle*, https://www.etsy.com/listing/939952078/zoom-virtual-background-image-zoom.

[19] Dan Canopy, *Samsung Frame TV Art, Paper Waves*, https://www.etsy.com/listing/1365776378/samsung-frame-tv-art-paper-waves.

[20] Francesca Margherita, *How to Structure Your Membership and Price Your Benefits*, Patreon, Creator Hub, https://creatorhub.patreon.com/articles/how-to-structure-your-membership-and-price-your-benefits.

[21] Patreon, *Pricing*, https://www.patreon.com/pricing.

legal implications (e.g., state-law obscenity or defamation claims).[22] That would

harm all platform users, both creators and their customers, as fewer creators would

be able to monetize their art and might not be accessible on the platforms at all.

Thus, to argue that Defendants may preserve their Section 230(c)(1) immunity

by not facilitating any purchases at all fails to recognize not only that Defendants

should have Section 230(c)(1) immunity when they do, but also that smaller

platforms or those with different business models do not have such a choice.[23]

Overall, narrowing Section 230(c)(1) immunity in this way would result in

diminished online speech and marketplaces, as the breadth and availability of apps

and content would be severely reduced. *See* Meta Opening Br. (July 24, 2023) at

57 (highlighting online content available for a fee or via subscription).

    Additionally, a rule that the provision of payment processing services may

be the basis for a loss of Section 230(c)(1) immunity would also have immense

---

[22] *See, e.g.*, Cyber Temptation (offering a membership for virtual art that is "NSFW [not safe for work] & XXX CONTENT"), Patreon, https://www.patreon.com/cybertemptation.

[23] *See* 2-ER-62, *Plaintiffs' Answer to Petition for Leave to Appeal and Conditional Cross-Petition* (Sept. 22, 2022) at 19 (arguing "[i]f, instead of handling the transactions themselves and taking a 30% cut, Defendants allowed the casino apps' developers to accept payment directly from their users, then Defendants would face no liability here").

consequences for all services up and down the internet "stack,"[24] not just companies that provide app stores or other end-user platforms. *See Jones,* 755 F.3d at 406 n.2 (describing how 230's immunity extends to "broadband providers, hosting companies, and website operators"). There are many intermediaries that enable a financial transaction for an allegedly unlawful piece of content to happen over the internet, from ISPs that provide internet access to web hosting companies that house back-end databases.[25] Thus, although this case concerns Section 230(c)(1)'s application to app stores, any interpretation of the statute that weakens its protections impacts the various intermediaries in the chain of content creation, hosting, distribution (including via sale)—thereby threatening user speech at multiple choke points.[26]

### C. Any Narrowing of Section 230(c)(1) Immunity Would Lead Platforms to Severely Censor User-Generated Content

Plaintiffs' arguments related to both recommendations and payment processing would force Defendants and other platforms to severely curtail their

---

[24] *See* Geoffrey A. Fowler & Chris Alcantara, *Gatekeepers: These Tech Firms Control What's Allowed Online*, Washington Post (March 24, 2021), https://www.washingtonpost.com/technology/2021/03/24/online-moderation-tech-stack/.

[25] *See* Jonathan Bell, *Three Best Payment Gateway Hosts for Secure E-Commerce in 2023*, Digital.com (Jan. 2, 2023), https://digital.com/best-web-hosting/payment-gateway/.

[26] *See* EFF, *Free Speech: Only As Strong As the Weakest Link*, https://www.eff.org/free-speech-weak-link.

services or outright censor user-generated content, to mitigate legal exposure in the absence of Section 230 immunity.

Any narrowing of Section 230(c)(1) 's immunity, apart from Plaintiffs' specific arguments, would incentivize online intermediaries to conduct a review of third-party content, including either *pre-screening* or *removing after-the-fact* any content that may be even *remotely* problematic to mitigate their legal risk. Pre-screening is particularly worrisome as it would prevent content from being published in the first place, ending the open internet—the unique ability of anyone with an internet connection to communicate with others around the world cheaply, easily, and quickly.[27]

Yet the ability—both logistically and financially—for modern online platforms to conduct a *fair review* is dubious given the incredible volume of content generated by internet users, resulting in wholly legitimate content being censored as well. The difficulty of fairly reviewing digital content remains even more true today than when Congress passed Section 230 in 1996, given the scale and continued growth of the internet. At that time, about 40 million people used the internet worldwide, and commercial online services in the United States had

---

[27] Paige Collins & David Greene, *General Monitoring is Not the Answer to the Problem of Online Harms*, EFF Deeplinks (Aug. 16, 2022), https://www.eff.org/deeplinks/2022/08/general-monitoring-not-answer-problem-online-harms.

almost 12 million individual subscribers. *See Reno*, 521 U.S. at 850–51. As of April 2023, there were more than 5 billion people online, with 4.8 billion people using social media platforms.[28] Those billions of internet users are creating more content than at any point in humanity's history. For example, as of 2022, users of YouTube, the popular video-based social media platform, were uploading 500 hours of videos each minute.[29] Relevant to this case, Google Play hosts two million apps and games used by "billions of people around the world, generating over \$120 billion in earnings for developers to date."[30] Apple's AppStore hosts 1.8 million apps.[31]

Given the staggering number of users on today's internet, requiring online intermediaries to review every piece of user-generated content they host is simply not feasible for any open platform of even moderate size. Thus, the consequences of the new censorship regime that a narrowed Section 230 would lead to would be felt by all internet users.

---

[28] *See* Ani Petrosyan, *Number of Internet and Social Media Users Worldwide as of April 2023*, Statista (May 22, 2023), https://www.statista.com/statistics/617136/digital-population-worldwide/.

[29] Jason Wise, *How Many Videos Are Uploaded to YouTube a Day in 2022?* Earthweb (Nov. 22, 2022), https://earthweb.com/how-many-videos-are-uploaded-to-youtube-a-day/.

[30] Google, *How Google Play Works*, https://play.google.com/about/howplayworks/.

[31] Apple, *AppStore*, https://www.apple.com/app-store/.

To keep the cost of human reviewers down, larger, more sophisticated platforms would likely turn to algorithms or artificial intelligence to flag and block problematic content. YouTube, which now has over 2 billion users each month,[32] is already using algorithms or artificial intelligence to moderate content on its platform.[33]

But automated tools are not a solution to the sheer volume of user-generated content created on platforms, because even the best automated systems lack the ability to identify nuance, context, and cultural differences.[34] Automated systems are more likely to result in censorship of journalists, human rights activists, artists, or any other creators of *lawful* content.[35] In response to

---

[32] *YouTube By The Numbers*, YouTube Official Blog, https://blog.youtube/press/.

[33] Susan Wojcicki, *Expanding Our Work Against Abuse of Our Platform*, YouTube Official Blog (Dec. 5, 2017) ("98 percent of the videos we remove for violent extremism are flagged by our machine-learning algorithms."), https://blog.youtube/news-and-events/expanding-our-work-against-abuse-of-our/.

[34] *See* Carey Schenkman et al., *Do You See What I See? Capabilities and Limits of Automated Multimedia Content Analysis*, Center for Democracy & Technology, 29-30 (May 2021), https://cdt.org/wp-content/uploads/2021/05/2021-05-18-Do-You-See-What-I-See-Capabilities-Limits-of-Automated-Multimedia-Content-Analysis-Full-Report-2033-FINAL.pdf.

[35] *See* Corynne McSherry, *Platform Censorship: Lessons from the Copyright Wars*, EFF Deeplinks (Sept. 26, 2018), https://www.eff.org/deeplinks/2018/09/platform-censorship-lessons-copyright-wars; Sydney Li & Jamie Williams, *Despite What Zuckerberg's Testimony May*

the increased liability, platforms' use of these automated systems would only increase, as would online censorship.

Meanwhile, smaller platforms without the substantial resources required to manage potential liability in this way—or to weather the significant litigation costs they would face if they chose not to—would be forced to shut down. And new companies would be deterred from even trying to offer open platforms for speech or would be unable to attract investors in the face of such massive legal exposure.[36]

Increased legal risk would end the essential role intermediaries play in fostering social and political discourse on the internet—not just in the U.S. but across the globe. Indeed, many individuals around the world use U.S.-based services to access and distribute all manner of content, from organizing in opposition to oppressive regimes[37] to sharing pictures of children with

_____

*Imply, AI Cannot Save Us*, EFF Deeplinks (April 11, 2018), https://www.eff.org/deeplinks/2018/04/despite-what-zuckerbergs-testimony-may-imply-ai-cannot-save-us.

[36] *See* Ethan Wham, *The Economic Case for Section 230, Disruptive Competition Project*, Computer & Communications Industry Association (Sept. 6, 2019), https://www.project-disco.org/innovation/090619-an-economic-case-for-section-230/.

[37] *See, e.g.*, Holly Dagres, *Meet Iran's Gen Z: the Driving Force Behind the Protests*, Foreign Policy (Nov. 1, 2022) ("Circumvention tools allow access to blocked international social media platforms, such as Facebook, Twitter, and YouTube."), https://foreignpolicy.com/2022/11/01/iran-protests-gen-z-mahsa-

grandparents. Indeed, the three largest internet companies globally by revenue are American companies: Alphabet (Google), Amazon, and Meta (Facebook)—two of whom are Defendants in this case.[38] Such robust, global online participation would never have been achieved without the immunity provided by Section 230.[39] Granting would-be plaintiffs an avenue to circumvent Section 230(c)(1) 's protections would undermine this global phenomenon. Because platforms would be unwilling to take a chance on provocative or unpopular speech, the global online marketplace of ideas—and as relevant to this case, actual online marketplaces— would be artificially stunted, and would instead become a sanitized, bland, homogenous online experience.

## II. Section 230 Incentivizes the Development of Diverse Online Platforms for User Speech

Section 230's robust protections for online intermediaries—such as Defendants' app stores, social media websites, blogging platforms, web hosting companies, and email services—ensure that they can provide the essential free expression architecture of today's internet. The internet depends upon

---

amini-social-media/; Matt Burgess, *Iran's Protests Reveal What's Lost If Twitter Crumbles*, Wired (Dec. 1, 2022), https://www.wired.com/story/protests-in-iran-twitter/.

[38] Andrew Bloomenthal, *World's Top 10 Internet Companies*, Investopedia (Dec. 28, 2022), https://www.investopedia.com/articles/personal-finance/030415/worlds-top-10-internet-companies.asp.

[39] *See* Kosseff, *Twenty-Six Words*, *supra* n.4, at 145-166.

intermediaries, "who serve as a vehicle for the speech of others."[40] Indeed, they are the primary way in which most people engage with one another online. They give a single person, with minimal resources or technical expertise anywhere in the world, the ability to communicate with others across the globe. *See Reno*, 521 U.S. at 870.

In enacting Section 230 as a whole, including Section 230(c)(1) and companion immunities in Section 230(c)(2),[41] Congress sought to incentivize online intermediaries to create diverse forums for user speech, in terms of communities served and the range of editorial approaches, from highly permissive to more strictly managed. Section 230's immunities allow online intermediaries to decide for themselves what user speech they host and how they host it, by greatly diminishing the fear of liability for those decisions.

Section 230 thus broadly protects editorial and curatorial discretion and promotes a variety of forums for user speech.[42] The statute has, as Congress

---

[40] Anupam Chander & Uyên P. Lê, *Free Speech*, 100 Iowa L. Rev. 501, 514 (2015).

[41] Section 230(c)(2)(A) immunizes online platforms from liability for "any action voluntarily taken in good faith to restrict access to or availability of material" that the platform finds objectionable. Section 230(c)(2)(B) immunizes "any action taken to enable or make available to information content providers or others the technical means to restrict access" to objectionable material online.

[42] Courts have applied both Section 230(c)(1) and Section 230(c)(2)(A) to immunize a service's editorial decisions. *See, e.g., NetChoice, LLC v. Moody*,

intended, facilitated the "true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." 47 U.S.C. § 230(a)(3).

Although it is impossible to catalog the many online intermediaries and approaches to hosting user speech enabled by Section 230, as they are as "diverse as human thought," *Reno*, 521 U.S. at 852, examples include:

**Large, general audience platforms:** A majority of the most popular websites in the United States—YouTube, Facebook, Reddit, Wikipedia, Twitter, and eBay—offer users a variety of ways to create and share different types of media.[43]

**Services that cater to particular types of content creation:** Instagram provides users with an opportunity to primarily share photographs, while TikTok caters to users creating short videos.[44]

**Services designed to share and build knowledge:** Wikipedia is a free online encyclopedia that is written by an enormous number of anonymous

_____

546 F. Supp. 3d 1082, 1090 (N.D. Fla. 2021), *aff'd on other grounds*, 34 F.4th 1196 (11th Cir. 2022) (user content takedown analyzed under Section 230(c)(2)(A))*; Domen v. Vimeo, Inc.*, 433 F. Supp. 3d 592, 602 (S.D.N.Y. 2020), *aff'd on other grounds*, 2021 WL 4352312 (2d Cir. 2021) (user content takedown analyzed under Section 230(c)(1)).

[43] *See* Kosseff, *Twenty-Six Words, supra* n.4, at 4.

[44] *See* Instagram*, About Instagram*, https://about.instagram.com/; TikTok*, Our Mission*, https://www.tiktok.com/about?lang=en.

contributors, most of whom are volunteers.[45] The site has more than 60 million articles in more than 300 languages.[46] Libraries offer similar opportunities for users to help create knowledge. Harvard Library Office of Scholarly Communications, for example, maintains an open access repository for research by Harvard community members. These community members have uploaded over 45,000 works of scholarship, including articles, conference proceedings, working papers, case studies, books and book chapters, theses, and dissertations, into the repository.[47] Many other academic libraries maintain repositories where community members can upload materials.[48] Libraries also provide online platforms where community members can upload oral histories.[49] Likewise, the Library of Congress' "By The People" crowdsourcing platform enables patrons

---

[45] *See* Wikipedia*, Wikipedia: About*,
https://en.wikipedia.org/wiki/Wikipedia:About.

[46] *Id.*

[47] Harvard Library, *DASH*, https://library.harvard.edu/services-tools/dash.

[48] *See, e.g.*, Yale Law School Lillian Goldman Law Library, *Communities in Yale Law School Open Scholarship Repository*, https://openyls.law.yale.edu/; University of Notre Dame Law School Kresge Law Library, *NDLS Scholarship*, https://scholarship.law.nd.edu/.

[49] *See, e.g.*, Library of Congress, *Veterans History Project*, https://www.loc.gov/programs/veterans-history-project/; Mid-Continent Public Libraries, *Tell Me a Story Oral History Projects*, https://www.mymcpl.org/genealogy/collections/tell-me-a-story; Erie County Public Library, *Covid-19 Oral History Project*, https://erielibrary.org/resources/covid19-history-project/.

to tag and annotate parts of its collection.[50] The National Archives' "Citizen Archivist" program invites users to "make contributions to the National Archives Catalog to enhance access and discoverability" by "[t]ranscrib[ing] historical documents, tag[ging] archival photographs, or shar[ing] comments with other community members."[51] Other institutions providing similar interactive computer services include the New York Public Library,[52] the University of Iowa Libraries,[53] and the Smithsonian Institution.[54] Similarly, the Internet Archive regularly gathers "snapshots"—accessible copies—of content on the World Wide Web through its "crawling" and indexing processes to prevent the internet and other digital content from disappearing into the past. The Internet Archive has so far archived over 818 billion webpages, many of which were archived by users.[55]

---

[50] Library of Congress, *How to Tag*, https://crowd.loc.gov/help-center/how-to-tag/.

[51] National Archives and Records Administration, *Citizen Archivist*, https://www.archives.gov/citizen-archivist.

[52] New York Public Library, *Building Inspector*, https://www.nypl.org/digital-research/projects/building-inspector.

[53] University of Iowa Libraries, *DIY History*, http://diyhistory.lib.uiowa.edu/.

[54] Smithsonian Institution, *Smithsonian Digital Volunteers*, https://transcription.si.edu/.

[55] The Internet Archive, *Save Pages in the Wayback Machine*, https://help.archive.org/help/save-pages-in-the-wayback-machine/. *See also* The Internet Archive (homepage), https://archive.org/.

**Services that enable people to practice their faith:** Even prior to the COVID-19 pandemic, many religious groups were using online services to offer or to extend their religious services. For example, a YouTube channel called "Living Lchaim" started in 2017 with the goal of distributing videos "to help enrich the lives of Orthodox Jews & the world."[56] Various religious services also relied on Zoom and other video-conferencing services to meet amid the pandemic, with some continuing to offer them today because they allow remote participation.[57]

**Services that enable people to create their own websites and forums:** WordPress is a free and open-source content management system available in over 50 languages that allows users around to globe to create free websites or blogs.[58] By 2022, people had used WordPress to create more than 455 million

---

[56] *See About, Living Lchaim*, https://www.youtube.com/@LivingLchaim/about.

[57] *See* Melissa Florer-Bixler, *Why My Church Isn't Dropping Our Online Service*, Sojourners (Feb. 2, 2022), https://sojo.net/articles/why-my-church-isn-t-dropping-our-online-service; Ivy Eisenberg, *How the Zoom Minyan Brought Me Closer to Judaism*, Table (Jan. 18, 2021), https://www.tabletmag.com/sections/belief/articles/zoom-minyan-brought-me-closer-to-judaism.

[58] Radoslov Ch., *What Percentage of Websites are WordPress in 2022?*, Techjury (Oct. 16, 2022), https://techjury.net/blog/percentage-of-wordpress-websites/.

websites. Many of those WordPress sites are blogs, and WordPress users create an estimated 70 million new blog posts each month.[59]

**Services that create online marketplaces:** Shopify is an e-commerce platform that helps customers create websites for their online stores.[60] Etsy, as mentioned above, *supra* Part I.B., is an online site that allows individuals to sell handmade crafts, jewelry, toys, art, and other goods.[61] Other online services that create spaces for individual buyers and sellers include eBay,[62] which similarly facilitates sales directly between two parties, and Craigslist, the online classified advertising website.[63]

**Services that cater to users based on their viewpoints and special interests:** Gettr is a "social media platform founded on the principles of free speech, independent thought, and rejecting political censorship and 'cancel culture,'"[64] but nevertheless reserves the right to "address" content that attacks

---

[59] *Id*.

[60] Shopify Partners, *A Commerce Solution Freelancers and Agencies Love*, https://www.shopify.com/partners/platform-features.

[61] Meira Gebel, *What is Etsy? Everything You Need to Know Before Buying or Selling on the Handmade and Vintage E-commerce Platform for Independent Creators*, Business Insider (Dec. 18, 2020), https://www.businessinsider.com/guides/tech/what-is-etsy.

[62] Ebay (homepage)*,* https://www.ebay.com/.

[63] Craigslist (homepage)*,* https://www.craigslist.org/about/sites.

[64] Gettr (homepage), https://gettr.com/landing.

any religion or race.[65] Roblox, a rapidly growing social network where users build and play their own games, promotes "optimism and civility," and thus prohibits certain content that is common on other platforms, such as profanity, content that "seeks real world romantic relationships," and much political content.[66] As the Eleventh Circuit summarized:

> Social-media platforms include both massive websites with billions of users—like Facebook, Twitter, YouTube, and TikTok—and niche sites that cater to smaller audiences based on specific interests or affiliations—like Roblox (a child-oriented gaming network), ProAmericaOnly (a network for conservatives), and Vegan Forum (self-explanatory).

*NetChoice*, 34 F.4th at 1204.

**Services created in response to concerns about large online intermediaries:** Truth Social and other platforms were developed in response to a perceived bias against conservative voices on the large mainstream social media platforms.[67] It bills itself as a "'Big Tent' social media platform that encourages

---

[65] Gettr, *Terms of Use,* https://gettr.com/terms.

[66] Roblox, *Roblox Community Standards*, https://en.help.roblox.com/hc/en-us/articles/203313410-Roblox-Community-Standards.

[67] *See* Philip Bump, *The Politics Undergirding the Social Media Fight*, Washington Post (July 7, 2023), https://www.washingtonpost.com/politics/2023/07/07/threads-twitter-media-fight/.

an open, free, and honest global conversation without discriminating on the basis of political ideology."[68]

**Services that offer a diverse range of moderation practices:** Many platforms work with users to moderate content and to establish community guidelines. For example, Reddit and Discord rely on certain users to moderate content through the practice of "community moderation." Reddit users manage and create thousands of communities, called "subreddits." Although Reddit has an overriding content policy, a moderator makes the decisions within each subreddit as guided by Reddit's "Moderator Guidelines for Healthy Communities."[69] Discord employs a similar model.[70] Each site empowers some users to remove and down-rank other users' speech if that speech is against the community's rules.[71] These platforms allow some users to change what other users see on the platform. Other platforms allow individual users to report content

---

[68] Truth Social (homepage), https://truthsocial.com/.

[69] Reddit, *Moderator Code of Conduct* (effective Sept. 8, 2022), https://www.redditinc.com/policies/moderator-guidelines.

[70] Discord, *Moderating on Discord*, https://discord.com/moderation.

[71] *See, e.g.,* Reddit, *Reddiquette*, https://reddit.zendesk.com/hc/en-us/articles/205926439-Reddiquette.

that violates the law or the platform's policies and change what content they themselves see.[72]

**Services that give users tools to create their own online experience:** Section 230 also empowers internet users and service providers to control their online experiences and to decide for themselves what content they would like to view.[73] This ultimately ensures that internet users have a plethora of choices when looking for filtering tools, either for themselves or their families, workplaces, schools, libraries, and so on. Section 230 also ensures that platforms have choices so they can create online spaces for a diverse array of audiences. For example, Section 230(c)(2)(B) incentivizes tools such as Privacy Badger, developed by *amicus* EFF. Privacy Badger is a browser add-on that was designed for internet users who want to browse the internet without having a third party secretly track

---

[72] *See, e.g.,* Facebook, *How to Report Things*, https://www.facebook.com/help/181495968648557?rdrhc; Facebook, *How Do I Take a Break From Someone's Profile on Facebook?*, https://www.facebook.com/help/1638212473101795.

[73] *See* 47 U.S.C. § 230(c)(2)(B).

them.[74] It allows users to block trackers and advertisements as they browse the web.[75]

## CONCLUSION

*Amicus* respectfully requests that this Court affirm the district court's holdings on Plaintiffs' first and third theories of liability, and reverse on the second theory of liability, to ensure that Section 230 broadly protects internet users' free speech.

August 1, 2023                    Respectfully submitted,

                    By:  */s/ Sophia Cope*
                         Sophia Cope
                         ELECTRONIC FRONTIER FOUNDATION
                         815 Eddy Street
                         San Francisco, CA 94109
                         Tel: (415) 436-9333
                         Fax: (415) 436-9993
                         Email: sophia@eff.org

                         *Counsel for Amicus Curiae*
                         *Electronic Frontier Foundation*

---

[74] EFF, *What is Privacy Badger?*, https://privacybadger.org/#What-is-Privacy-Badger.

[75] EFF, *Privacy Badger*, https://www.eff.org/privacybadger; EFF, *How Does Privacy Badger Work?*, https://privacybadger.org/#How-does-Privacy-Badger-work.

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify as follows:

1.     This Brief of *Amicus Curiae* Electronic Frontier Foundation in Support of Defendants-Appellants and Affirmance in Part and Reversal in Part, complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,964 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365, the word processing system used to prepare the brief, in 14 point font in Times New Roman font.

 Dated: July 31, 2023                              */s/ Sophia Cope*
                                                          Sophia Cope

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on July 31, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: July 31, 2023                    */s/ Sophia Cope*
                                        Sophia Cope