**Nos. 22-16914, 22-16916, 22-16888, 22-16889, 22-16921, 22-16923**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

*In re Apple Inc. App Store Simulated Casino-Style Games Litigation*

*In re Google Play Store Simulated Casino-Style Games Litigation*

*In re Facebook Simulated Casino-Style Games Litigation*

On Appeal from the
United States District Court for the Northern District of California
Nos. 5:21-md-2985, 5:21-md-3001, 5:21-cv-2777
Hon. Edward J. Davila

## Plaintiffs-Appellees' Consolidated
## Principal and Response Brief

Rafey S. Balabanian
Todd Logan
EDELSON PC
150 California St, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300
Fax: 415.373.9435

Jay Edelson
Alexander G. Tievsky
EDELSON PC
350 N LaSalle St, 14th Floor
Chicago, IL 60654
Tel: 312.589.6370
Fax: 312.589.6378
atievsky@edelson.com

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................... ii

TABLE OF AUTHORITIES .............................................................. v

INTRODUCTION .............................................................................. 1

STATEMENT OF JURSIDICTION .................................................. 2

ISSUES PRESENTED FOR REVIEW ............................................. 5

STATEMENT OF THE CASE .......................................................... 5

I.    Factual Background ................................................................ 5

      A.    Social Casino Games Offer Illegal Gambling ............... 6

      B.    Social Casinos Bring in Massive Profits by
            Targeting and Exploiting Addicted Players ............... 8

      C.    The Platforms Act as the Cashier's Cage for Social
            Casino Apps .................................................................. 9

II.    Procedural Background ......................................................... 12

SUMMARY OF THE ARGUMENT ................................................. 15

ARGUMENT .................................................................................... 18

I.    Whether the Social Casino Apps Constitute Gambling Is
    Not At Issue in These Appeals ............................................. 18

II.    Plaintiffs' Claims Do Not Seek to Treat Defendants as
    Speakers or Publishers ......................................................... 21

A.   Section 230 Immunity Extends Only to Treating Interactive Computer Services as Speakers or Publishers ........................................................... 23

B.   Processing Unlawful Transactions Alongside Publishing Activity Does Not Transform the Transaction Into Publication ........................................ 25

C.   The Platforms' Liability Results from Brokering Unlawful Gambling Transactions, Not Publishing Apps ...................................................................... 28

D.   Brokering Gambling Transactions Is Not Part of Being a Publisher ............................................... 29

E.   State Gambling Laws Create No Duty for Defendants to Monitor the Third-Party Content They Host ........ 36

F.   *HomeAway* In No Way Depends on a "Brick-and-Mortar" Transaction ........................................... 42

III.  Defendants' Business Decision to Couple Gambling Transactions with Publication Activities Does Not Confer Immunity for the Platforms' Own Actions ............................. 47

A.   The Neutrality of a Tool Is Relevant Only to the Third Prong of the *Barnes* Analysis ........................... 48

B.   Offering a Feature or Service, Neutral or Not, Only Constitutes Publication If It Is Bound Up with the Display of Data ................................................... 50

C.   In-App Payment Tools Are Separable from Publishing ........................................................... 56

IV.  The Court Should Modify the Order to Reflect that the Motions to Dismiss Are Denied in Full ................................. 60

**A.** **Courts Cannot Dismiss Theories under Rule 12**....... 60

**B.** **The Court Should Not Affirm an Order in a Manner that Risks an Advisory Opinion**.................................. 65

**CONCLUSION** ......................................................... 70

**CERTIFICATE OF COMPLIANCE** .................................................. 71

iv

# TABLE OF AUTHORITIES

## Cases

*Ahrenholz v. Bd. of Trustees of Univ. of Illinois*,
219 F.3d 674 (7th Cir. 2000) ........................................................... 68

*Am. Int'l Indus. v. Brenntag Specialties, Inc.*,
No. 2:21-CV-03888-RGK-KK,
2021 WL 5264239 (C.D. Cal. Aug. 30, 2021) ................................. 63

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................ 61

*Backpage.com, LLC v. Cooper*,
939 F. Supp. 2d 805 (M.D. Tenn. 2013) ......................................... 31

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) .................................................*passim*

*BBL, Inc. v. City of Angola*,
809 F.3d 317 (7th Cir. 2015) .......................................................... 62

*Benoit v. Saint-Gobain Performance Plastics Corp.*,
959 F.3d 491 (2d Cir. 2020) ........................................................... 65

*Benson v. Double Down Interactive, LLC*,
No. 2:18-CV-00525-RBL, 2020 WL 4607566
(W.D. Wash. Aug. 11, 2020) .......................................................... 34

*Bilek v. Federal Insurance Co.*,
8 F.4th 581 (7th Cir. 2021) ............................................................ 62

*Brown v. Rawson-Neal Psychiatric Hosp.*,
840 F.3d 1146 (9th Cir. 2016) ....................................................... 61

*Bullseye Distrib. LLC v. State Gambling Comm'n,*
    127 Wash. App. 231, 110 P.3d 1162 (2005) .................................... 35

*Candace B. v. Blue Cross,*
    No. 2:19-CV-00039, 2020 WL 1474919 (D. Utah Mar. 26, 2020) .. 63

*Carafano v. Metrosplash.com, Inc.,*
    339 F.3d 1119 (9th Cir. 2003) ................................................. 24, 55

*Coffee v. Google, LLC,*
    No. 20-CV-03901-BLF, 2022 WL 94986
    (N.D. Cal. Jan. 10, 2022) ................................................................ 59

*Conservation Force v. Salazar,*
    646 F.3d 1240 (9th Cir. 2011) ........................................................ 60

*Deutsche Bank Nat. Tr. Co. v. FDIC,*
    744 F.3d 1124 (9th Cir. 2014) ........................................................ 19

*Doe v. Internet Brands, Inc.,*
    824 F.3d 846 (9th Cir. 2016) ...................................................*passim*

*Doe v. Regents of the Univ. of California,*
    No. 2:19-CV-10385-HDV-MRW, 2023 WL 6194148
    (C.D. Cal. Aug. 11, 2023) ............................................................... 63

*Dreith v. Nu Image, Inc.,*
    648 F.3d 779 (9th Cir. 2011) ......................................................... 65

*Dyroff v. Ultimate Software Group, Inc.,*
    934 F.3d 1093 (9th Cir. 2019) ........................................... 48. 49, 51

*Erie Ins. Co. v. Amazon.com, Inc.,*
    925 F.3d 135 (4th Cir. 2019) ................................................... 53, 57

*Evans v. Hewlett-Packard Co.,*
    No. C 13-02477 WHA, 2013 WL 4426359
    (N.D. Cal. Oct. 10, 2013) ............................................................... 31

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
    521 F.3d 1157 (9th Cir. 2008) ...................................................*passim*

*Fed. Agency of News LLC v. Facebook, Inc.*,
    432 F. Supp. 3d 1107 (N.D. Cal. 2020) .......................................... 55

*Force v. Facebook, Inc.*,
    934 F.3d 53 (2d Cir. 2019).................................................. 27, 40, 68

*Fortyune v. City of Lomita*,
    766 F.3d 1098 (9th Cir. 2014) ....................................................... 21

*F.T.C. v. Accusearch Inc.*,
    570 F.3d 1187 (10th Cir. 2009) ..................................................... 46

*F.T.C. v. Facebook, Inc.*,
    581 F. Supp. 3d 34 (D.D.C. 2022) ................................................. 63

*G.G. v. Salesforce.com, Inc.*,
    76 F.4th 544 (7th Cir. 2023) ........................................................ 11

*Goddard v. Google, Inc.*,
    No. C 08-2738JF(PVT), 2008 WL 5245490
    (N.D. Cal. Dec. 17, 2008).............................................................. 31

*Gonzalez v. Google LLC*,
    2 F.4th 871 (9th Cir. 2021) ........................................................... 66

*Green v. Hart*,
    41 F.2d 855 (D. Conn. 1930) ........................................................ 35

*Hartmann v. California Dep't of Corr. & Rehab.*,
    707 F.3d 1114 (9th Cir. 2013) ....................................................... 61

*HomeAway.com, Inc. v. City of Santa Monica*,
    918 F.3d 676 (9th Cir. 2019) ...................................................*passim*

*Internet Cmty. & Ent. Corp. v. Washington State Gambling Comm'n*,
    169 Wash. 2d 687 (2010) ................................................................ 10

*Jane Doe No. 1 v. Backpage.com, LLC*,
    817 F.3d 12 (1st Cir. 2016) .............................................................. 51

*Kater v. Churchill Downs Inc.*,
    886 F.3d 784 (9th Cir. 2018) .................................................*passim*

*Kimzey v. Yelp! Inc.*,
    836 F.3d 1263 (9th Cir. 2016) ................................................. 24, 55

*Klayman v. Zuckerberg*,
    753 F.3d 1354 (D.C. Cir. 2014) ....................................................... 69

*Lemmon v. Snap, Inc.*,
    995 F.3d 1085 (9th Cir. 2021) ...............................................*passim*

*Lemmon v. Snap, Inc.*,
    440 F. Supp. 3d 1103 (C.D. Cal. 2020) .......................................... 45

*Leon v. Indiana Univ. Health Care Assocs., Inc.*,
    No. 1:22-CV-00937-JRS-MG, 2022 WL 16657961
    (S.D. Ind. Nov. 3, 2022) ................................................................... 4

*Lopez v. Smith*,
    203 F.3d 1122 (9th Cir. 2000) ........................................................ 69

*Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*,
    141 S. Ct. 13 (2020) .......................................................................... 2

*Mamani v. Berzain*,
    825 F.3d 1304 (11th Cir. 2016) ...................................................... 68

*Marvin v. Trout*,
    199 U.S. 212 (1905) .......................................................................... 2

*Massachusetts Port Auth. v. Turo Inc.*,
   487 Mass. 235 (2021) ................................................................ 52, 57

*Monarch Content Mgmt. LLC v. Arizona Dep't of Gaming*,
   971 F.3d 1021 (9th Cir. 2020) ........................................................ 28

*Monsarrat v. Newman*,
   28 F.4th 314 (1st Cir. 2022) .......................................................... 69

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
   138 S. Ct. 1461 (2018) ................................................................... 28

*Oberdorf v. Amazon.com Inc.*,
   930 F.3d 136 (3d Cir. 2019).......................................................54, 57

*Oberdorf v. Amazon.com Inc.*,
   936 F.3d 182 (3d Cir. 2019)............................................................ 54

*Oberdorf v. Amazon.com Inc.*,
   818 F. App'x 138 (3d Cir. 2020) ..................................................... 54

*Oberdorf v. Amazon.com Inc.*,
   661 Pa. 535, 237 A.3d 394 (2020) .................................................. 54

*Pavelic & LeFlore v. Marvel Ent. Grp.*,
   493 U.S. 120 (1989) ........................................................................ 61

*Perfect 10, Inc. v. CCBill LLC*,
   488 F.3d 1102 (9th Cir. 2007) ........................................................ 33

*Pinnacle Ventures LLC v. Bertelsmann Educ. Servs. LLC*,
   No. 18-CV-03412-BLF, 2019 WL 4040070
   (N.D. Cal. Aug. 26, 2019) ........................................................ 63, 64

*Reese v. BP Expl. (Alaska) Inc.*,
   643 F.3d 681 (9th Cir. 2011) ........................................................... 4

*State v. Marvin*,
211 Iowa 462, 233 N.W. 486 (1930) ................................................. 35

*Taylor v. Apple, Inc.*,
No. 20-CV-03906-RS, 2021 WL 11559513
(N.D. Cal. Mar. 19, 2021) ................................................................. 31

*There to Care, Inc. v. Comm'r of Indiana Dep't of Revenue*,
19 F.3d 1165 (7th Cir. 1994) ............................................................ 32

*United States ex rel. Michaels v. Agape Senior Cmty., Inc.*,
848 F.3d 330 (4th Cir. 2017) ............................................................ 68

*YZ Prods., Inc. v. Redbubble, Inc.*,
545 F. Supp. 3d 756 (N.D. Cal. 2021),.............................................. 56

## Rules and Statutory Provisions

18 U.S.C. § 1962 ...................................................................................... 3

28 U.S.C. § 1292 ................................................................................... 3, 4

28 U.S.C. § 1331 ...................................................................................... 3

28 U.S.C. § 1332 ................................................................................... 2, 3

28 U.S.C. § 1367 ...................................................................................... 3

47 U.S.C. § 230 ................................................................................*passim*

Fed. R. Civ. P. 8 ................................................................................ 61, 64

Fed. R. Civ. P. 12 ................................................................................... 60

## Other Authorities

Founders Letter, 2021, from Mark Zuckerberg, Meta (Oct. 28, 2021),
https://about.fb.com/news/2021/10/founders-letter/......................... 1

Natasha Dow Schüll,
    *Addiction by Design: Machine Gambling in Las Vegas* (2014) ....... 8

**INTRODUCTION**

In 1996, Congress passed Section 230 of the Communications Decency Act to allow online computer services that operate virtual discussion forums to "perform some editing on user-generated content without thereby becoming liable for all defamatory or otherwise unlawful messages that they didn't edit or delete." *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008) (en banc). In the quarter-century since Congress passed Section 230 of the Communications Decency Act, the internet has become ubiquitous, and technology companies now speak of an "embodied internet" where "you'll be able to do almost anything you can imagine—get together with friends and family, work, learn, play, shop, [and] create[.]" Founders Letter, 2021, from Mark Zuckerberg, Meta (Oct. 28, 2021), https://about.fb.com/news/2021/10/founders-letter/.

As it turns out, you can also gamble. The defendants in these three cases—Apple, Google, and Meta—each act as the cashier's cage for a bevy of online casinos that offer slot machine gambling, complete with spinning reels and flashing lights. They broker the transfer of billions of dollars from eager gamblers to the slot machine operators,

1

keeping a 30% cut for themselves. And although "the power of the state to enact laws to suppress gambling cannot be doubted," *Marvin v. Trout*, 199 U.S. 212, 224 (1905), the defendants insist that Section 230 immunizes them from the liability they would face if they engaged in the exact same conduct offline.

This tactic is nothing new for these companies, who have been asking courts to stretch Section 230 far beyond what Congress intended for years. *See Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 14-15, 17-18 (2020) (statement of Thomas, J.). This Court, however, has "consistently eschewed an expansive reading of the statute that would render unlawful conduct magically lawful when conducted online." *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 683 (9th Cir. 2019) (cleaned up). The district court correctly refused to confer immunity for the act of brokering illegal gambling transactions, and this Court should do the same.

## STATEMENT OF JURISDICTION

1.    The district court has jurisdiction over these actions under 28 U.S.C § 1332(d) because (1) they are class actions; (2) the defendants are corporations that have their principal places of business in

California and are organized under the laws of either California (Apple, Inc.) or Delaware (Meta Platforms, Inc. f/k/a Facebook, Inc. and Google LLC[1]); (3) one of the class members in each action is Jennifer Andrews, a natural person and a citizen of Minnesota; and (4) the amount in controversy is greater than $5,000,000 in each action. Apple-ER-149–50; Google-ER-234–35; Meta-2-ER-260–61.[2] The district court also has jurisdiction under 28 U.S.C. § 1331 because Plaintiffs allege violations of 18 U.S.C. § 1962(c)-(d) and can exercise supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367. *Id.*

2.     This Court's jurisdiction over these interlocutory appeals depends on 28 U.S.C. 1292(b) and (e). The district court *sua sponte* certified the orders entered in these cases for interlocutory appeal on September 2, 2022. Apple-ER-39. As required by § 1292(b), the district court determined its order involved "controlling questions of law" on

---

[1]     *See* 28 U.S.C. 1332(d)(10) ("For purposes of this subsection and section 1453, an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized.").

[2]     As at the petition stage, Plaintiffs respond to the defendants' briefs in a consolidated fashion. For references to the district court's order—entered in all three cases in identical form—only Apple's excerpts of record are cited.

which "reasonable minds could differ" and that "immediate appeal would materially advance the ultimate termination of the litigation." Apple-ER-38. Defendants each filed a petition for interlocutory review. Pursuant to 28 U.S.C. § 1292(e) and Federal Rule of Appellate Procedure 5(b)(2), Plaintiffs filed cross-petitions. *See also Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011) (holding that the Court has jurisdiction to review an issue not certified if raised in a cross petition). The motions panel of this Court granted the petitions and cross petitions. While Plaintiffs asserted at the petition stage that the Court lacked jurisdiction over Defendants' interlocutory appeals, the panel reviewing the merits "defer[s] to the ruling of the motions panel granting an order for interlocutory appeal," *id.*, so Plaintiffs assume that the matter has already been adjudicated.

3.     The defendants in each case filed petitions for interlocutory appeal on September 12, 2022, and the plaintiffs in each case timely filed cross-petitions on September 22, 2022, as required by Federal Rule of Appellate Procedure 4(b)(2).

## ISSUES PRESENTED FOR REVIEW

1.      Whether an online service acts as a "publisher or speaker" under 47 U.S.C. § 230(c)(1) when it brokers gambling transactions for a social casino in violation of state law.

2.      Whether Federal Rules of Civil Procedure 8(d)(2) and 12(b)(6) permit a district court to dismiss some theories of liability but not others, without dismissing any particular claim.

## STATEMENT OF THE CASE

### I.      Factual Background

Defendants Meta (formerly Facebook), Apple, and Google (the "Platforms") are three of the largest technology companies in the world. As part of their many tiered business models, each operates some version of an online app store, which permits independent app developers to deploy applications for use within the Platforms' online ecosystem. The Platforms operate the app stores, allowing users to browse the different offerings by third-party developers and choose which ones to download, often for a payment.

Many of these applications are innocuous—think the New York Times crossword puzzle. The ones at issue in this case, however, are illegal, unlicensed casinos, known in the industry as "social casino"

5

games. Just as in brick-and-mortar establishments, these virtual casinos allow players to exchange real money for virtual "chips" and gamble those chips at slot machines in hopes of winning still more chips to keep gambling. While third-party developers are the ones running the slots, the Platforms happily sit behind the virtual glass in the cashier's cage, processing every transaction and taking a 30% cut off the top for their services. These unlawful transactions form the basis of Plaintiffs' claims against the Platforms.

### A. Social Casino Games Offer Illegal Gambling.

Social casino games have been before this Court before, in *Kater v. Churchill Downs Inc.*, which held that a social casino was, indeed, illegal gambling. 886 F.3d 784, 785 (9th Cir. 2018) ("[D]espite collecting millions in revenue, Churchill Downs, like Captain Renault in *Casablanca*, purports to be shocked—shocked!—to find that Big Fish Casino could constitute illegal gambling. We are not."). Plaintiffs allege that the roughly 50 social casino games at issue in these cases operate in the same manner, in all material respects, as the game at issue in *Kater*. Meta-2-ER-258–59; Google-ER-232; Apple-ER-147.

6

Social casino apps are designed to look and feel like the electronic slot machines found in traditional casinos. Meta-2-ER-262. And like in traditional casinos, social casinos operate on a system of "chips" (some games call them "coins" or use other similar names), which "are a credit that allows a user to place another wager or re-spin a slot machine." *Kater*, 886 F.3d at 787; *see also* Apple-ER-151–52; Meta-2-ER-262–63; Google-ER-236–37. After players burn through a small allotment of free chips, they put up real money to get more. Apple-ER-144; Google-ER-229; Meta-2-ER-254–55. "[I]f a user runs out of virtual chips and wants to continue playing …, she must buy more chips to have the 'privilege of playing the game.' Likewise, if a user wins chips, the user wins the privilege of playing … without charge." *Kater*, 886 F.3d at 787; *see also* Apple-ER-151–52; Meta-2-ER-262–63; Google-ER-236–37. These characteristics are what make the social casinos illegal gambling games in at least one state—and Plaintiffs allege many more—even though the chips are not redeemable for cash. *See, e.g.*, *Kater*, 886 F.3d at 787 (rejecting argument that whether social casino was an illegal gambling game depended on whether players can redeem chips "for money or merchandise").

7

**B.**   **Social Casinos Bring in Massive Profits by Targeting and Exploiting Addicted Players.**

States ban unlicensed gambling for good reason: it's addictive and extraordinarily pernicious, regardless of if what players win is cash or additional chances to spin the wheel. *See* Apple-ER-145; Google-ER-230; Meta-2-ER-255; *see generally* Natasha Dow Schüll, *Addiction by Design: Machine Gambling in Las Vegas* 19 (2014) ("[I]t is not the chance of winning to which [slot machine gamblers] become addicted; rather, what addicts them is the world-dissolving state of subjective suspension and affective calm they derive from machine play."). The losses are staggering. Last year alone, consumers gambled away an estimated *$6 billion USD* in social casino chips. Apple-ER-146; Google-ER-231; Meta-2-ER-256. In a single year, just one of these social casinos takes in approximately $400 million. Apple-ER-147; Google-ER-232; Meta-2-ER-258.

Worse, the losses are not evenly distributed among players. Social casinos target and exploit what they call "whales"—their highest spending users. Some of the plaintiffs are among them. Plaintiff Ben Kramer has lost approximately $220,000 at social casinos, devastating his financial future and nearly ending his marriage. Apple-ER-161.

8

Ashley Honeysuckle has lost about $30,000, causing her to fall behind on her rent and car payments. *Id.* Sheri Miller and Jennifer Andrews have each lost at least $50,000 gambling on social casinos. Meta-2-ER-275–78; Google-ER-249. Eleanor Mizrahi, twice that amount. Meta-2-ER-278.

In the states that are at issue in this litigation, victims of illegal gambling can sue the winner, dealer, or proprietor of the game to recoup their losses. Those states also make it unlawful to broker or profit from unlawful gambling transactions and offer injured people a remedy. And here, Plaintiffs in these cases seek relief from the Platforms that profit handsomely from their business decision to enter into financial relationships with the developers of social casino apps. *See* Apple-ER-174–223; Google-ER-258–311; Meta-2-ER-283–331.

## C. The Platforms Act as the Cashier's Cage for Social Casino Apps.

The Platforms play several roles with respect to the virtual casinos. One of those roles is to operate the app stores, which allow developers to make their apps available to the public. Each of the Platforms has their own app store. And for many innocuous free apps,

making the app available through the app store is the extent of the relationship between app developer and platform.

For social casinos, however, the Platforms play an additional role: that of exclusive payment processor and banker. As discussed above, when users run out of chips, they in fact exchange real money to get more. At a traditional casino, this would happen at the cashier's cage. In social casinos, however, the Platforms operate the cashier's cage, not the app developers.[3] Apple-ER-159; Google-ER-245–46; Meta-2-ER-270–71. The Platforms have entered into agreements with each of the social casino app developers to act as the *sole* payment processor for all users on that platform. *Id.* That means that if a player downloads a social casino app onto her iPhone, the only way to exchange money for chips is through Apple. If she's on an Android phone, she has to go through

---

[3] Google and Meta appear to disagree with or otherwise dislike Plaintiffs' use of the term "bookmaker" to describe their role. Although there are varying definitions, at least one state supreme court holds that "bookmaking is charging a fee for the opportunity to place a bet[.]" *Internet Cmty. & Ent. Corp. v. Washington State Gambling Comm'n*, 169 Wash. 2d 687, 695 (2010). Plaintiffs' claims do not rest on any particular statutory definition of "bookmaking," so to avoid a satellite dispute, they will use a more precise land-based casino metaphor in this brief.

Google, and if she's playing through Facebook, then Meta brokers the exchange.

The Platforms demand such agreements from all app developers because it is an extraordinarily lucrative business model. *Id.* While a credit card processor might take a few percent as a transaction fee, the Platforms take a whopping 30% of all chip transactions. *Id.* That means that of one social casino app's $400 million in illegal gambling revenue, the Platforms kept $120 million. Apple-ER-147; Google-ER-232; Meta-2-ER-258. And to be clear, there's nothing secret about what the transactions in these games are for. Apple-ER-148; Google-ER-232; Meta-2-ER-259. As all of the Platforms know, substantially all of the chips they're selling are for the purpose of gambling. Apple-ER-152; Google-ER-237; Meta-2-ER-263.

While Plaintiffs allege a number of claims against each defendant under the laws of various states, the claims each ultimately boil down to the contention that Platforms are liable because they conducted illegal gambling transactions or themselves engaged in harmful and unfair business practices by virtue of conducting those transactions. *See* Apple-ER-174–223; Google-ER-258–311; Meta-2-ER-283–331. More

11

specifically, Plaintiffs allege that it is illegal for the Platforms to broker the gambling transactions or to profit from gambling activity, and that they are entitled to redress for the injuries caused by that unlawful conduct. *See* Ala. Code § 8-1-150(a); Ala. Code § 8-19-1; Ark. Code. Ann. § 16-118-103; Ark. Code Ann. § 4-88-101; Conn. Gen. Stat. Ann. § 52-554; Conn. Gen. Stat. Ann. § 42-110a; Cal. Bus. & Prof. Code § 17200; Ga. Code Ann. § 13-8-3; Ga. Code Ann. § 10-1-390; 720 Ill. Comp. Stat. Ann. 5/28-8; 815 Ill. Comp. Stat. Ann. 505/1; Ind. Code Ann. § 34-16-1-2; Ky. Rev. Stat. Ann. § 372.020; Ky. Rev. Stat. Ann. § 367.110; Minn. Stat. Ann. § 541.20; Miss. Code Ann. § 87-1-5; Mo. Ann. Stat. § 434.030; Mo. Ann. Stat. § 407.020; Mont. Code Ann. § 23-5-131; N.M. Stat. Ann. § 44-5-1; N.M. Stat. Ann. § 57-12-3; N.J. Stat. Ann. § 2A:40-5; N.J. Stat. Ann. § 56:8-2; N.Y. Gen. Oblig. Law §§ 5-419 & 5-421; Ohio Rev. Code § 3763.02; Or. Rev. Stat. § 30.740; S.C. Code § 32-1-10; Tenn. Code § 28-3-106; Va. Code Ann. § 11-15; Wash. Rev. Code § 4.24.070; Wash. Rev. Code § 19.86.020; W. Va. Code § 55-9-2; and W. Va. Code § 46A-6-104.

## II. Procedural Background

The actions against the three defendants are separate from each other, but each is pending before the same district judge, who is

coordinating certain pretrial matters for efficiency, including motions to dismiss. After the complaints were filed, the defendants indicated that they intended to seek dismissal of the case on multiple grounds. However, because all three defendants were raising the issue of immunity under Section 230 of the Communications Decency Act, the district court decided to resolve that issue separately, before discovery and before any other issues were reached. To be clear, the district court did not conduct an analysis of whether social casino games are in fact, gambling under the laws of various states; that will occur later. Google-ER-128.

Each of the Platforms filed a separate motion to dismiss, which Plaintiffs in all three cases responded to jointly. After briefing and argument, the district court then entered the same order in all three cases, which granted the motions to dismiss in part, denied them in part, *sua sponte* certified the question for interlocutory review, and stayed the cases pending that review.

In the order, the district court undertook an in-depth review of this Court's jurisprudence on Section 230. Then, although Plaintiffs neither pleaded nor argued their case in this manner, the district court

13

divided Plaintiffs' allegations into three separate "theories" and considered whether each of those theories survived Section 230's grant of immunity.

The district identified the first theory as "offering, categorizing, and promoting social casino applications in their respective app stores," although Plaintiffs never argued that these actions were a basis for liability. The district court determined that Section 230 did confer immunity for these actions and "dismissed" the theory. Apple-ER-34.

The second theory identified by the district court is that Defendants are liable for the "processing of *unlawful* transactions for *unlawful* gambling." Apple-ER-35. This is the theory that Plaintiffs primarily argued in their opposition to Defendants' motion to dismiss. On this revenue-based theory, the district court held that "the requested relief is grounded in the Platforms' own bad acts, not in the content of the social casino apps that the Platforms display on their websites." *Id.* It therefore declined to apply Section 230 immunity.

The third theory is that Defendants "are closely involved in social casinos' business strategies" such as by assisting social casino developers in targeting high-spending users, or whales. Apple-ER-34.

14

Noting that this theory was the "trickiest," the district court determined that the business assistance Defendants are alleged to have provided to the social casino apps "is like an editor providing edits or suggestions to a writer," and that conduct falling under this "classic editorial role" is therefore subject to Section 230 immunity. Apple-ER-36–37. The district court "dismissed" this theory as well.

Finally, the district court *sua sponte* certified the order for interlocutory review under 28 U.S.C. § 1292(b) and stayed proceedings. Apple-ER-37–38. These appeals followed.

## SUMMARY OF THE ARGUMENT

Apple, Google, and Meta operate the cashier's cage for unlawful social casino apps, brokering payments for bets and pocketing a share of players' money. The Platforms seek immunity under the Communications Decency Act for their active, voluntary role in enabling illegal gambling, but their conduct in brokering unlawful transactions is worlds apart from the publishing activity that Section 230 protects. The Court should decline the invitation of major technology companies to expand Section 230 far beyond Congress's intention so that it effectively

grants them blanket immunity for nearly everything that they do, so long as it relates in some way to user content.

As a preliminary matter, the question of whether the social casino apps here constitute illegal gambling is irrelevant on these interlocutory appeals. The district court's order extends only to whether Section 230 bars these claims, and it assumed that the social casino apps offer illegal gambling for purposes of analyzing the Platforms' immunity defense. The Platforms' implications to the contrary are distractions, not legal arguments.

Turning to the substance of the Section 230 issue, this Court's decision in *HomeAway* is dispositive. At its core, this case targets the Platforms' decision to act as banker, broker, and profiteer for illegal gambling enterprises. Their liability arises from operating the casino cashier's cage, not from any exercise of editorial discretion or anything even resembling traditional publishing activity. That the Platforms may have business reasons to want to monitor third-party content is irrelevant to the Section 230 analysis, because Plaintiffs' claims seek to treat the Platforms as brokers of financial transactions, not publishers.

16

It is similarly irrelevant that the Platforms have bundled financial services with app store publishing to maximize profits. While the Court has found that offering neutral tools like search functions or algorithms does not equate to creating one's own content, the neutrality analysis has nothing whatsoever to do with the question of whether conduct constitutes publishing in the first place. Brokering unlawful gambling transactions is unnecessary to the display of third-party apps or any other publishing activity that the Platforms engage in. Such ancillary services fall completely outside Section 230, no matter how strategically intertwined by business model.

Finally, the district court erred procedurally in dismissing "theories" under Rule 12(b)(6), which permits only dismissal of claims. The proper course on appeal is to modify the order to an outright denial, avoiding advisory opinions on interlocutory appeal and allowing full factual development on the Platforms' involvement in targeting addicted "whales."

The Court should modify the order and affirm to hold the Platforms accountable for their own unlawful gambling transactions.

Section 230 cannot shield those who handle the cash for online casinos from longstanding state anti-gambling laws.

## ARGUMENT

### I. Whether the Social Casino Apps Constitute Gambling Is Not At Issue in These Appeals.

These appeals are about the reach of immunity under Section 230 of the Communications Decency Act, not whether the Plaintiffs have properly alleged that the social casino apps at issue here offer gambling. Nevertheless, all of the Platforms expound—sometimes at great length—on their apparent belief that the social casino apps are harmless fun and not insidious, unregulated gambling that allows them to pocket millions while destroying lives. *See, e.g.*, Apple Br. at 21, 42-43; 51–53; Google Br. at 5–6; Meta Br. at 10–13; 41–42.

To the extent the Platforms are truly arguing that the Court should find that the apps at issue here are not gambling, it is entirely inappropriate. The district court has not yet considered the application of each state's gambling law to the allegations in the complaint. Rather, the order on appeal considered *solely* the question of Section 230. And on an interlocutory appeal, this Court "decline[s] to reach any issues that are not encompassed within the certified order issued by the

18

district court." *Deutsche Bank Nat. Tr. Co. v. FDIC*, 744 F.3d 1124, 1135 (9th Cir. 2014). For the purposes of this appeal, the Court should accept the district court's decision to leave the issue of whether the apps constitute gambling under state law to another day. *See* Google-ER-128.

Given that none of the Platforms actually engage in any meaningful analysis of any state gambling statute, it appears that the actual import of these arguments is not to stake out any actual legal position, but to make these cases seem trivial. The Platforms have a vested interest in calling social casino apps "make-believe gambling," Meta. Br. at 13, but there is nothing make-believe about either the fact that it is gambling or the harms that it causes. As Plaintiff Ben Kramer explained in the declaration attached to the Apple and Meta complaints:

> DoubleDown has affected my life in so many ways. First, the money I have spent on this game is hard to talk about. Overall, I believe that I have spent well over $220,000 playing DoubleDown. … My husband and I dreamed of paying off our house and retiring at age 60. My addiction to DoubleDown likely ruined that plan. The financial consequences have caused a lot of strain in our relationship. When I got hooked on DoubleDown again, I lied to my husband about the total amount I had spent because I was afraid he would divorce me if he were to find out the real amount. He found out anyway, and when he did, he contacted a divorce attorney to start the process of separation. Luckily for me, he decided to give me

> another chance. I am so thankful for his patience with me, but
> I feel terrible that I have put him through all this.

Apple-ER-229–30.

Meta and the other Platforms are free to argue that they are not legally responsible for Mr. Kramer's harms but waving off social casino apps as "pretend" and "make-believe" or comparing them to classic arcade games is both inaccurate and callous. The casino chips in this case are not "virtual ghosts in a game of Pac-Man," Apple Br. at 21, nor are they "a figment of the game—just like the gold coins Mario collects in 'Super Mario Bros,'" Meta Br. at 10. Unlike the games of chance at issue in this case, Pac-Man and Super Mario Bros. are games of skill. Pac-Man players maneuver the hero to gobble up dots while using their reflexes to avoid evil ghosts. At no point do Pac-Man players buy ghosts, load them into a slot machine, and spin away their retirement savings.

It is settled law that social casino games, unlike Pac-Man, are illegal gambling in at least one state. *Kater*, 886 F.3d at 787 (holding that virtual casino chips are "things of value" and social casino was therefore gambling because "virtual chips extend the privilege of playing" the game); *see also* Meta Br. at 10 ("The virtual chips … can be used only to extend … the gameplay ….") *and* Apple Br. at 10

("Purchased chips 'extend game- play' in the apps."). Plaintiffs allege that the law of many other states is in accord. This will be a matter of substantial briefing and argument in the district court as this case progresses. For now, however, it suffices to say that Plaintiffs' claims will only succeed if the social casino transactions that the Platforms broker are unlawful, and that it was entirely reasonable for the district court to undertake the Section 230 analysis assuming, without deciding, that they are. None of the Platforms state otherwise, so there is no reason to consider their contrary innuendo.

The only issue in the Platforms' appeals is a legal one: Does Section 230 immunize the Platforms from liability if they process illegal gambling transactions? The Court reviews the district court's order denying the motions to dismiss on those grounds de novo. *Fortyune v. City of Lomita*, 766 F.3d 1098, 1101 (9th Cir. 2014).

## II.    Plaintiffs' Claims Do Not Seek to Treat Defendants as Speakers or Publishers.

Section 230 of the Communications Decency Act "protects certain internet-based actors from certain kinds of lawsuits." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1099 (9th Cir. 2009). "The statute is designed at once 'to promote the free exchange of information and ideas over the

Internet and to encourage voluntary monitoring for offensive or obscene material.'" *Id.* at 1099-1100. However, "Congress has not provided an all purpose get-out-of-jail-free card for businesses" that operate online, *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 853 (9th Cir. 2016), and this Court has repeatedly warned of the need to "be careful not to exceed the scope of the immunity provided by Congress," *id.* (quoting *Roommates.Com, LLC*, 521 F.3d at 1164 n.15).

Defendants rely heavily on early decisions of this Court that, at times, used "language … that was unduly broad" to describe the scope of that immunity. *See Roommates.Com*, 521 F.3d at 1171. The correct analysis is that immunity extends only as far as causes of action that treat the defendant as publishers, which means imposing a duty to engage in the types of traditional editorial activities that a publisher would undertake or holding them liable for engaging in those activities. Brokering unlawful transactions, and particular unlawful gambling transactions, does not fall into that category. It does not involve putting up or taking down content, nor does it necessarily require monitoring that content in a way that a publisher might. And nothing in this Court's precedent suggests that Section 230 extends to all conduct that

takes place online, as long as it doesn't leave the internet. The Court should faithfully follow its precedents and hold that illegal gambling is not publishing.

### A. Section 230 Immunity Extends Only to Treating Interactive Computer Services as Speakers or Publishers.

The operative statute here is 47 U.S.C. § 230(c)(1), which provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." "Though somewhat jargony, this provision shields from liability those individuals or entities that operate internet platforms, to the extent their platforms publish third-party content." *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1090-91 (9th Cir. 2021). Its main purpose is to permit websites "to self-regulate offensive third party content without fear of liability." *Internet Brands,* 824 F.3d at 852. Without the immunity provided by Section 230, Congress was concerned that websites who removed some offensive content posted by their users might wind up liable for all of the other offensive content that they didn't remove. *Id.*

To be clear, however, "the CDA does not provide a general immunity against all claims derived from third-party content." *Internet Brands*, 824 F.3d at 853. Rather, to determine whether Section 230(c)(1) bars a cause of action, the Court applies "the three-prong test set forth in *Barnes v. Yahoo!, Inc.*," under which a defendant "enjoys CDA immunity only if it is (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Lemmon*, 995 F.3d at 1091 (quotation marks omitted).

The first prong grants Section 230 immunity to a relatively broad range of entities, since the definition of "interactive computer service" includes effectively anyone who runs a website or internet platform *See Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003). Inquiries into the third prong consider whether the content is actually someone else's or whether it is the website's own. *See, e.g., Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1266 (9th Cir. 2016) (explaining that Section 230's "grant of immunity applies only if the interactive computer service provider is not also an 'information content provider,' which is defined

as someone who is 'responsible, in whole or in part, for the creation or development of' the offending content.'").

The Platforms' appeals relate to the second prong, which requires courts to "ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker'" of someone else's content. *Barnes*, 570 F.3d at 1102. "In this particular context, 'publication' generally 'involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content.'" *Lemmon*, 995 F.3d at 1091 (quoting *HomeAway*, 918 F.3d at 681) (alteration omitted). If the alleged duty does not derive from those activities, then there is no immunity under Section 230. *Barnes*, 570 F.3d at 1102.[4]

### B. Processing Unlawful Transactions Alongside Publishing Activity Does Not Transform the Transaction Into Publication.

This Court's recent decision in *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676 (9th Cir. 2019), illustrates the limiting principle found in the second *Barnes* prong and is dispositive here. In

---

[4] The Platforms suggest that Plaintiffs concede that the third prong is met. That is inaccurate. The analysis ends with the failure of the second.

*HomeAway*, the plaintiff platforms operated websites that were essentially "online marketplaces that allow[ed] 'guests' seeking accommodations and 'hosts' offering accommodations to connect and enter into rental agreements with one another." *Id.* at 679. These hosting platforms displayed vacation rental listings supplied by the hosts and also facilitated the bookings, collecting a fee for each successful one. *Id.* To combat the social ills caused by a proliferation of unlicensed vacation rentals, a city passed an ordinance requiring that hosting platforms "refrain[] from completing any booking transaction for properties not licensed and listed on the City's registry." *Id.* at 680. The hosting platforms sued the city, alleging that Section 230 preempted the ordinance.

This Court rejected the hosting platforms' argument that the ordinance treated them as the publishers of the third-party listings. The challenged ordinance, the Court explained, did not force the hosting platforms to alter, review, monitor, or perform any other publishing activity with respect to the third-party listings *Id.* at 682-83. Rather, it "require[d] only that transactions involve licensed properties." *Id.* at 683. Any liability that was faced by the hosting platforms under the

26

ordinance arose "only from unlicensed bookings"—that is, the hosting platforms' own conduct in brokering a transaction made unlawful by the ordinance—and not from the content of any listing or booking provided by a third party. *Id.* at 684; *cf. Force v. Facebook, Inc.*, 934 F.3d 53, 84 (2d Cir. 2019) (Katzmann, C.J, concurring in part and dissenting in part) ("Plaintiffs' material support and aiding and abetting claims premise liability, not on publishing *qua* publishing, but rather on Facebook's provision of services and personnel to Hamas. It happens that the way in which Facebook provides these benefits includes republishing content, but Facebook's duties … arise separately from the republication of content.").

Accordingly, even though the transaction was prompted by the hosting platforms' publication of the third-party listing, the Court determined that regulation governing the booking transaction itself did not reach publication activities. This is the key teaching of *HomeAway*: Section 230 provides immunity for conduct that actually constitutes publishing, not for brokering distinct and unlawful transactions that occur alongside publishing, even if the transactions wouldn't have happened absent the publication.

27

**C.  The Platforms' Liability Results from Brokering Unlawful Gambling Transactions, Not Publishing Apps.**

The Platforms in this case are in the same position as the hosting platforms in *HomeAway*. Like the hosting platforms, they allow third parties (social casino app developers) to post content (social casino apps) using the Platforms' online services (the app stores). And like the hosting platforms, that is not the only facet of the Platforms' business. On top of hosting social casino apps in their app stores, the Platforms *also* broker transactions prompted by those apps—the purchase of chips for the purpose of gambling. They then "collect a fee from each successful" gambling transaction. *See HomeAway*, 918 F.3d at 679 n.1.

Like in *HomeAway*, the Platforms' liability stems from engaging in unlawful transactions of a type that are strictly regulated at the state level. *Cf. Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1483 (2018) (explaining the federal policy to "respect the policy choices of the people of each State on the controversial issue of gambling"); *Monarch Content Mgmt. LLC v. Arizona Dep't of Gaming*, 971 F.3d 1021, 1028 (9th Cir. 2020) ("[T]he regulation of gambling lies at the heart of the state's police power[.]"). As permitted by Section 230,

"any liability arises only from unlicensed [transactions]." *See HomeAway*, 918 F.3d at 684. Specifically, Plaintiffs allege that the Platforms' act of brokering gambling transactions for unlicensed social casino apps and taking a cut of the money is unlawful and entitles them to relief. Apple-ER-174–217; Google-ER-258–306; 2-Meta-ER-283–326.

In sum, the duty imposed on the Platforms does not involve publishing or declining to publish any social casino app or any other content. The Platforms' liability results from their decision to enter into financial relationships with the social casino apps by which it brokers gambling transactions and keeps a whopping 30 percent of the profits. The corresponding duty is not to engage in or profit from unlawful financial transactions. Accordingly, as the district court correctly pointed out, "the requested relief is grounded in the Platforms' own bad acts, not in the content of the social casino apps that the Platforms display on their websites," and Section 230 does not apply. Apple-ER-35.

## D. Brokering Gambling Transactions Is Not Part of Being a Publisher.

In response, Google promises that if it is held to account for brokering and profiting from illegal gambling transactions, the result

would be that "any plaintiff harmed by an unlawful podcast or newsletter could try to sue the online intermediary for their 'own bad acts' in 'processing of *unlawful* transactions for *unlawful*' content while disclaiming any attempt to impose liability for the hosting of the content." Google Br. at 36. Meta and Apple offer similar doomsday predictions. Meta Br. at 38-40; Apple Br. at 56.

The comparison is inapt, because Section 230 still grants immunity when an online service takes "action that is quintessentially that of a publisher." *Barnes*, 570 F.3d at 1103. For example, "removing content is something publishers do, and to impose liability on the basis of such conduct necessarily involves treating the liable party as a publisher of the content it failed to remove." *Id.* "It is because such conduct is *publishing conduct* that [the Court has] insisted that section 230 protects from liability 'any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online.'" *Id.* (emphasis in original)

Offering a subscription or selling a newsletter is quintessentially publishing conduct. *See id.* at 1102 (holding that "publication involves reviewing, editing, and deciding whether to publish or to withdraw from

30

publication third-party content"); *see also* "Publish," Black's Law Dictionary (11th ed. 2019) ("To distribute copies (of a work) to the public."). If all the Platforms did was put the casino apps up in their app stores, that would be publishing. *Compare Evans v. Hewlett-Packard Co.*, No. C 13-02477 WHA, 2013 WL 4426359, at *3 (N.D. Cal. Aug. 15, 2013) (applying immunity where defendant offered app for sale in app store) *with Taylor v. Apple, Inc.*, No. 20-CV-03906-RS, 2021 WL 11559513, at *4 (N.D. Cal. Mar. 19, 2021) ("Plaintiffs are seeking to hold Apple liable for selling allegedly illegal gaming devices, not for publishing or speaking information."). So would putting up an advertisement for a social casino website, even if there were a charge to do so. *See Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 824 (M.D. Tenn. 2013) ("In the realm of paid advertising, charging advertisers a fee in exchange for hosting and providing space for the advertisers' message 'is something publishers do'—online classified advertisement services included."); *Goddard v. Google, Inc.*, No. C 08-2738JF(PVT), 2008 WL 5245490, at *1 (N.D. Cal. Dec. 17, 2008) (applying immunity to functionality by which Defendant Google displayed a third party's

advertisements for allegedly fraudulent services in response to certain search terms).

Brokering a gambling transaction, however, is not quintessentially publishing conduct. The Court "need not perform any intellectual gymnastics to arrive at this result, for it is rooted in the common sense and common definition of what a publisher does." *See Barnes*, 570 F.3d at 1102. Gambling will always involve some combination of words, numbers, and pictures, but that does not turn slot machine transactions into publishing activities. *Cf. There to Care, Inc. v. Comm'r of Indiana Dep't of Revenue*, 19 F.3d 1165, 1167 (7th Cir. 1994) (Easterbrook, J.) (holding that bingo is conduct, not speech, because the words used "do not convey ideas"). Regardless of how many times the Platforms repeat the word "content," the fact remains that exchanging money for casino chips to be gambled and lost at a slot machine bears no resemblance to any editorial function. *See Barnes*, 570 F.3d at 1102.[5]

---

[5] What the Platforms likely mean when they repeat the word "content" is that they don't believe that social casino apps are really gambling. But in the states that ban social casino apps, the use of virtual casino chips does not make illegal gambling any less gambling,

The Platforms insist that the Court's decision in *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102 (9th Cir. 2007), overrides reason and compels the conclusion that selling casino chips is publishing. It does not. In that case, the Court did apply Section 230 immunity to a payment processor defendant, but it did not consider whether that defendant had acted as the publisher of third-party content. Instead, the panel merely relied on *Carafano v. Metrosplash.com, Inc.* for the proposition that Section 230 "establish[es] broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service," assumed that was sufficient to apply Section 230 to the defendants' conduct, and moved on to another part of the statute. *See id.* at 1118-19 (analyzing whether state law causes of action fall under the "intellectual property" exception to Section 230). The following year, however, the Court issued an en banc opinion that expressly "disavow[ed] any suggestion that *Carafano* holds an information content provider *automatically* immune so long as the content originated with another information content

---

or any less illegal. *See Kater*, 886 F.3d at 788 ("Because the virtual chips are a 'thing of value,' we conclude that Big Fish Casino falls within Washington's definition of an illegal gambling game.").

provider." *Roommates.Com*, 521 F.3d at 1171 n.31 (emphasis in original). To the extent that *Perfect 10* implies that payment processing is *per se* protected under Section 230, it has been abrogated.

Reaching even further into the past. Meta argues that operating a social casino's cashier's cage constitutes publishing because publishers sold books in the 17th century. Meta Br. at 38-39. Publishers do indeed sell books, but it isn't the selling part that makes them publishers. Publishers that give away books for free are engaged in the same editorial activity as the ones who charge money. That money is exchanged provides no information about whether or not an activity involves publishing. It does, however, provide a great deal of information about whether it involves gambling. *See Benson v. Double Down Interactive, LLC*, No. 2:18-CV-00525-RBL, 2020 WL 4607566, at *2 (W.D. Wash. Aug. 11, 2020) (quoting *Kater*, 886 F.3d at 787) (explaining that "[t]o extend 'the privilege of playing,' a user must either win more virtual chips or purchase them, making the chips a 'thing of value'" and the social casino a gambling game).

Recasting gambling as something else to skirt state law is nothing new. This Court and others have been seeing through similar ruses for

nearly a century. *See, e.g.*, *Kater*, 886 F.3d at 785; *Bullseye Distrib. LLC v. State Gambling Com'n*, 127 Wash. App. 231, 242, 110 P.3d 1162, 1166 (2005) (rejecting argument that would mean "one could combine the operation of any slot machine with the sale of a product, thus separating the consideration from the gambling device and marrying it to the product sale"); *State v. Marvin*, 211 Iowa 462, 233 N.W. 486, 486 (1930) (explaining that if a device functioned like a slot machine and dispensed tokens that functioned as a movie ticket, their "character as a gambling device would be readily recognized"); *Green v. Hart*, 41 F.2d 855, 856 (D. Conn. 1930) (holding that machine offered gambling where winning players received tokens that entitled them to "readings of witty sayings or prophecies" because "the number of readings which a player receives is dependent upon the number of tokens received"). So while the Platforms accuse Plaintiffs of "creative" pleading, it is the Platforms who are engaged in creative recharacterization of gambling transactions as publishing in an attempt to apply immunity far beyond Congress's intent. The district court correctly declined to ignore "the common sense and common definition of what a publisher does," *see Barnes*, 570 F.3d at 1102, and this Court should do the same.

35

### E. State Gambling Laws Create No Duty for Defendants to Monitor the Third-Party Content They Host.

The Platforms also contend that *HomeAway* supports their position because the district court's order would require them to "monitor" third-party content. Meta Br. at 40-41; Apple Br. at 51–52; Google Br. at 34-35. This argument depends on the Court's analysis in *HomeAway*, which considered whether the duty imposed "would necessarily require an internet company to monitor third-party content." 918 F.3d at 682.

As an initial matter, the Platforms all miss important context. The Court has used the term "monitoring" only in the sense that it involves publication activity. *See id.* (referring to "monitoring or other publication activities"); *Internet Brands*, 824 F.3d at 852 (holding that a claim was not barred by Section 230 because it had "nothing to do with [the defendant's] efforts, or lack thereof, to edit, monitor, or remove user generated content"). Brokering a gambling transaction is not publishing, and the purpose of any monitoring that the Platforms would purportedly need to do is not policing or removing user content, like a publisher would do.

Nevertheless, the Platforms insist that "Section 230 bars liability theories that would require an online service 'to remove any user content or otherwise affect how it publishes or monitors such content.'" Meta Br. at 40 (quoting *Internet Brands*, 824 F.3d at 851); *see also* Apple Br. at 50–51; Google Br. at 34-35. In fact, *HomeAway* holds exactly the opposite. 918 F.3d at 682 (rejecting "the view that CDA immunity follows whenever a legal duty 'affects' how an internet company 'monitors' a website"). Section 230 extends only to situations where a duty "*necessarily* require[s] an internet company to monitor third-party content" in the manner of a publisher. *Id.* (emphasis added). It does not encompass situations where monitoring and removing third-party content would be the "best option 'from a business standpoint'" or even "the most practical … option[.]" *Id.* at 683. Thus, the Court found no fault with the ordinance at issue in *HomeAway* even though it required the hosting platforms to review every single booking transaction individually for compliance. The monitoring required of the hosting platforms was deemed acceptable because it "relate[d] to incoming requests to complete a booking transaction—content that, while resulting from the third-party listings, is distinct, internal, and

37

nonpublic." *Id.* at 682. It was of no matter that, practically speaking, the hosting platforms would choose to monitor third-party content as a result of the duty to monitor incoming requests. *Id.*

Here, the Platforms complain that Plaintiffs seek to impose a duty to monitor every user's transactions across every app nationwide, cross-reference it with the content of the app and the user's location and make one-by-one determinations as to whether to allow the transaction to go forward. But monitoring incoming requests to complete financial transactions to ensure that they comply with applicable law is not publishing activity, and state regulations "can fairly charge parties with keeping abreast of the law without running afoul of the CDA." *Id.* at 683. The Platforms do not identify any editorial decision they are being forced to make, nor do they point to any requirement to conduct any function even remotely related to what a publisher would do. It should not be a surprise that brokering gambling transactions requires the Platforms to comply with state gambling laws, and the Platforms' "concerns about the administrative burdens of state and local regulations" cannot expand Section 230 beyond what Congress intended. *See id.* at 684.

This Court found no fault with requiring websites to monitor every user transaction, but to comply with their duties here, the Platforms do not even need to go that far. They need only monitor a much smaller set of incoming requests: those from app developers, asking that the Platforms enter into a financial relationship to process transactions and take a 30 percent cut. While those requests certainly result from the app developers' content, they are also distinct, internal, and nonpublic—precisely the type of request to broker a financial transaction that the Court found not to offend Section 230 in *HomeAway*. The Platforms could review if the request is to broker transactions that are legal or transactions that are illegal in some or all areas, then decide if they want to enter into the relationship. Whether the answer is yes or no is not an editorial decision and has no impact on publication, because apps can remain published and available on the Platforms' app stores, regardless of whether the Platforms agree to enter into a payment processing relationship with the developers of those apps.

In fact, the Platforms could even still continue to process transactions without reviewing the content of the apps. One approach

would be for the Platforms to refuse to process transactions for apps in the social casino category, regardless of the app's precise functionality. Another might be to condition payment processing services on an app developer's promise to indemnify the Platforms against allegations that the transactions were unlawful. Or, as Judge Katzmann suggested in his partial concurrence in *Force v. Facebook, Inc.*, 934 F.3d 53, 83 (2d Cir. 2019), they could simply stop brokering transactions altogether. While some of these options would dent the Platforms' bottom lines, none would require monitoring, reviewing, taking down, or otherwise acting in a publisher-type role with respect to any of the app developers' publicly-facing content.

It is similarly immaterial to the Section 230 analysis that, as a practical matter, the Platforms' refusal to enter into payment processing arrangements might prevent social casino apps from working at all. *See* Meta Br. at 52. The truth is that this problem could easily be remedied by permitting the social casino apps to process their own payments, which the Platforms do not want to allow them to do (so that they can keep taking their 30% cut). But even imagining that declining to enter into payment processing relationships with social

40

casino apps would cause the apps to break, so what? The Court faced the same scenario in *HomeAway*, where the housing platforms argued that banning unlicensed bookings resulted in them having to take down third-party content because "common sense explains that they cannot leave in place a website chock-full of un-bookable listings[.]" 918 F.3d at 683. The Court rejected the argument, holding that "[e]ven assuming that removing certain listings may be the Platforms' most practical compliance option, allowing internet companies to claim CDA immunity under these circumstances would risk exempting them from most local regulations and would, as this court feared in *Roommates.Com*, 521 F.3d at 1164, 'create a lawless no-man's-land on the Internet.'" *Id.* The Platforms have no duty to host only apps that function, and any choice to remove broken apps would not implicate Section 230.

In sum, imposing a duty not to broker unlawful gambling transactions does not necessarily require the Platforms to monitor third-party content, in the editorial sense. Rather, they have many options for how to handle requests from app developers to process payments, some of which do not involve monitoring anything other than

distinct, internal, and non-public requests to enter into a business relationship.

### F. *HomeAway* In No Way Depends on a "Brick-and-Mortar" Transaction.

Finally, all three of the Platforms contend that the holding of *HomeAway* doesn't apply because it involved bookings of brick-and-mortar properties, as where the unlawful gambling transactions here take place on the internet. Meta Br. at 50-51; Google Br. at 16; Apple Br. at 49. After stripping away the rhetoric and insinuations that social casino apps are not real gambling, this argument boils down to the contention that because Plaintiffs' claims "depend" on third-party content, Section 230 must apply. Apple Br. at 49–50; Google Br. at 28–31; Meta Br. at 29, 46–50. This contention is incorrect. There is no "but-for" test that provides immunity for all claims that depend on or otherwise involve third-party content. Rather, Section 230 can only apply if the claim would require thrusting the defendant into the role of publisher with respect to that content. If the defendant has another role—say, cashier—then Section 230 has no application.

That argument proves too much. *Everything* on the internet can, in some sense, be described as content. But the Court has repeatedly

42

"rejected use of a 'but-for' test that would provide immunity under the CDA solely because a cause of action would not otherwise have accrued but for the third-party content." *HomeAway*, 918 F.3d at 682; *accord Lemmon*, 995 F.3d at 1092; *Internet Brands*, 824 F.3d at 853. There can be no doubt "the CDA does not declare 'a general immunity from liability deriving from third-party content.'" *Internet Brands*, 824 F.3d at 853 (quoting *Barnes*, 570 F.3d at 1100). The Platforms do not explain how the CDA could simultaneously grant immunity solely because a claim "depends on" third-party content and not do so for all claims "derived from" third-party content. To put it in terms of formal logic, all claims that are "derived" from third-party content necessarily "depend" on third-party content, and not all claims "derived" from third-party content are the subject of immunity under Section 230. Therefore, it cannot be that all claims that depend on third-party content are the subject of immunity.

The Platforms' position is based on a misreading of this Court's opinion in *Lemmon v. Snap, Inc.* The Platforms each cite *Lemmon* for the premise that "[c]laims treat defendants as publishers when they 'depend [*sic*] on a third party's content, without which no liability could

have existed.'" Meta Br. at 29 (quoting *Lemmon*, 995 F.3d at 1094); *see also* Google Br. at 31 (same); Apple Br. at 1 (same); *id.* at 17 (same); *id.* at 20 (same); *id.* at 25 (same); *id.* at 29 (same); *id.* at 31 (same); *id.* at 40 (same); *id.* at 45 n.8 (same); *id.* at 47 (same). *Lemmon* contains no such holding. While Meta reproduces the quotation mostly accurately, it and the other Platforms fail to note that it has nothing to do with whether or not a claim treats a defendant as a publisher. The sentence fragment appears in the Court's analysis of the third *Barnes* factor: whether the claim "turn[s] on information provided by another information content provider." *Lemmon*, 995 F.3d at 1093. Answering that question does indeed turn on whether "a plaintiff's claim faults the defendant for information provided by third parties," which is why the Court wrote what it did. *See id.* That, as the Platforms all agree, has nothing to do with these appeals. Meta Br. at 28-29; Apple Br. at 26; Google Br. at 19.

Unsurprisingly, the real holding of *Lemmon* did not announce a rule that it eschewed two pages earlier. In that case, the plaintiffs alleged that the developer of a photo-sharing app had designed the app negligently in such a way that it encouraged teenagers to drive at high speeds for the purpose of taking a picture with a graphical overlay of a

speedometer, leading to a fatal car crash. *Lemmon*, 995 F.3d at 1092.
The trial court accepted the developer's argument "that the [third party]
content itself"—the teenager's picture—"is at the crux of Plaintiffs'
claims" and dismissed the case on the basis of Section 230. *Lemmon v.
Snap, Inc.*, 440 F. Supp. 3d 1103, 1112 (C.D. Cal. 2020), *rev'd and
remanded,* 995 F.3d 1085 (9th Cir. 2021). On appeal, this Court
reversed, explaining that because the "duty to design a reasonably safe
product is fully independent of [the app developer's] role in monitoring
or publishing third-party content," the negligent design claim did not
seek to treat the developer as a publisher. *Lemmon*, 995 F.3d at 1093. It
did not matter that the claim depended on the teenagers' use of the
photo-sharing app to create content.

Those principles have straightforward application to this case.
Like the Defendant in *Lemmon*, the Platforms here have multiple roles.
One of those roles is publishing third-party content through their app
stores. Another role is brokering financial transactions on behalf of the
third parties who operate apps in their app stores. When they broker
transactions, Plaintiffs allege that the Platforms have a duty to comply
with the same law that everyone else complies with when brokering

transactions: making sure that they're not unlawful gambling transactions. *See F.T.C. v. Accusearch Inc.*, 570 F.3d 1187, 1206 (10th Cir. 2009) (Tymkovich, J., concurring) ("While Internet publication of the confidential phone data, by itself, may very well be protected by the CDA, the CDA does not immunize, expressly or implicitly, the manner in which [the defendant] conducted its business."). They would have the same duty if the social casinos operated offline. *See id.* at 1206 n.5 ("[The defendant's] duty to refrain from engaging in the solicitation and distribution of unlawfully-obtained confidential telephone records should not depend on the medium within which it chooses to operate."). If compliance is made difficult by their nationwide operation, Section 230 is not the answer. *See HomeAway*, 918 F.3d at 684 ("We do not discount the Platforms' concerns about the administrative burdens of state and local regulations, but we nonetheless disagree that § 230(c)(1) of the CDA may be read as broadly as they advocate, or that we may ourselves expand its provisions beyond what Congress initially intended."). The duty is fully independent from any role the Platforms have in monitoring or publishing the third-party content that they host.

**III.** **Defendants' Business Decision to Couple Gambling Transactions with Publication Activities Does Not Confer Immunity for the Platforms' Own Actions.**

Perhaps recognizing that brokering gambling transactions is not actually publishing activity, the Platforms peddle the notion that Section 230 immunity applies because payment processing services are a "neutral tool" that they bundle together with the content they say they publish. Each contends that knowingly processing gambling transactions and taking a substantial cut of those transactions is "'part and parcel' of the publication of the casino-themed video games" and therefore protected as publishing activity. Meta Br. 48; *see also* Google Br. at 29 ("Google acts as the publisher of these virtual chips by making them available to the users who purchase them, using the same tools generally available to all apps and paid content on Google's platform."); Apple Br. at 46 ("Apple merely provides neutral and non-tortious tools for all developers to conduct in-app transactions with consumers[.]").

The Court has *never* employed the neutral tools analysis this way. When the Court has considered whether a tool or feature is neutral, it has always been to answer the question of who was publishing content, not whether an act involved publication at all. By contrast, when the

47

legal question is whether an online service's tool or feature constitutes publication, the proper question is whether that feature is inexorably bound with the display of content. If the tool that an online service offers can easily be decoupled from its role as publisher, then it offering the tool is not an act of publication. Here, the Platforms' business decision to bundle their publication of casino apps with the contract to broker gambling transactions does not transform their commercial transactions into publication.

## A. The Neutrality of a Tool Is Relevant Only to the Third Prong of the *Barnes* Analysis.

The Platforms contend that because their payment processing service is "content neutral," that somehow transforms it into publishing activity that is protected under Section 230. This Court has indeed considered the question of whether an online service's tools are neutral, but only in the context of the third prong of the *Barnes* analysis. The neutral tools test is designed to determine who is the publisher of content, not whether an action constitutes publication at all.

For example, in *Dyroff v. Ultimate Software Group, Inc.*, the defendant's social networking website "recommended groups for users to join, based on the content of their posts and other attributes" and

48

sent email notifications to members of groups when new content was posted. 934 F.3d 1093, 1095 (9th Cir. 2019). The Court held that when a website provides tools that are "meant to facilitate the communication and content of others" by reorganizing and displaying that information in a different way, it is engaged in publishing. *Id.* at 1098. It then further concluded that when those tools are neutral—that is, when the tools "facilitate" communication of content without "materially contribut[ing] to the content"—the provider of the tools is not considered to have created or developed the content. *Id.* at 1099.

By contrast, sometimes an online service's tools interact with content in a manner so substantial that it can fairly be charged with having developed the content itself. That's what happened in *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC*, where the defendant designed its housing search website "to use allegedly unlawful criteria so as to limit the results of each search, and to force users to participate in its discriminatory process" by answering questions about protected characteristics in order to power the search. 521 F.3d at 1167. Its tools curated and displayed the content in a discriminatory and therefore illegal manner. Rather than neutral tools,

49

these tools contributed to the content and made it illegal, causing the defendant to forfeit Section 230 immunity.

The distinction between *Dyroff* and *Roommates.Com* is the sum total of the neutral tools test. It allows courts to differentiate when a tool offered by an online service publishes a third party's content and when such a tool publishes the service's *own* content—the third prong of *Barnes*. It has nothing whatsoever to say about whether the tool is a publishing tool in the first place. Figuring out whether or not the tools created by the apps are neutral is a fully meaningless exercise if offering the tools does not itself constitute publishing.

### B. Offering a Feature or Service, Neutral or Not, Only Constitutes Publication If It Is Bound Up with the Display of Data.

For the purposes of the second prong of the *Barnes* analysis, the question is whether a tool offered by an online service constitutes publication, not whether it is neutral. As the First Circuit explained when applying Section 230 immunity to a website on which users posted advertisements that allegedly contributed to sex trafficking:

> [The plaintiff's] claims challenge features that are part and parcel of the overall design and operation of the website (such as the lack of phone number verification, the rules about whether a person may post after attempting to enter a

50

> forbidden term, and the procedure for uploading photographs).
> Features such as these, which reflect choices about what
> content can appear on the website and in what form, are
> editorial choices that fall within the purview of traditional
> publisher functions.

*Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 21 (1st Cir. 2016).

The sophistication of the features may vary from a mere passive display to a sophisticated search system, but the common thread is that the tool performs a traditional publishing function. Absent that link, Section 230 has no applicability, because the act in question is not publication.

Indeed, what *Dyroff* and *Roommates.Com* have in common is that both defendants were providing tools that were inseparable from the display of the allegedly unlawful content. *See Dyroff*, 934 F.3d at 1098 (holding that the defendant was as publisher because the tools at issue existed only to display others' content in different ways); *Roommates.Com*, 521 F.3d at 1166 ("By requiring subscribers to provide the information as a condition of accessing its service, and by providing a limited set of pre-populated answers, Roommate becomes much more than a passive transmitter of information provided by others; it becomes the developer, at least in part, of that information."). That connection is what met the second prong of the *Barnes* analysis and

triggered the need to evaluate whether a defendant in each case was merely providing neutral tools or whether it was contributing materially to the illegality of the content. Absent that connection, there is no need to consider whether a tool or feature is neutral, because there is no need to determine who is responsible for creating any content.

The Massachusetts Supreme Court's decision in *Massachusetts Port Authority v. Turo Inc.*, 487 Mass. 235 (2021), is instructive in this regard, and relies heavily on this Court's precedent. In that case, a platform allowed car owners to "to list their privately owned vehicles for rent as well as to set their vehicles' availability, pricing, and pick-up and drop-off locations, including [Boston's] Logan Airport." *Id.* at 237. At the same time, it also provides other services, including "payment-processing assistance[.]" *Id.* at 238. The airport's public operator sued and sought a preliminary injunction, on the basis that the car rental platform unlawfully "facilitated its hosts' and guests' vehicle rental transactions at Logan Airport" for years, in violation of a state law prohibiting such transactions. *Id.* at 237-38 ("No Operator or Driver shall solicit or transact car rental business at Logan Airport except as

authorized pursuant to a current and valid agreement specifically permitting such activities.").

When the car rental platform sought protection from enforcement under Section 230, the court examined the platform's "dual role as both the publisher of its users' third-party listings and the facilitator of the rental transactions themselves[.]" *Id.* at 242. In addition to acting as publisher of listings, the platform also provided "substantial ancillary services" which included "collecting and remitting payments[.]" *Id.* at 243. Relying on this Court's decision in *HomeAway*, the Massachusetts court held that "the immunity provisions of § 230 simply do not apply" because the claims "are not predicated on the *publication* of [the] hosts' content." *Id.* (emphasis added). The "ancillary" services that the car rental platform provided could easily be separated from any publishing that the platform did.

The Fourth Circuit came to much the same conclusion in *Erie Insurance Co. v. Amazon.com, Inc.*, 925 F.3d 135 (4th Cir. 2019). That case involved the application of Section 230 for claims brought against Amazon as the seller of a defective headlamp. *Id.* at 138. The listing for the headlamp had been placed there by a third party, which both posted

product listings on Amazon's website and, at the same time, contracted with Amazon to broker the transaction, accept payment, and ship the headlamp. *Id.* Amazon sought Section 230 immunity on the basis that all of these services were effectively a package deal and part of its role as the publisher of third-party listings. The Fourth Circuit held that despite the bundling, seeking to hold Amazon liable for brokering the sale did not result in treating Amazon as a publisher *Id.* at 139. The additional services were fully separable from the publication of the third-party listing. *See also Oberdorf v. Amazon.com Inc.*, 930 F.3d 136, 153 (3d Cir.), *reh'g en banc granted, opinion vacated*, 936 F.3d 182 (3d Cir. 2019) ("Amazon's involvement in transactions extends beyond a mere editorial function; it plays a large role in the actual sales process. This includes receiving customer shipping information, processing customer payments, relaying funds and information to third-party vendors, and collecting the fees it charges for providing these services").[6]

---

[6]     The Third Circuit panel's opinion in *Oberdorf* was vacated, and the court certified the underlying question of Pennsylvania tort law to the Pennsylvania Supreme Court. *Oberdorf v. Amazon.com Inc.*, 818 F. App'x 138, 143 (3d Cir.), *certified question accepted*, 661 Pa. 535, 237

By contrast, the cases the Platforms cite nearly all involve tools or functionality that are traditionally the realm of a publisher and cannot be separated from the display of content. *See, e.g.*, *Kimzey*, 836 F.3d at 1270 (applying Section 230 immunity to functionality that "reduces [user-provided] information into a single, aggregate metric" and displays it); *Carafano*, 339 F.3d at 1124-25 (applying immunity even though online service "offer[ed] additional features, such as 'matching' profiles with similar characteristics or highly structured searches based on combinations of multiple choice questions" because those features were designed solely to "structure the information provided by users"); *Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1118-19 (N.D. Cal. 2020) (rejecting argument that Defendant Meta's data mining invalidated its Section 230 immunity on the basis that the data mining was for the purpose of "organizing and displaying content exclusively provided by third parties"). When the tool or service is so

---

A.3d 394 (2020). The parties stipulated to dismissal before the certified question was answered. Although the panel opinion is not binding authority in the Third Circuit, nothing in the en banc court's opinion calls the persuasive value of the panel's Section 230 analysis into question.

closely connected to publication that it cannot be separated, then it is publishing activity.[7]

In sum, immunity is only a possibility where a functionality is fully bound up in the defendant's role as a publisher of content. By contrast, where a defendant could face liability for providing tools or functionality fully decoupled from the display of content, Section 230 has no application.

## C. In-App Payment Tools Are Separable from Publishing.

Here, the Platforms choose to bundle separate functions together as part of their business model. Like the car rental platform in *Turo*, they publish third-party content—here, the social casino apps—and they also broker financial transactions between the social casino apps and their players as an additional, ancillary function.

That ancillary service is fully separable from the display of content or any other traditional publishing activity. As explained in

---

[7] One case, *YZ Productions, Inc. v. Redbubble, Inc.*, 545 F. Supp. 3d 756, 769 (N.D. Cal. 2021), appears to hold that a defendant acted as a publisher when it facilitated transactions. Despite having been decided after *HomeAway*, it does not cite it. This oversight was likely caused by the fact that neither of the parties to that case called the district court's attention to this binding authority in their briefs.

Section I.D, *supra*, financial transactions are not publishing activity, even if they occur alongside it. Here, the Platforms could continue publishing the social casino apps—that is, offering them for download in their app stores—while still declining to broker the financial transactions associated with those apps. Conversely, the Platforms could broker the gambling transactions without hosting or publishing the apps. These ancillary services extend beyond a mere editorial function and are therefore not publishing activity. *See Turo*, 487 Mass. at 243; *Erie*, 925 F.3d at 139; *Oberdorf*, 930 F.3d at 153.

There are certainly business reasons why the Platforms would not want to separate these two services. Social casino app developers want to have their apps in the app stores, because that is how they attract users. The Platforms want to leverage that fact to make their 30% cut, so they require that the app developers funnel all payments through them. But there is no technical reason that the apps could not hire someone other than the Platforms to handle their payment processing, or simply bill users' directly. The only reason is that the Platforms choose not to allow it. Similarly, while there may be business reasons why the Platforms would want to limit their provision of payment

processing services exclusively to apps that they host, there is no technical or logical reason that the Platforms could not offer that same service to an app developer who hosted its own social casino on its own website or on a different website. The service of processing payments and brokering financial transactions can be fully severed from the display of third-party content.

To be clear, the fact that brokering the sale of social casino chips can be separated from the act of publishing in no way supports Apple's theory that the Platforms' sale of chips is divorced from the gambling transaction because there are two steps to the gambling transaction. Plaintiffs allege that Apple and the other Platforms broker the transactions with the full knowledge that the chips are being sold for the purpose of gambling, and that substantially all of chips are used to spin slot machines. Apple-ER-152; Apple-ER-157; Google-ER-237; Google-ER-244; Meta-2-ER-263; Meta-2-ER-270. Apple's speculation that more than a de minimis number of chips might theoretically be used for something else cannot be considered at the pleading stage (not that it would make a difference—the operator of a Las Vegas cashier's

cage can't deny that changing chips for money is part of a gambling transaction because gamblers sometimes tip the waitstaff with a chip).

If Apple's two-transaction theory were correct, the housing platforms in *HomeAway* could have avoided the ordinance by permitting the property owners to sell tokens, which users could then redeem directly with the property owners for nights at unlicensed properties. Plainly, adding in the extra step of buying the token does not materially change the transaction and there is no reason to believe that it would have changed the outcome in *HomeAway*. Indeed, a district court considering claims that Google brokered gambling by processing an app developer's transactions came to exactly that conclusion. *See Coffee v. Google, LLC*, No. 20-CV-03901-BLF, 2022 WL 94986, at *7 (N.D. Cal. Jan. 10, 2022) ("Claims based on Google's processing of Loot Box sales, and retaining a 30% cut of those sales, would not be based solely on publication of third-party apps and provision of neutral tools."). Such hand-waving does not grant immunity.[8]

---

[8]     *Coffee* ultimately came out in favor of immunity because the plaintiffs sought to impose liability for "*lawful* transactions for virtual currency." 2022 WL 94986, at *6 (emphasis in original). Here, by contrast, all the transactions are unlawful.

In sum, the unlawful gambling transactions are not intrinsically tied to the Platforms' publication of third-party content. The Platforms created the connection to bundle services together and increase profits, not because the transaction functionality is inseparable from publication. Neutral or not, the tools do not constitute publication.

## IV. The Court Should Modify the Order to Reflect that the Motions to Dismiss Are Denied in Full.

Plaintiffs have also cross-appealed the district court's decision to dismiss two of the theories that it identified in the order. First, Rule 12(b)(6) does not permit district courts to dismiss theories, only claims. And second, affirming such a dismissal on an interlocutory appeal risks entering what would effectively be an advisory opinion and creating unnecessary confusion. The Court should modify the order to a denial of the Platforms' motions to dismiss and affirm the order as modified.

### A. Courts Cannot Dismiss Theories under Rule 12.

It is a familiar refrain that "[a] motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted tests the legal sufficiency of a *claim.*" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011) (quotation marks omitted) (emphasis added). "Dismissal under Rule 12(b)(6) is

appropriate *only* where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Hartmann v. California Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013) (emphasis added). "If even one theory supporting a claim for relief is plausible, the claim cannot be dismissed under Rule 12(b)(6)." *Brown v. Rawson-Neal Psychiatric Hosp.*, 840 F.3d 1146, 1152 (9th Cir. 2016) (Graber, J., dissenting).

Whether a claim is legally sufficient is governed generally by Federal Rule of Civil Procedure 8. *Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009). ("[Rule 8] governs the pleading standard in all civil actions and proceedings in the United States district courts.") (quotation marks omitted). Relevant here is Rule 8(d)(2), which provides:

> A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.

The rule's text is unambiguous: if a party submits a pleading that contains multiple ways to support the same claim, the claim cannot be dismissed if any of those ways is viable. *Cf. Pavelic & LeFlore v. Marvel Ent. Grp.*, 493 U.S. 120, 123 (1989) ("We give the Federal Rules of Civil

61

Procedure their plain meaning, [citation], and generally with them as with a statute, when we find the terms unambiguous, judicial inquiry is complete.") (cleaned up). Put another way, a "motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) (emphasis in original).

The Seventh Circuit's decision in *Bilek v. Federal Insurance Co.*, 8 F.4th 581 (7th Cir. 2021), illustrates that point well. In *Bilek*, the plaintiff had alleged that the defendant was liable under three different theories of vicarious liability, all of which the district court found insufficient. *Id.* at 585. The Seventh Circuit reversed in full after finding that the plaintiff had properly stated a claim on one of those theories. *Id.* at 587. Critically, the court did not then go on to evaluate the other two theories:

> With a viable agency claim on its actual authority theory, Bilek's complaint moves forward at this pleading stage. In reaching this result, we need not and do not reach Bilek's apparent authority and ratification theories of agency liability. Of course, the parties may pursue discovery on these theories. And the parties may move for summary judgment on all or any part of Bilek's claims. Fed. R. Civ. P. 56(a). At this stage, we hold only that Bilek's complaint should not have been dismissed under Rule 12(b)(6).

*Id.* at 589. This contrasts with the procedure at summary judgment, which "explicitly allows for the parties to move for judgment on parts of claims to narrow individual factual issues for trial[.]" *Id.* at 587. "In sum, at the motion-to-dismiss stage, once a court determines that a claim states a viable basis for relief, it cannot further parse out whether other portions of the claim would suffice on their own." *F.T.C v. Facebook, Inc.*, 581 F. Supp. 3d 34, 60 (D.D.C. 2022); *accord Leon v. Indiana Univ. Health Care Assocs., Inc.*, No. 1:22-CV-00937-JRS-MG, 2022 WL 16657961, at *4 (S.D. Ind. Nov. 3, 2022) ("[T]o strike out an incorrect legal theory in one 'count' (or seventeen 'counts,' as the case may be) does not affect the sufficiency of the complaint, so long as, working from the facts as alleged (that is, the claim or claims), at least one plausible theory remains.").[9]

---

[9] Although this Court does not appear to have squarely addressed this issue before—likely because an order dismissing part of a claim would typically be non-final—district courts in this circuit and elsewhere that have considered the issue are generally in agreement with the Seventh Circuit. *See, e.g.*, *Doe v. Regents of the Univ. of California*, No. 2:19-CV-10385-HDV-MRW, 2023 WL 6194148, at *3 (C.D. Cal. Aug. 11, 2023); *Am. Int'l Indus. v. Brenntag Specialties, Inc.*, No. 2:21-CV-03888-RGK-KK, 2021 WL 5264239, at *3 (C.D. Cal. Aug. 30, 2021); *Candace B. v. Blue Cross*, No. 2:19-CV-00039, 2020 WL 1474919, at *6 n.78 (D. Utah Mar. 26, 2020); *Pinnacle Ventures LLC v.*

Here, the district court conceived of Plaintiffs' complaints in the same manner that the Seventh Circuit conceived of the complaint in *Bilek*, as "assert[ing] three theories of liability." Apple-ER-33. But unlike the Seventh Circuit, the district court analyzed all three theories, holding "that Plaintiffs' first and third theories of liability must be dismissed under section 230." Apple-ER-37.

Putting aside whether Plaintiffs actually set forth three different theories of liability, the district court's procedure does not accord with the purposes of Rule 12 or with Rule 8(d)(2). If one of Plaintiffs' theories of liability on a claim is viable, then the claim as a whole is pleaded sufficiently. The district court's order does not identify any particular claim that depends solely on one of the rejected theories. Rather, the theories are discussed as alternatives that can each support all of Plaintiffs' claims. And as Rule 8(d)(2) explains, if one alternative is sufficient, the entire claim survives. Therefore, the district court, upon finding that Plaintiffs stated a viable legal theory, should have denied Defendants' motions in full.

---

*Bertelsmann Educ. Servs. LLC*, No. 18-CV-03412-BLF, 2019 WL 4040070, at *3 (N.D. Cal. Aug. 26, 2019).

**B.** **The Court Should Not Affirm an Order in a Manner that Risks an Advisory Opinion.**

Ordinarily, the district court's technically improper use of Rule 12(b)(6) would have little real effect on the litigation. Because no claims have been dismissed, the case would proceed as to all of Plaintiffs' claims. Further, because the "district court has the inherent power to revisit its non-final orders," *Dreith v. Nu Image, Inc.*, 648 F.3d 779, 787 (9th Cir. 2011), there would always be the opportunity to revisit the determination if the facts or circumstances change. In effect, the "dismissal" of a legal theory is little more than an expression of the scope of discovery the district court will permit.

On interlocutory appeal, however, such an order creates a problem. "The purpose of section 1292(b) is not to offer advisory opinions rendered on hypotheses which evaporate in the light of full factual development." *Benoit v. Saint-Gobain Performance Plastics Corp.*, 959 F.3d 491, 508 (2d Cir. 2020) (cleaned up). Deciding whether the complaint as a whole can proceed is not advisory. But determining that, as a matter of law, Plaintiffs can't proceed on one particular theory as pleaded does little beyond create confusion as to under what

65

circumstances the district court is bound by that ruling and how it is to put the mandate into effect.

The issue is most acute as it relates to what the district court termed Plaintiffs' third theory of liability, which it called "the trickiest" of the three it identified. Apple-ER-36. The district court held that Section 230 immunity applied to allegations that Defendants were "closely involved in social casinos' business strategies." Apple-ER-34. It explained that this theory "directly turns on how the Platforms aid the social casino developers in developing social casino apps" and determined that the type of aid Plaintiffs alleged—"helping develop the social casino apps using big data to make the games more profitable and more addicting"—was akin to "making minor edits" to a website. Apple-ER-36–37.

The district court expressed some concern about the implications of this holding:

> Finally, the Court joins other opinions that note that the history of section 230 does not support a reading of the CDA so expansive as to reach a website[']s-generated message and functions. *See, e.g.*, *Gonzalez*, 2 F.4th at 913 (Berzon, J., concurring); *Force*, 934 F.3d at 76 (Katzmann, C.J., concurring in part and dissenting in part). As analyzed, the twin goals of section 230 do not support this broad reading. Immunizing a website's own targeted advertisements and

algorithms does not advance a website's internal policing of indecent content or promoting third-party speech. The data-driven targeting of consumers by big social-media platforms can hardly be compared to the Internet of 1996. Platforms like Facebook, Google, and Apple are more than mere message boards, they are creators of content themselves, and they should be treated as such.

Apple-ER-37. And after the district court's order, the Seventh Circuit determined that a defendant was not protected by Section 230 for allegations that it engaged in conduct similar to what the Platforms are alleged to have done here. *Compare G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 567 (7th Cir. 2023) ("Rather, plaintiffs seek to hold Salesforce accountable for *supporting* Backpage, for *expanding* Backpage's business, for *providing* Backpage with technology, for *designing* custom software for Backpage, for *facilitating* the trafficking of G.G., for *helping* Backpage with *managing* its customer relationships, *streamlining* its business practices, and *improving* its profitability, and for *enabling* Backpage to scale its operations and increase the trafficking conducted on Backpage.") (quotation marks omitted) (emphasis in original) *with* Apple-ER-178 ("The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2)

contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Apple's gaming platform; and (3) offers and distributes social casinos through the App Store and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiffs[.]").

Plainly, this issue is both difficult and heavily fact-dependent, not the usual "abstract legal issue that the court of appeals can decide quickly and cleanly" on interlocutory review. *Mamani v. Berzain*, 825 F.3d 1304, 1312 (11th Cir. 2016) (quotation marks omitted); *accord Ahrenholz v. Bd. of Trustees of Univ. of Illinois*, 219 F.3d 674, 677 (7th Cir. 2000) (Posner, C.J.); *United States ex rel. Michaels v. Agape Senior Cmty., Inc.*, 848 F.3d 330, 340 (4th Cir. 2017). Moreover, as Plaintiffs explained below, both targeted discovery in these cases and the potential introduction of presently-under-seal discovery produced in related litigation are likely to uncover "additional facts about the Platforms' non-publisher, non-speaker roles in the Social Casino Enterprise." Apple-ER-80. On top of that, Section 230 is an affirmative defense. *Force*, 934 F.3d at 57; *Salesforce.com*, 76 F.4th at 566;

68

*Monsarrat v. Newman*, 28 F.4th 314, 318 (1st Cir. 2022); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014). That means that to survive a motion to dismiss, all Plaintiffs need to do is not plead themselves out of court, which the district court already determined that they haven't done with respect to Section 230. *Salesforce.com*, 76 F.4th at 566; *accord York Cty. on Behalf of Cty. of York Ret. Fund v. HP, Inc.*, 65 F.4th 459, 466 (9th Cir. 2023).

Accordingly, unless the Platforms make a clean sweep, any order the Court enters regarding this issue will have little effect on the litigation. If the Court agrees with the district court and affirms the order in full, Plaintiffs will almost certainly seek to amend their complaint based on additional information that they learn during the course of discovery on the rest of the issues, which they should be permitted to do. *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc). If the Court determines the allegations already are sufficient, then the same thing will happen, minus the amendment. Nothing would be gained except the potential for a round of briefing on whether the interlocutory appeal forever bars Plaintiffs from pursuing the

theory (which, given that review is limited to whether they pleaded themselves out of court on *this* complaint, it cannot).

The better solution is to hold that because Plaintiffs have identified one way in which their claims survive a motion to dismiss on Section 230, analysis of more complicated theories can and should wait for a complete record. By modifying the district court's opinion to reflect that the motion to dismiss has been denied, the Court both avoids entering an advisory opinion and avoids suggesting that more should be read into an affirmance than is appropriate.

## CONCLUSION

The Court should modify the district court's order to be a denial in full of the motion to dismiss and affirm it as modified.

Dated October 25, 2023                    Respectfully Submitted,

By: s/ Alexander G. Tievsky
One of Plaintiffs-Appellees' attorneys

Rafey S. Balabanian
Todd Logan
EDELSON PC
150 California St, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300
Fax: 415.373.9435

Jay Edelson
Alexander G. Tievsky
EDELSON PC
350 N LaSalle St, 14th Floor
Chicago, IL 60654
Tel: 312.589.6370
Fax: 312.589.6378
atievsky@edelson.com

*Counsel for Plaintiffs-Appellees*

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-16914, 22-16916, 22-16888, 22-16889, 22-16921, 22-16923

I am the attorney or self-represented party.

**This brief contains** | 14,141 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

◉ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

　☐ it is a joint brief submitted by separately represented parties.
　☐ a party or parties are filing a single brief in response to multiple briefs.
　☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [         ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Alexander G. Tievsky | **Date** | 10/25/2023
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                    *Rev. 12/01/22*