**Nos. 22-16888, 22-16889**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————————

*In re Apple Inc. App Store Simulated Casino-Style Games Litigation*

*In re Google Play Store Simulated Casino-Style Games Litigation*

*In re Facebook Simulated Casino-Style Games Litigation*

———————————————

On Appeal from the United States District Court for the
Northern District of California
Nos. 5:21-md-2985, 5:21-md-3001, 5:21-cv-2777
The Honorable Edward J. Davila, District Court Judge

———————————————

## BRIEF OF THE ELECTRONIC PRIVACY INFORMATION CENTER AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS SUPPORTING AFFIRMANCE IN PART & REVERSAL IN PART

———————————————

Megan Iorio
Tom McBrien
ELECTRONIC PRIVACY
INFORMATION CENTER
1519 New Hampshire Ave. NW
Washington, DC 20036
(202) 483-1140
iorio@epic.org

November 1, 2023          *Attorneys for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, *amicus curiae* the Electronic Privacy Information Center states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......................................... i

TABLE OF AUTHORITIES......................................................... iv

INTEREST OF THE *AMICUS CURIAE* ...................................1

SUMMARY OF THE ARGUMENT....................................................2

ARGUMENT.................................................................................5

I.    Section 230 permits interactive computer service providers to engage in publishing activities without adopting the duty common-law publishers have to monitor, edit, or remove harmful content. .5

    A.    Congress passed Section 230 for the limited purpose of preventing courts from imposing publisher duties on interactive computer service providers simply because they engaged in content moderation. ....................................................7

    B.    Duties with which a defendant could comply without monitoring, editing, or removing harmful content are not publisher duties and are not prohibited by Section 230........13

    C.    Duties that are imposed because a defendant engaged in non-publishing activity are not publisher duties and are not prohibited by Section 230. ...........................................16

    D.    The Plaintiffs' claims do not treat the Defendants as publishers because the Defendants' alleged duty springs from non-publishing activity and because the Defendants could comply with the alleged duty without altering third-party content..................................................................20

II.   The "neutral tool" test analyzes whether a defendant contributed to illegal information, not whether the claim treats the defendant as a publisher...............................................24

A.    The neutral tool analysis only applies to determine whether an interactive computer service provider made a material contribution to the challenged content. .....................................26

B.    Many of this Court's previous Section 230 cases would be wrongly decided if the neutral tool test controlled the outcome. ..........................................................................................28

III.    Permitting the claims in this case to be judged on their merits will not break the internet. .............................................................................29

CONCLUSION .............................................................................................35

CERTIFICATE OF COMPLIANCE .........................................................36

CERTIFICATE OF SERVICE ...................................................................37

# TABLE OF AUTHORITIES

## Cases

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009). ..................passim

*Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003) ........27

*Cubby, Inc. v. CompuServe, Inc.*, 776 F. Supp. 135 (S.D.N.Y. 1991)........8

*Doe v. Internet Brands*, 824 F.3d 846 (9th Cir. 2016) ....................passim

*Dyroff v. Ultimate Software Group*, 934 F.3d 1093 (9th Cir. 2019)........27

*Erie Insurance Co. v. Amazon.com, Inc.*, 925 F.3d 135 (4th Cir. 2019)..18

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008)...................................passim

*Gonzalez v. Google LLC*, 598 U.S. 617, 617 (2023).................................34

*Henderson v. Source for Public Data, L.P.*, 53 F.4th 110 (4th Cir. 2022) 6

*HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676 (9th Cir. 2019) ....................................................passim

*Kimzey v. Yelp! Inc.*, 836 F.3d 1263 (9th Cir. 2016) ...............................27

*Lemmon v. Snap*, 995 F.3d 1085 (9th Cir. 2021)...........................passim

*Stratton Oakmont, Inc. v. Prodigy Services Co.*, 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995)...........................................8, 9

*Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023).......................................34

## Statutes

47 U.S.C. § 230(c)(1).................................................................................5

47 U.S.C. § 230(f)(3)...............................................................................25

Cal. Penal Code § 330b(d).......................................................................22

## Other Authorities

141 Cong. Rec. 22046 ...............................................................................9

141 Cong. Rec. 22045 .............................................................................10

Amnesty International, *Amnesty Reveals Alarming Impact of Online Abuse Against Women* (Nov. 20, 2017) ...........................................30

Restatement (Second) of Torts § 581 (Am. L. Inst. 1965) ........................8

## INTEREST OF THE *AMICUS CURIAE*

The Electronic Privacy Information Center ("EPIC") is a public interest research center in Washington, D.C., established in 1994 to focus public attention on emerging privacy and civil liberties issues. EPIC advocates for meaningful government oversight of abusive, exploitative, invasive, and discriminatory data collection systems, algorithms, and platform design decisions. EPIC is interested in this case because of the organization's concern that overly broad interpretations of the scope of 47 U.S.C. § 230 can hamper society's ability to address some of the most egregious forms of online harm. EPIC previously filed *amicus* briefs on the scope of Section 230 immunity in *Bride v. Yolo Technologies, Inc.* (No. 23-55134) (9th Cir.), *NetChoice v. Bonta* (No. 22-cv-08861) (N.D. Cal.), *Gonzalez et al. v. Google*, 598 U.S. ___ (2023) and *Herrick v. Grindr, LLC*, 765 F. App'x 586 (2d Cir. 2019).[1]

---

[1] All parties consent to the filing of this brief. In accordance with Rule 29, the undersigned states that no party or party's counsel authored this brief in whole or in part nor contributed money intended to fund the preparation of this brief. No outside person contributed money intended to fund the preparation of this brief.

## SUMMARY OF THE ARGUMENT

The Ninth Circuit has established a three-prong test for determining whether Section 230 prohibits a claim: plaintiffs cannot bring claims in which (1) the defendants are interactive computer service providers (ICSs) (2) that are treated as the publishers or speakers of information (3) that is provided by another information content provider. *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–01 (9th Cir. 2009). If defendants fail to show that one of these prongs is fulfilled, then Section 230 does not apply. Plaintiffs in this case focus on prong two: their claims do not treat defendants as the publishers or speakers of information.

In recent years, the Ninth Circuit has developed important limiting principles for when a claim treats a defendant as a publisher under the second prong. Section 230 only applies to claims that allege that a defendant had a publisher's duty—that, by engaging in some publishing conduct, the defendant adopted a legal duty to monitor, edit, and remove improper third-party content. In other words, for Section 230 to apply, a defendant has to show that the duty underlying the claim could only be met by engaging in publishing activities *and that*

2

the defendant adopted the alleged duty by engaging in publishing activities.

It follows that plaintiffs can show that their claims are not barred by Section 230 either by showing that the defendant could fulfill its alleged duty by engaging in non-publishing activity *or* that the defendant's duty stems from its non-publishing conduct. Plaintiffs in the current case have demonstrated both. Plaintiffs allege that defendants had a duty not to sell or broker transactions for social casino applications ("apps"). Defendants could have fulfilled this duty by not processing transactions for the apps, which does not involve editing or removing any third-party content. Further, the defendants adopted this duty by providing a marketplace for apps and processing transactions within apps, not merely by publishing information about the apps.

The district court erred by applying the neutral tool test in this case instead of applying the test for whether a claim treats a defendant as a publisher. The neutral tool test helps courts determine whether a defendant made a material contribution to the content at issue in a claim. The plaintiffs in this case do not argue that defendants made a material contribution to the social casino apps; they argue that their

claims do not treat the defendants as publishers or speakers. Thus, the neutral tool test is irrelevant to this case and the district court should not have applied it.

Recognizing that the Plaintiffs' claims are not barred by Section 230 will not destroy the internet. Congress passed Section 230 to prevent companies from having to make a "grim choice": over-censor users for fear of the liability their speech might carry or avoid liability for user speech by leaving all user content up, including spam and abuse. The claims in this case do not force companies into this choice. No publisher will be required to remove user speech. The only effect will be to require online stores to comply with regulations on sellers, ensuring that online stores do not sell dangerous products. Complying with regulations may be costly and even onerous, but Section 230 was not meant to create a general immunity from regulation online. Just as this Court's previous decisions allowing claims to proceed against online businesses did not break the internet, so too will the internet survive a ruling in favor of plaintiffs in this case.

Because the legal claims in this case did not allege that the defendants had a duty to monitor, edit, or remove any third-party

content, and because the activities alleged to have given rise to the defendants' duties were not publishing activity, the decision below should be modified to be a denial in full of the Defendants' motion to dismiss and affirmed as modified.

## ARGUMENT

### I. SECTION 230 PERMITS INTERACTIVE COMPUTER SERVICE PROVIDERS TO ENGAGE IN PUBLISHING ACTIVITIES WITHOUT ADOPTING THE DUTY COMMON-LAW PUBLISHERS HAVE TO MONITOR, EDIT, OR REMOVE HARMFUL CONTENT.

Under Section 230 of the Communications Decency Act, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The Ninth Circuit has broken down this sentence into a three-prong test: Section 230 applies to "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat . . . as a publisher or speaker (3) of information provided by another information content provider." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–01 (9th Cir. 2009).

A tempting, but incorrect, interpretation of the second prong's "treat . . . as a publisher" language would be to prohibit any claim that hinges on the defendant's publishing third-party content. This court and others have soundly and repeatedly rejected this "but-for" interpretation of Section 230 because it would "eviscerate [the statute]" and create "a lawless no-man's-land on the Internet." *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1164, 1171 (9th Cir. 2008) (en banc); *see also Lemmon v. Snap*, 995 F.3d 1085, 1092–93 (9th Cir. 2021); *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019); *Doe v. Internet Brands*, 824 F.3d 846, 853 (9th Cir. 2016); *Henderson v. Source for Public Data, L.P.*, 53 F.4th 110, 122 (4th Cir. 2022).

Instead, the Ninth Circuit has recognized that to "treat" a defendant as "the publisher" of third-party information means to impose a publisher's duty on the defendant. Publisher duties are duties imposed on publishers (or those who act like publishers) to ensure that the information they publish complies with the law.

To evaluate whether a claim treats a defendant as a publisher, the Ninth Circuit looks at each claim and identifies (1) the duty alleged by

the claim and (2) the conduct alleged to have triggered that duty. If a claim alleges the defendant has a duty to review, edit, and remove harmful content, and if the claim alleges the defendant adopted the duty by acting like a publisher, then Section 230 prohibits the claim. If not, then Section 230 is not a bar.

### A. Congress passed Section 230 for the limited purpose of preventing courts from imposing publisher duties on interactive computer service providers simply because they engaged in content moderation.

The history and purpose of Section 230 show that a claim "treat[s]" an ICS "as the publisher" of third-party content only when it alleges that, by engaging in publishing conduct, an ICS adopted a duty to monitor, remove, or edit tortious third-party information.

In *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, the *en banc* court explained that the "principal or perhaps the only purpose" of Section 230 was "to overrule *Stratton-Oakmont* [sic] *v. Prodigy*." 521 F.3d 1157, 1163, 1163 n.12 (9th Cir. 2008). In *Stratton Oakmont*, the court imposed strict defamation liability on the online service provider Prodigy by labeling it a "publisher" as opposed to a "distributor." *Id.* at 1163. Publishers

7

exercise editorial control over the information they publish, and as a consequence the law imposes a duty on them to ensure that all of the information they publish is not tortious by closely monitoring, vetting, and editing the material. *Stratton Oakmont, Inc. v. Prodigy Services Co.,* 31063/94, 1995 WL 323710, at *3 (N.Y. Sup. Ct. May 24, 1995); Restatement (Second) of Torts § 581 (Am. L. Inst. 1965). Distributors, on the other hand, do not edit the contents of materials they distribute and so only have a duty to ensure that they not distribute known tortious material. *Id.*; Restatement (Second) of Torts § 581 (Am. L. Inst. 1965). Before *Stratton Oakmont*, some courts had labeled internet service providers as distributors, not publishers, of content users posted to their services because the service providers did not exercise editorial judgment analogous to traditional publishers like newspapers. *See, e.g.*, *Cubby, Inc. v. CompuServe, Inc.*, 776 F. Supp. 135, 139 (S.D.N.Y. 1991).

The question in *Stratton Oakmont* was whether to label Prodigy, an online message board operator, as a publisher or a distributor. Prodigy argued that it was more like a distributor than a publisher because it did not—and could not—exert editorial control over the 60,000 messages posted to its website every day. *Stratton Oakmont*,

1995 WL 323710 at *3. But the court held that Prodigy was a publisher because the company had adopted community guidelines and implemented technology to screen for obscenity on its message boards. *Id.* at *4. In the court's opinion, these modest content moderation activities were sufficiently similar to a newspaper's level of editorial control to justify holding that Prodigy had "the same responsibilities," or duties, as a traditional publisher. *Id.*

As Congress recognized, the line of reasoning in *Stratton Oakmont* was dubious because Prodigy was unlikely to have sufficient editorial control over 60,000 message board posts per day to ensure that none contained defamation. *See* 141 Cong. Rec 22046 (Rep. Goodlatte remarking that "[t]here is no way that any of these entities, like Prodigy, can take the responsibility to edit out information that is going to be coming in to them from all manner of sources onto their bulletin boards."). It also created the wrong incentives: because internet services that declined to moderate content at all could avoid an onerous duty to monitor their services for tortious materials, companies would likely abandon content moderation altogether. *Roommates.com*, 521 F.3d at

1163 (citing *Cubby, Inc. v. CompuServe, Inc.*, 776 F.Supp. 135, 140 (S.D.N.Y.1991)).

*Stratton Oakmont* created what the Ninth Circuit called a "grim choice" for internet service providers: voluntarily engage in content moderation and thus adopt an onerous duty to review, edit, and remove any tortious materials that third parties provide, or bury one's head in the sand and ignore problematic posts altogether to escape liability. *Id.*; *see also* 141 Cong. Rec. 22045 (Rep. Cox explaining that *Stratton Oakmont* would create "a massive disincentive" for internet service providers to engage in content moderation). Either way, the result would be harmful for free speech principles and the growth of the then-nascent web: companies would either have to allow reams of horrible content to thrive, aggressively censor users to ensure they would not be held liable, or simply shut down entirely to avoid either of those options.

To spare internet companies from this grim choice, Congress intervened with Section 230. Section 230 operates by breaking the link between the publishing activities of monitoring, editing, and removing offensive content—which Congress wanted to incentivize—and a publisher's onerous common-law duties, which companies were loath to

10

adopt. That is what Section 230's prohibition on "treat[ing]" an ICS "as the publisher" means: it bars claims alleging that, because an entity is engaging in publishing conduct, it must fulfill a publisher's duties. 47 U.S.C. § 230(c)(1) (1994); *see Roommates.com,* 521 F.3d at 1163. Breaking this link between publishing conduct and publishing duties was crucial for the burgeoning internet because it allowed internet services to moderate third-party content without requiring them to ensure that their services were free of all improper material. In the decades that have elapsed since Section 230's enactment, companies have overwhelmingly chosen the content moderation model over the blind-eye approach, likely thanks in part to Section 230's role in equalizing the legal incentives to both.

While Section 230 plays an important role in internet governance, it is a very limited role. Companies do much more than publish user speech online: they sell products, facilitate rental bookings, transmit food orders, book rides, and much more. Just as these activities are regulated offline to ensure consumer and public safety, so too must these activities be regulated online, and Section 230 is not a bar to the enforcement of these regulations. Section 230 does not prohibit claims

11

alleging that internet companies have *non-publisher* duties. *See HomeAway*, 918 F.3d at 682–83 (a duty not to broker unlawful rental transactions is not a publisher's duty); *Lemmon* 995 F.3d at 1092 (Snap's duty "to take reasonable measures to design a product more useful than it was foreseeably dangerous" was not a publisher's duty). And Section 230 does not prohibit claims that allege an ICS has adopted a duty to monitor, edit, or remove third-party information by its choice to engage in *non-publishing* conduct, such as making an enforceable promise to engage in those activities. *See Barnes*, 570 F.3d at 1107. Preventing claims against internet companies any time harmful third-party content is a but-for cause of the claim would immunize them from pretty much everything, upending important regulatory regimes with no corresponding benefit. *See Roommates.com*, 521 F.3d at 1164 (a but-for test for Section 230 application would create a "lawless no-man's-land on the Internet"); *Lemmon*, 995 F.3d at 1092–93 ("though publishing content is a but-for cause of just about everything Snap is involved in, that does not mean that the Parents' claim, specifically, seeks to hold Snap responsible in its capacity as a publisher or speaker."). Section 230 is strictly limited to prevent this outcome.

**B. Duties with which a defendant could comply without monitoring, editing, or removing harmful content are not publisher duties and are not prohibited by Section 230.**

The first step to deciding whether a claim alleges that a defendant has a publisher's duty is to determine whether the claim would "necessarily require[]" the defendant to "review[], edit[], and decid[e] whether to publish or to withdraw from publication third-party content." *HomeAway*, 918 F.3d at 681 (internal quotation marks and citations omitted).

Publishers' duties require publishers to ensure that the information they publish complies with the law. If a defendant could have fulfilled a duty underlying a claim without monitoring, altering or removing any third-party content, it is a clear indication that the company is not being held liable for improper content published on their services, and Section 230 is not implicated. *Internet Brands*, 824 F.3d at 851; *Lemmon*, 995 F.3d at 1092. For example, in *Doe v. Internet Brands*, a model sued a message board company after sexual assaulters used the company's message board to set up a meeting where they attacked her. 824 F.3d at 848. She argued that under California law, the company

had a duty to warn her of this danger because it had learned of the sexual assault scheme through news reports and other sources. *Id.* at 850. The company argued that Section 230 prohibited the claim because the messages between the assaulters and the plaintiff were the but-for cause of the claim. *Id.* at 852–53. The Court rejected the argument, ruling that the claim did not treat the defendant as a publisher because the defendant's alleged duty to warn users "could have been satisfied without changes to the content posted by the website's users." *Id.* at 851. Similar reasoning justified the *Lemmon v. Snap* decision: Section 230 did not prohibit the plaintiffs' products liability claim because "Snap could have satisfied its alleged obligation—to take reasonable measures to design a product more useful than it was foreseeably dangerous—without altering the content that Snapchat's users generate." *Lemmon*, 995 F.3d at 1092 (internal quotation marks omitted). In both *Internet Brands* and *Lemmon*, claims were not prohibited by Section 230 when the duties they alleged did not require monitoring, editing, or removing third-party content.

It is not enough for Section 230 protection that a defendant might *choose* to monitor, edit, or remove third-party content to comply with a

duty. What matters is what the claim would *necessarily require* a defendant to do to escape liability. *HomeAway*, 918 F.3d at 682. In *HomeAway*, internet companies that allowed users to rent out their homes to vacationers raised a pre-enforcement challenge to a city ordinance that regulated their ability to facilitate rentals. *Id.* at 680. The ordinance, among other things, prohibited the plaintiffs from facilitating the rental of any homes that were not on the city's registry of pre-approved properties. *Id.* HomeAway argued that the ordinance imposed a publisher duty because HomeAway's "best option from a business standpoint" would be to remove non-conforming third-party listings from its website so it would not be "chock-full of un-bookable listings." *Id.* at 681. But publisher's duties do not merely incentivize companies to monitor, edit, or remove third-party content: they *require* those actions to avoid liability. *Id.* at 682–83. HomeAway could have avoided liability by taking other actions, such as refusing to process any transactions that attempted to register non-approved properties. For that reason, Section 230 did not prohibit the claim.

15

**C. Duties that are imposed because a defendant engaged in non-publishing activity are not publisher duties and are not prohibited by Section 230.**

Determining that a claim would necessarily require a defendant to edit, monitor, or remove content does not conclude the court's analysis of whether the claim is treating the defendant as a publisher. A court must also examine whether the alleged duty "derives from the defendant's status or conduct as a publisher or speaker." *Barnes*, 570 F.3d at 1101–02. If the defendant's publishing conduct is what triggers the duty to monitor, edit, or remove third-party content, then Section 230 prohibits the claim. But if other conduct triggered the alleged duty, such as making a promise or selling a product, then Section 230 does not apply. *See HomeAway*, 918 F.3d at 683.

The court's differential treatment of the claims brought in *Barnes v. Yahoo!, Inc.* illustrates this distinction. In the case, the plaintiff sued Yahoo for failing to remove social media profiles her ex-boyfriend created to impersonate and harass her. *Barnes*, 570 F.3d at 1098. Yahoo had promised it would remove the fake profiles but failed to do so. *Id.* One of the plaintiff's claims was for the tort of negligent undertaking, and the other was for breach of contract. *Id.* at 1099. Both

16

claims alleged the defendant had a duty to remove harmful third-party content and would necessarily have required Yahoo to edit or remove harmful third-party content to avoid liability. *See id.* at 1103, 1107. But Section 230 only prohibited the negligent undertaking claim. *Id.* at 1102–03.

The difference between the two claims in *Barnes* can only be explained one way: the duties were triggered by different activities. Yahoo's publishing activities triggered the negligent undertaking claim, whereas Yahoo's promise triggered the breach of contract claim. *Id.* at 1107. The negligent undertaking claim attached as soon as Yahoo "undertook" the service of moderating third-party content. *Id.* But Yahoo adopted the duty in the breach of contract claim by *promising* to remove content, not merely by publishing third-party content. *Id.* The court explained "[p]romising . . . is not synonymous with the performance of the action promised," so holding Yahoo liable for the breach of the promising duty did not conflict with Section 230. *Id.*

Several other rulings from this court have also found that duties triggered by non-publishing activities do not trigger Section 230 immunity. In *Doe v. Internet Brands*, the Court noted that the

defendant's alleged duty to warn users that assaulters were using the defendant's website to lure potential victims was triggered by "information it obtained from an outside source," *not* from the mere fact that the company hosted third-party content. 824 F.3d at 851. In *Lemmon v. Snap*, the court noted that "the duty that Snap allegedly violated 'springs from' its distinct capacity as a product designer" and had "nothing to do" with its publishing activities. 995 F.3d at 1092 (quoting *Barnes*, 570 F.3d at 1107). And in *Erie Insurance Co. v. Amazon.com, Inc.*, the Fourth Circuit ruled that the plaintiffs' claims alleged Amazon violated its duty as a downstream seller of third-party products, not as the publisher of a third party's speech. 925 F.3d 135, 139 (4th Cir. 2019) ("[t]he underpinning of Erie's claims is its contention that Amazon was the *seller* of the headlamp and therefore was liable as the seller of a defective product"). Whether Amazon would be forced to monitor the contents of third-party listings to avoid selling defective products was immaterial because the duty was not triggered by Amazon's publication of the page featuring the defective headlamp. Amazon's act of selling goods to people generally triggered its duty to

ensure that it was not selling defective products, and that was enough to prevent Section 230's application.

In all of these cases, defendants tried to frame their non-publishing conduct as publishing activities. Online businesses must publish information about their products and services, but that does not transform the fundamental nature of their non-publishing activities into publishing activities. When a defendant says that they "host products in their online store," they minimize the most salient fact about their conduct—that the defendant operates a store—while reframing the sale of products into a publishing act. Online stores sell products; they do not merely host product descriptions in their stores. Similarly, online rental companies book rentals; they do not merely host information about rentals on their rental booking sites. As *Amazon* and *HomeAway* show, Section 230 does not prevent plaintiffs from bringing claims against companies that violate their duties as sellers of products or bookers of rentals, but getting to this conclusion requires treating defendants' framing of their activities with a healthy amount of skepticism.

In sum, Section 230 only prohibits a claim if the duty alleged by that claim stems from the defendant's publishing activities.

**D. The Plaintiffs' claims do not treat the Defendants as publishers because the Defendants' alleged duty springs from non-publishing activity and because the Defendants could comply with the alleged duty without altering third-party content.**

The Plaintiffs allege that the Defendants have a duty to not provide or profit from social casino apps, yet did. These kinds of claims do not treat the Defendants as publishers. First, the Defendants would not have to alter any third-party content to comply with the alleged duty. Second, the Defendants adopted the duty by running a marketplace for online goods, not by publishing third-party information. For this reason, Section 230 should not have barred any of the claims.

A duty not to profit from social casino apps is not a publisher's duty because it does not require altering or removing third-party content. For example, Count VI in the complaint against Apple states a claim based on a Connecticut law prohibiting any entity from profiting from an unlicensed gambling operation. Apple-ER-181. The Plaintiffs allege the Defendants violated this law by profiting from social casino games sold on their app stores. *Id.* Avoiding liability would not require

the Defendants to alter any third-party content: They could avoid liability by refusing to process download requests for the specific challenged apps, refusing to allow downloads from the social casino genre in general, or refusing to process transactions for virtual chips within these apps.

*HomeAway* is directly on point because the duties in both cases are similar: a duty of any seller, online or offline, not to broker unlawful transactions. As in *HomeAway*, removal of the social casino apps' pages may be the Defendants' best option from a business standpoint, but that fact alone does not a publisher's duty make. *See HomeAway*, 918 F.3d at 683. As in *HomeAway*, this duty may require some monitoring of third-party content—the addresses in *HomeAway* and the game features in the instant case—but only in deciding whether to broker a transaction, not in deciding whether to remove third-party content to avoid liability.

The Plaintiffs' claims are also not covered by Section 230 because the conduct they allege to have triggered the Defendants' duties is not publishing conduct. The Defendants adopted these alleged duties by operating and profiting from a marketplace where gambling games are sold, not by publishing third-party content. The Plaintiffs' complaints

are replete with the non-publishing actions the Defendants engage in to run such a marketplace, which include providing technological tools to app developers, collecting and analyzing customer purchasing habits, reviewing the apps to be sold in the store, and taking a cut of all profits, among other activities. *See* Apple-ER-178; Meta-2-ER-287–88; Google-ER-263. When a company provides a marketplace for others to sell goods and services, it must follow laws that apply to marketplace providers, no matter whether the marketplace is online or offline. California and other states require marketplace providers to ensure that they are not selling illegal gambling machines. *See, e.g.*, Cal. Penal Code § 330b(d). If a brick-and-mortar GameStop in Sacramento were to sell illegal gambling games, nobody would question whether the relevant laws would apply to them, and this Court has "consistently eschewed an expansive reading of [Section 230] that would render unlawful conduct 'magically ... lawful when [conducted] online,' and therefore 'giv[ing] online businesses an unfair advantage over their real-world counterparts.'" *HomeAway*, 918 F.3d at 683 (citing *Roommates.com*, 521 F.3d at 1164, 1164–65 n.15).

The district court's decision to recast the Plaintiffs' claims as "theories of liability" confused the court's analysis on this issue by re-writing the Plaintiffs' legal theories and dismissing strawmen of its own creation. For example, the first theory of liability states that the Plaintiffs seek to hold the Defendants liable for "hosting, categorizing, and promoting" the allegedly illegal apps. *See* Apple-ER-33; Meta-1-ER-33; Google-ER-33. But the Plaintiffs have not alleged that the Defendants violated the statutes merely by "hosting, categorizing, and promoting" the apps: They alleged the Defendants violated the statutes through various non-publishing actions such as developing advertisements for the apps, using data-mining to target susceptible users, and acting as the games' bookies. *See, e.g.*, Apple-ER-178; Meta-2-ER-287–88; Google-ER-263. To the extent that the complaint mentions that the Defendants hosted the games, that is a necessary factual allegation to establish that the games were available through the Defendants' services, not a legal assertion that mere hosting is sufficient to violate the statute. The statutes simply do not impose duties on publishers; they impose duties on purveyors of games, and the

fact that the defendants provide their services online does not immunize them from liability.

## II. THE "NEUTRAL TOOL" TEST ANALYZES WHETHER A DEFENDANT CONTRIBUTED TO ILLEGAL INFORMATION, NOT WHETHER THE CLAIM TREATS THE DEFENDANT AS A PUBLISHER.

Section 230 protects defendants against certain types of claims. It does not prevent certain activities or technologies from ever forming the basis of liability. But that is effectively what the district court decided, and what Defendants and *amici* are arguing for, when they declare that Section 230 prohibits any claims involving neutral tools such as recommendation algorithms or payment processors. This reasoning ignores this Court's precedent on prong two of the *Barnes* test and artificially elevates its material contribution analysis under prong three into an all-encompassing theory of Section 230's applicability. When a claim does not treat the defendant as a publisher, it does not matter whether the defendant's tool was neutral or not.

The third prong of this Court's Section 230 analysis evaluates whether the plaintiff's claims stem from "information provided by *another* information content provider." 47 U.S.C. § 230(c)(1) (emphasis

added); *see Roommates.com*, 521 F.3d at 1164–65. A defendant does not enjoy Section 230 protection for claims based on material for which the defendant was "responsible, in whole or in part, for the creation or development of." 47 U.S.C. § 230(f)(3). Thus, Section 230 does not bar any claim that is based on content that a defendant created itself or to which it made a material contribution. *See Roommates.com*, 521 F.3d at 1164–65.

The neutral tool test developed as a way to evaluate a subset of prong three material contribution arguments that allege the defendant's website design effectively forced third parties to break the law, thus constituting a material contribution to the illegality. *Id.* The neutral tool test is only appropriate for evaluating prong three material contribution arguments. It is not appropriate for evaluating whether a claim treats a defendant as a publisher under prong two. The district court erred in this case by applying the neutral tool test in a prong two analysis to dismiss claims that did not treat the defendants as publishers.

## A. The neutral tool analysis only applies to determine whether an interactive computer service provider made a material contribution to the challenged content.

This Court's neutral tool test has a specific and limited application: it is used to analyze whether a defendant has lost Section 230 protections by designing its website to contribute to whatever made third-party information unlawful. The seminal Ninth Circuit case on this issue is *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008). In that case, the Ninth Circuit found that the defendant lacked Section 230 protection for the majority of the plaintiff's claims because the way the defendant designed its website essentially forced users to break the Fair Housing Act. *Id.* at 1165–66, 1168. The company required users to select traits they sought in a potential roommate, and these traits were protected characteristics under the Fair Housing Act. *Id.* at 1169. Because users could not use the site without selecting these characteristics, the court found that the website design made a material contribution to the discriminatory outcomes. *Id* at 1169–70. In other words, the website design made a material contribution to the discrimination and was not

26

a "neutral tool" that third parties used in a discriminatory way. *Id.* at 1166.

The neutral tool test has been used often by this Court to dispense with claims that exaggerate the extent to which a website design feature contributed to illegal content. In *Dyroff v. Ultimate Software Group*, the plaintiff sued an online message board after her son used the message board to procure drugs on which he fatally overdosed. 934 F.3d 1093, 1095 (9th Cir. 2019). The plaintiff argued that the website's recommendation and notification functions made a material contribution to the messages between the drug dealer and the son. *Id.* at 1096. The Court rejected this argument because the site's features, unlike the ones at issue in *Roommates.com*, did not particularly privilege, incentivize, or force users to engage in drug dealing. *Id.* at 1097–98; *see also Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1266, 1269 (9th Cir. 2016) (holding that Yelp's five-star review feature did not make Yelp the developer of allegedly defamatory reviews); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1124 (9th Cir. 2003) (holding that the defendant had not become an ICP for harassing impersonating profiles simply by providing users the ability to make profiles).

In cases like *Carafano* and *Kimzey*, the court did not analyze whether the plaintiffs' claims treated the defendants as publishers; they only analyzed whether the defendants made a material contribution to the offending content. These cases are not applicable to arguments that a claim does not treat the defendant as a publisher. The district court went astray by applying the neutral tool test to the plaintiffs' prong two arguments.

### B. Many of this Court's previous Section 230 cases would be wrongly decided if the neutral tool test controlled the outcome.

If the neutral tool test determined whether a claim treated the defendant as a publisher, then many of this Court's previous Section 230 cases would be wrongly decided. In *Barnes*, for example, both of the plaintiff's claims were based on the same neutral tools: social media functions that allowed users to create profiles and match with other users. 570 F.3d at 1098. If the tools' neutrality had controlled the analysis, then both claims should have been prohibited by Section 230. But, as already described, one claim survived and one claim did not based on whether they treated the defendant as a publisher. *Id.* at 1102–03, 1107. *HomeAway*, *Lemmon*, and *Internet Brands* are

28

additional examples of cases in which this Court ruled that Section 230 did not prohibit the plaintiffs' claims, despite the fact that the website features at issue were as neutral as the features at issue in this case. *See HomeAway*, 918 F.3d at 681–82; *Lemmon*, 995 F.3d at 1087; *Internet Brands*, 824 F.3d at 851. All of these cases would be wrongly decided based on the district court's reasoning that Section 230 bars claims in which neutral tools are involved.

## III. PERMITTING THE CLAIMS IN THIS CASE TO BE JUDGED ON THEIR MERITS WILL NOT BREAK THE INTERNET.

Section 230 protects internet companies from the impossible, speech-stultifying choice presented by the outcome of *Stratton Oakmont*, not from normal business regulations—even ones the companies find onerous. Recognizing this limitation will not destroy the internet. The real danger is interpreting Section 230 in a way that prevents common-sense regulations, such as prohibitions most states have placed on profiting from illegal gambling, just because they are being applied to companies that operate on the internet.

Section 230 protects online speech by preventing companies from having to make the "grim choice" presented by *Stratton Oakmont*:

moderating content, which would have meant taking full responsibility for all third-party content, or engaging in no content moderation at all. Forgoing all content moderation would have allowed abusive and hateful messages that drown out valuable speech and drive away many speakers, especially from oppressed groups. *See, e.g.*, Amnesty International, *Amnesty Reveals Alarming Impact of Online Abuse Against Women* (Nov. 20, 2017).[2] But engaging in content moderation under the *Stratton Oakmont* rule would have required companies to accept responsibility for all third-party content and would have incentivized them to over-censor users to minimize liability risk. Claims that do not force companies to over-censor or disincentivize them from moderating content do not implicate the speech concerns that motivated Section 230.

Consider *Barnes v. Yahoo*. The negligent undertaking claim forced Yahoo into the grim choice: either abandon content moderation on its social media platform to avoid having to "undertake" such services

---

[2] https://www.amnesty.org/en/latest/press-release/2017/11/amnesty-reveals-alarming-impact-of-online-abuse-against-women/.

"reasonably," or engage in content moderation and face liability for any failure to remove harmful materials. *Barnes*, 570 F.3d at 1102–03. But the breach of contract claim offered Yahoo two other options: abide by its promise to remove the specifically identified harmful information, or avoid making such promises in the first place. *Id.* at 1108. The breach of contract claim did not endanger free expression online because a company's decision to make a promise, and the resulting liability risk the company has for failing to abide by that promise, did not impact other people's speech.

In *HomeAway*, the challenged ordinance prohibited companies from booking unlicensed rentals; it did not regulate the content of what third parties could say. *HomeAway*, 918 F.3d at 680. The ordinance thus imposed a higher liability risk on companies that facilitated rental bookings, not on publishers of third-party speech, so the grim choice— and Section 230—were not implicated.

Similarly, permitting the claims against the Defendants in this case would in no way force them into the grim choice that Congress sought to avoid with Section 230. The defendants in this case could avoid liability by ensuring that they do not sell or otherwise provide

illegal products. They have this duty whether or not they engage in publishing activity, and the duty does not force them to alter any third-party content to avoid liability. The companies may be required to take on the task of monitoring the products they sell or scaling back on additional services, like in-app purchase processing. But imposing this duty does not force the defendants into the grim choice. Nor would it force *any* publisher of third-party content into the grim choice because the duties only apply to companies that run app stores; they cannot be imposed on companies that merely publish third-party content.

When Defendants and *amici* warn about the threat and difficulty of compliance with the regulations, they are making a policy argument concerning the statutes that give rise to the claims, not a legal argument about why this Court should disregard its Section 230 precedent. While internet companies, like any other business, may have "concerns about the difficulties of complying with numerous state and local regulations, the CDA does not provide internet companies with a one-size-fits-all body of law. Like their brick-and-mortar counterparts, internet companies must also comply with any number of local regulations." *HomeAway*, 918 F.3d at 683.  The claim that particular

regulations are onerous presents a political question to be dealt with by a legislature, not a problem for which Section 230 was crafted as a backdoor deregulatory tool. Permitting the claims brought in cases such as *Barnes*, *HomeAway*, *Lemmon*, and *Internet Brands* did not break the internet—and neither would permitting the claims in this case. The real danger is in blocking the claims in this case and making it harder to ensure that merchants do not sell products that legislatures and regulators have determined are dangerous.

To the extent that the Defendants and *amici* dispute the merit of Plaintiffs' claims, that is also not a Section 230 question. Companies have plenty of defenses for claims that lack merit or are against public policy. Even after defeating an assertion of Section 230 immunity, Plaintiffs must still establish standing, overcome First Amendment defenses, and win on the merits of their claims. *See Internet Brands*, 824 F.3d at 853 ("[T]he argument that our holding will have a chilling effect presupposes that Jane Doe has alleged a viable failure to warn claim under California law. That question is not before us and remains to be answered."). When courts overextend Section 230's coverage, whether through misinterpretation or in response to seemingly weak

claims, they do collateral damage to worthy plaintiffs. *Cf. Gonzalez v. Google LLC*, 598 U.S. 617 (2023) ("We therefore decline to address the application of § 230 to a complaint that appears to state little, if any, plausible claim for relief."); *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 478 (2023) (deciding a case factually indistinguishable from *Gonzalez v. Google* on the merits). Plaintiffs who have suffered real harms should not be barred from the courtroom through overly expansive interpretations of Section 230.

## CONCLUSION

For the foregoing reasons, EPIC respectfully urges the Court to modify the district court's order to be a denial in full of the Defendants' motion to dismiss and to affirm the modified order.

**Date:**      November 1, 2023          /s/ Megan Iorio
                                         Megan Iorio
                                         Tom McBrien
                                         ELECTRONIC PRIVACY
                                         INFORMATION CENTER
                                         1519 New Hampshire Ave. NW
                                         Washington, DC 20036
                                         (202) 483-1140

                                         *Attorneys for Amicus Curiae*
                                         *Electronic Privacy Information*
                                         *Center*

## CERTIFICATE OF COMPLIANCE

I am the attorney or self-represented party.

**This brief contains 6,542 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** */s/ Megan Iorio*　　　　　　　**Date:** November 1, 2023

36

## CERTIFICATE OF SERVICE

I certify that on November 1, 2023, this brief was e-filed through the CM/ECF System of the U.S. Court of Appeals for the Ninth Circuit. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

**Date:**     November 1, 2023     /s/ Megan Iorio
                                  Megan Iorio
                                  Tom McBrien
                                  ELECTRONIC PRIVACY
                                  INFORMATION CENTER
                                  1519 New Hampshire Ave. NW
                                  Washington, DC 20036
                                  (202) 483-1140

                                  *Attorneys for Amicus Curiae*
                                  *Electronic Privacy Information Center*